## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LATERAL RECOVERY LLC, BENCHMARK BUILDERS, INC., FTE NETWORKS, INC., JUS-COM LLC and FOCUS WIRELESS, LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CAPITAL MERCHANT SERVICES LLC; GREEN CAPITAL FUNDING, LLC; MIDNIGHT CAPITAL, LLC, YITZHAK STERN, DAVID GLASS AND TSVI DAVIS, and the JANE AND JOHN DOE INVESTORS,<br><br>                    Defendants. | Civ. A. No.:  21-cv-09336-LJL |

## AMENDED COMPLAINT

Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC ("Focus") (collectively "FTE") as and for their Complaint against Capital Merchant Services, LLC ("CMS"), Green Capital Funding, LLC ("Green Capital"), and Midnight Capital, LLC ("Midnight Capital"), Yitzhak Stern ("Stern"), David Glass ("Glass"), Tsvi Davis and the Jane and John Doe Investors states as a follows:

## NATURE OF THE ACTION

1.      This is a RICO action against several related merchant cash advance ("MCA") companies that were controlled and manipulated by Yitzhak Stern, David Glass and Tsvi Davis to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain millions of dollars in funds from FTE.  Over the course of little more than one year, the Defendants' companies entered into more than ten so-called "Merchant Agreements" with FTE

pursuant to which they purportedly paid lump sums to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments. While couched as the purchase of future receipts, the agreements' terms, conditions and the Defendants' actions demonstrate that despite the form of their agreements (collectively, the "FTE Agreements"), no sale of receipts ever took place. In reality, the FTE agreements were term loans for which Yellowstone anticipated repayment within a fixed time period. This fixed term, not the percentage of receivables, is the metric that Yellowstone's own funders use to determine whether to approve a deal. And under New York law, intent is the touchstone of whether a transaction is a loan, regardless of what the face of the contract purports it to be. Acknowledging these transactions as the true loans that they are, these loans charged interest rates that exceeded not less than 100%, and in some instances exceeded 900%, rates that are far greater than twice the maximum 25% permitted under New York Penal Law.

2.      The sham nature of Yellowstone's form agreement also recently drawn scrutiny by New York's highest court. In answering certified questions from this Circuit concerning the procedural remedies available to redress Yellowstone's (also known as CMS) *unlawful* collection activities, a dissenting member of the Court questioned the underlying premise of the questions presented, i.,e., that the underlying judgment was presumed to be a lawful one:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY

Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

3.      As alleged by the Federal Trade Commission, Stern and Glass directed and

controlled the affairs of the common enterprise, including the use of the sham form of the

agreements to be used by the common enterprise. *See, e.g.,* Ex. 1:

> **From:** Isaac D. Stern
> **Sent:** Monday, June 19, 2017 4:43 PM
> **To:** Funders <Funders@yellowstonecapllc.com>
> **Subject:** Fwd: California
>
> See below, this is effective immediately!
>
> **Isaac D. Stern – Chief Executive Officer**
> **Yellowstone Capital LLC**
> **Ph: (800) 955-2411 X 1060**
> **Fax (888) 315-8546**
> **Cell: (917) 743-8369**
> **Email: Isaac@Yellowstonecap.com**
> **www.Yellowstonecap.com**
>
> Begin forwarded message:
>
> **From:** Jake Weiser <jw@yellowstonecapllc.com>
> **Date:** June 19, 2017 at 4:35:40 PM EDT
> **To:** "Isaac D. Stern" <Isaac@yellowstonecapllc.com>, David Glass - Gmail
> <Glassysc@gmail.com>
> **Subject: California**
>
> Funders,
>
> As you know, we recently considered switching our funding strategy in California from making loans to MCAs, primarily so that we could obtain COJs on those deals.
>
> While we initially received some concern from our attorneys (which is why we paused this funding strategy), we have since fully-assessed the compliance risk associated with doing MCAs in California, and are pleased to announce that going forward, we will be doing MCAs with COJs in California:

4.      Notably, a comparison of the MCA form contract Stern circulated with the earlier

loan contract Yellowstone had been using shows few changes. The form of contract used for a

Yellowstone loan is largely the same as the MCA form Stern circulated. *Compare* Ex. 1 and Ex.

21.

5.     Nor was usury the limit of Defendants' misconduct.  Defendants also engaged in other predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from FTE.  Among other things, Defendants charged FTE hundreds of thousands of dollars in so-called "origination fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive," but, in actuality, were fully automated and just cost a mere fraction of the fees charged to FTE.

6.     While these accusations may be alarming, it is not the first time Defendants have been accused of fraud.  The New Jersey Attorney General's Office ("NJ AG") and the Federal Trade Commission (the "FTC") each filed separate actions against Defendants and others, alleging that for years they have engaged in deceptive conduct to conceal the true nature of their transactions with merchants, including the very conduct underlying this action.  *See* Exs. 2-3, which factual allegations are incorporated herein by reference.

7.     In response to these regulatory actions, Yellowstone and its investors have sued Davis for being the primary cause of the unlawful tactics alleged by regulators and various victims.  *See* Ex. 4.  Though some of Yellowstone's allegations are self-serving, Yellowstone admits in that complaint the substantial role that defendant Davis played in the organization through August 2018 (a critical time period for the FTE loans at issue here).  Yellowstone further admits in that complaint that Davis continued collection activity on loans made by the Enterprise even beyond August 2018, and that to this day he continues to hold a distribution-producing ownership interest in Yellowstone's parent company, .

8.     The amount of money unlawfully obtained here is staggering.  In the span of fourteen months, FTE received $2,146,844 from Defendants, and paid back $6,766,975.  In other words, Defendants charged FTE $4,620,131 in interest in the span of just fourteen months.

9.      It is against this backdrop that Plaintiffs file this Complaint.

## THE PARTIES

10.     FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

11.     At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

12.     At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

13.     At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

14.     At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

15.     Capital Merchant Services is a limited liability company duly organized under the laws of New York with its principal place of business in New Jersey.

16.     Green Capital Funding is a limited liability company duly organized under the laws of New York with its principal place of business in New Jersey.

17.     Midnight Capital LLC is a limited liability company duly organized under the laws of New York with its principal place of business in New Jersey.

18.     Yitzhak Stern is an individual who resides in New Jersey.

19.     David Glass is an individual who resides in Florida.

20.     Tsvi Davis is an individual who resides in New York.

21.    The Jane and John Doe Investors are individuals and business entities organized under various state laws.

## JURISDICTION

22.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims, individually, and on behalf of similarly situated persons, for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U. S. C. §§ 1961–68.  The Court has subject-matter jurisdiction over the state-law claims of the Plaintiffs' and putative Class Members because they are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

24.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

### A.    The Predatory MCA Industry

25.    As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*

admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

26.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[4]

27.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

28.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The Yellowstone Umbrella**

29.     Yellowstone was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."

30.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."

31.     Stern, the former CEO of Yellowstone, is David Glass' brother-in-law.

---

[3] *Id.*
[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

32.     Just like the movie, Yellowstone utilizes high-pressure boiler room tactics by employing salespersons with absolutely no financial background whatsoever.

33.     In fact, Yellowstone's number one funder, who is dubbed "the Closer," has no financial experience whatsoever.  Rather, his apparent expertise came from working for Verizon, as a customer sales representative.  He now generates over $47 million in funding a year.[5]

34.     Stern actively solicits and recruits these boiler room salespersons on his personal social media websites.  *See also* Ex. 3.

35.     Although many of these high-pressure sales pitches use the promise of helping these small businesses grow, in reality, all they do is fatten the pockets of the Enterprise.

36.     In addition to charging unlawful interest, the scheme is designed to trap the small businesses in a never-ending spiral of debt similar to payday lending where the small business has to take out additional loans to pay off the prior one.

37.     Since being founded in 2009, Yellowstone has expanded its umbrella to include numerous other MCA companies that operate under its management and control but exist under other corporate names.  These MCA companies include Advance Merchant, LLC, Arch, Capital Advance Services, LLC, Capital Merchant Services, LLC, HSC, World Global Capital, LLC, Green Capital Funding, LLC, Merchant Funding Services, LLC, and YCW.  With the exception of Arch, each of these other MCA companies use the same location of 30 Broad Street, 14th Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters at 1 Evertrust Plaza, Jersey City, New Jersey 07302.

---

[5] deBanked, The Closer – Meet the Yellowstone Capital Rep that Originated $47 Million in Deals Last Year, dated Feb. 10, 2016.

38.     Although each of these MCA entities operates out of New Jersey, they were strategically organized under the laws of New York so that they could utilize New York's confession of judgment statute and post-judgment collection devices.

39.     In addition to its fleet of MCA companies, Yellowstone utilizes a vast network of Independent Sales Offices ("ISOs") and brokers to sell their criminally usurious loans.

40.     In its suit against Davis, Yellowstone represented that it also works with Independent Funding Organizations ("IFOs").  According to Yellowstone, IFOs underwrite and service MCA transactions using Yellowstone's platform and systems; are entrusted with the execution and maintenance of those MCAs; are responsible for determining which merchants to offer MCAs and the terms of the MCAs; and the amount of commission paid to ISOs.

41.     According to Yellowstone, IFOs are typically entitled to receive fifty percent (50%) of the profits on their deals, net of fifty percent (50%) of any losses.

42.     According to Yellowstone, IFOs are required to post security as an offset for potential losses on their deals.  The amount of security varies based on the size of the IFO's portfolio and is often in the hundreds of thousands of dollars.

43.     In 2017, Yellowstone and its related companies issued over $400 million in loans.

44.     In Yellowstone's complaint against Davis, it states that its parent company is Pinnex Capital Holdings, LLC.

C.      **The Investors**

45.     On January 16, 2015, the Enterprise, through Stern, entered into an agreement with various investors for the sole purpose of funding the Enterprise's unlawful loansharking scheme (the "Pinnex Agreement").  *See* Ex. 5.

46.     The Pinnex Agreement provided over $55 million to fund the Enterprise.

47.     Stern personally contributed over $20 million.

48.     Although the Pinnex Agreement does not identify Glass as an investor, on information and belief, Glass is a silent investor through Stern.

49.     Tsvi Davis and Caporly contributed $4,230,000.

50.     In Yellowstone's complaint against Davis, Yellowstone states that Caporly "was called to contribute capital to Pinnex," including two substantial contributions in December 2017, indicating that the investment commitment extended over time.

51.     According to the amended Limited Liability Company Agreement of Pinnex Capital Holdings LLC (Ex. 5), the company is formed to "operate, finance, market and engage in the business of merchant cash advance" and related activities.

52.     On information and belief, through the Pinnex Agreement, the Investors became aware of the true nature of Yellowstone's business: namely, that it treated its agreements as absolutely repayable loans.

53.     The other potential John and Jane Doe investors that provided funding to the Enterprise are Pinnex Capital Partners LLC, Redwood Investments Group, Inc., Steve Cramer, Jeff Reece, Chris Clarke, Moshe Mandelbaum, Robin Spence, and Steve Weinrib.

**D.      Yellowstone and its Employees Admit That its MCA Agreements are Loans**

54.     In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

55.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

56.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

57.     Yellowstone targets small businesses in need of "a loan":



58.     Yellowstone employees, including, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

59.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

60.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

61.     Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

62.     The actors in the videos were all employees of Yellowstone.

63.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

64.    One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[6]

65.    This video is titled "Bad Credit Business Loans ™ | 855-445-9649." *Id.*

66.    The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account.  *Id.*  This video clearly targeted these loans for personal consumer use.

67.    Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me**.  So I went online and found Yellowstone Capital.  I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.**  It's crazy because my heartrate is higher than my credit score.  So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse.  *Id.* (emphasis added).

68.    Below the video is the following link: "CLICK  HERE  TO  APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

69.    As the video played, subtitles described Yellowstone's MCA program:

> Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured  bad  credit  business  loan,  or  unsecured  business  funding.**

> We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

> Been turned away for a small business credit card? **Apply at Yellowstone Capital  for  a  <u>bad  credit  business  loan,  also  known  as  a  business  cash advance</u>, or a merchant cash advance.**

[6] EZBusinessLoans, *Bad Credit Business Loans ™ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**Our business loans** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **bad credit business loan** application today! *Id.* (emphasis added).

70.     These videos all link to a loan application on Yellowstone's website. *Id.*

71.     On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[7]

72.     The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **a simple loan** is at your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com  *Id.* (emphasis added).

73.     Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

**E.      The MCA Agreements Are Substantively And Procedurally Unconscionable.**

74.     The Enterprise agreements (the "MCA Agreements"), including those entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

75.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans.

76.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's

---

[7] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

77.    The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.   Among these knowingly false statements are that:   (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

78.    The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the

end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

79.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

**F.     The Intent of the Enterprise is to Issue Fixed-Term Loans Using a Sham Reconciliation Provision to Disguise the Loans.**

80.     In order to evade state usury laws, the Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

81.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

82.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

83.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a

good-faith estimate of the percentage of receivables purchased. By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

84.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

85.     In fact, the daily payment is calculated by dividing the payback amount by the intended duration of the loan. *See, e.g.,* Exhibit 6, 7. The Enterprises's agents specifically consider the "term" of the loan as a vital part of approving the transaction. *See, e.g.,* Exhibit 8.

86.     The New Jersey Attorney General undertook an investigation of Yellowstone.

87.     As part of this investigation, the New Jersey Attorney General reviewed Yellowstone's own documents.

88.     As part of this investigation, the New Jersey Attorney General also interviewed merchants regarding their experiences with Yellowstone's actual business practices.

89.     Based on this investigation, including a review of Yellowstone's own business records, the New Jersey Attorney General concluded that the reconciliation provision is a sham and that the transactions are loans.

90.     Specifically, the New Jersey Attorney General's investigation found that consumers were unable to modify daily payments through reconciliation.

91.     The New Jersey Attorney General's complaint against Yellowstone notes both that some merchants were unable to reach Yellowstone and that Yellowstone refused to adjust the amount for other merchants.

92.     The New Jersey Attorney General's complaint noted three specific instances in which reconciliation attempts were ignored or even scorned:

a.      Before defaulting and being forced into an unfavorable settlement agreement with Defendant Yellowstone, a Pennsylvania Consumer had emailed Yellowstone twice "asking for relief and to slow down my payback." Yellowstone replied that the Consumer "was a new customer and that [the Consumer] was not far enough in to [her] loan, when in fact [she] was more than 60% through [her] second loan with Yellowstone."

b.      One Consumer sent an email to Defendant MCA Recovery providing in pertinent part: "this week will be a severe cash flow crunch for me – leading up to Memorial Day weekend sales have been slower than usual. Can you please postpone pulls for a week until after the holiday?" MCA Recovery responded by asking if the Consumer had another account that it could debit from.  In response to subsequent emails from the Consumer explaining that "I'm 62 with a young disabled son, I'm about to lose our home, and file for bankruptcy" and again requesting a revised repayment plan, MCA Recovery forwarded that email to Defendant Yellowstone with the message: "CONTROL YOUR GIRL. Craziest fucking merchant ever."

c.      When a New York Consumer contacted Defendant Yellowstone to advise that his account was overdrawn and to request a "temporary daily payment decrease from $750 to $100 for 3 weeks," Yellowstone "stated they needed several documents of which all were sent. Then they needed one more document[,] [but] when it was sent[,] they stated since I had taken out a loan after theirs[,] they could not work with me even though I informed them that my account was overdrawn and if I didn't get the issue resolved I would not have the ability to keep my bank account opened. They were not concerned and still refused to negotiate." In responding to the Consumer, Yellowstone noted that he "accepted funds based on set terms that he ultimately could not meet" and that the Consumer "had taken the full funding amount based on a contractually predetermined agreement in terms of payback schedule."

93.     The New Jersey Attorney General's investigation also found that merchants were frequently induced to "refinance" rather than engage in reconciliation, but did not disclose that this strategy would result in double the interest on the same principal amount.

94.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**G.    The Enterprise Intentionally Disguised the True Nature of the Transaction.**

95.    Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)    The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)    While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)    The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)    The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)    The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)    The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the

18

Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)    The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

96.    But most important is intent:  New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of Yellowstone which determine the payback based on the number of days in which Yellowstone wants to be paid back.  The number of days for payback has no relation to the timing of the percentage of receivables that the Enterprise MCA companies were purporting to purchase.

97.    Internal emails show that the daily payment disguises a finite term for repayment (rendering these transactions loans).  Exs. 6, 7.

98.    Specifically, these example internal emails authorizing transactions use the length of payback as a critical factor, and often omit any reference to percentage of receivables.  In some cases, these internal authorizations expressly refer to the "term" of the agreement:

- 30K 80 days (Exhibit 6)

- Need 30 max amount of days, can we? (Exhibit 6)

- 25k 1.459 60 days (Exhibit 6)

- Iso needs: $5K at 90 days to close. (Exhibit 7)

- 2nd   4,500K @ 1.45   90 payments   199 bank (Exhibit 7)

- 2nd - 3,500 @ 1.45 - 72 payments - 99 bank  (Exhibit 7)

- 60k, 87540 payback, 1169 daily (Exhibit 8)

- Need longer term (Exhibit 8).

99.    These examples demonstrate intent: the Enterprise intends the transaction to be a fixed term loan.

100.    The interest rates on Yellowstone's loans are routinely well in excess of usury laws.  For instance, in the complaint by the New Jersey Attorney General against Yellowstone, the New Jersey Attorney General listed three examples of transactions by Yellowstone or subsidiaries that it had reviewed that were well in excess of New Jersey's 50% usury rate for corporations:

a.    Yellowstone subsidiary Green Capital loaned a Colorado Consumer $125,000 (the "Purchase Price") and required the Consumer to pay back $186,875 (the "Purchased Amount") in daily payments of $1,995 (the "Daily Payment") over the course of approximately 93 business days, or approximately 119 calendar days.3 Thus, the annual interest rate charged by Green Capital exceeds the rates permitted by New Jersey usury laws.

b.    A Florida Consumer's Merchant Agreement with Yellowstone provided for a Purchase Price of $3,000, a Purchased Amount of $4,377, a Daily Payment of $65 per business day, and repayment term of 85 days.  Thus, the annual interest rate charged by Yellowstone exceeds the rates permitted by New Jersey usury laws.

c.    A Maryland Consumer's Merchant Agreement with Yellowstone subsidiary World Global provided for a Purchase Price of $285,000, a Purchased Amount of $427,215, a Daily Payment of $4,299 per business day, and repayment term of 127 days. Thus, the annual interest rate charged by World Global exceeds the rates permitted by New Jersey usury laws.

101.    Instead of reconciliation, troubled merchants are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest.  See e.g., Ex. 9.

102.    The New Jersey Attorney General's investigation determined that Yellowstone pushed for refinance as a means of avoiding reconciliation.

103.    On information and believe, the Enterprise MCA companies systemically offers refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

104.    The Enterprise MCA Companies also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

105.    The Enterprise MCA Companies also show in their underwriting practices that their agreements are loans.  Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  When underwriting new transactions, the Enterprise Companies do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

106.    When the Enterprise MCA Companies go to collect upon their agreements, they treat them just like loans.  For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the Enterprise MCA Companies in substantially all of the merchant's assets to ensure that the daily payments are made.

107.    They also require that the merchants execute confessions of judgment that the Enterprise MCA Companies could file if the merchant fails to make as few as two daily payments under their agreements.  In other words, the Enterprise MCA Companies structure

21

their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

108.    The Enterprise MCA Companies also engage in other unscrupulous behavior toward their merchants.  Among other things, the Enterprise MCA Companies often fail to advance merchants the full amounts provided for in their agreements, charge exorbitant fees for services that are never provided and costs that are never incurred, and often simply over collect the daily payments due under their agreements so that merchants end up paying tens of thousands of dollars more than they are required to pay under the applicable agreements.

109.    In the Federal Trade Commission's complaint against Yellowstone, for instance, the FTC noted evidence of misrepresentations regarding the financing amount, noting that merchants only learn the funding they are actually receiving *after* the documents have been signed.  The FTC reports one consumer to have said, upon learning that she would receive roughly $4,000 less than her contract stated, "I think something is wrong," and "you guys are like highway robbery."

110.    They also fail to properly record merchant's payments such that merchants' frequently "overpay" the Enterprise MCA Companies who, thereafter, fail to give the merchant credit for the payments or simply refuse to repay the merchant when the merchant demands that the overpayments be repaid.

## THE UNDERLYING FTE TRANSACTIONS

### A.    FTE Networks.

111.    At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network

infrastructures and buildings.    The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.    The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation.    Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

112.    Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

113.    Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

114.    Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.    Lateral**

115.    On or about October 28, 2016, Lateral, as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

116.    FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

117.    Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

118.    In or around July 2019, FTE defaulted under the terms of the Credit Agreement. Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, without limitation, the claims asserted herein.

### C.    FTE Networks and the MCA Industry

119.    In 2017, prior to defaulting under the Credit Agreement, FTE needed additional financing.  To procure that financing, FTE turned to the merchant cash advance industry, including the Enterprise MCA Companies, falling victim to the tactics described above.

### D.    The Capital Merchant Services ("CMS") Transactions

120.    Over a three-month period between September 21, 2018 and November 28, 2018, FTE entered into a series of transactions with CMS pursuant to which CMS advanced FTE just $596,000 in actual cash but collected an astounding $2,323,500.

121.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $8,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just six weeks which, on its face, translates into an annual interest rate of more than 300% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

122.    On information and belief, the Enterprise's intent was to make a six week term loan.  On information and belief, internal approval for this transaction relied on ten weeks, not a percentage of receivables, as a critical factor for approval.

123.    Even worse, CMS did not advance FTE the full Purchased Amount.  Instead, CMS advanced only $235,000, after deducting an Origination and ACH Program Fee in the amount of $15,000.

124.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

125.    When the fees are taken into consideration, the actual interest rate under exceeded 400% per annum.

126.    Moreover, while the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, the Specified Percentage, by an addendum, was replaced with the fixed $8,999 Daily Payment.

127.    On or about October 12, 2018, FTE entered into a second agreement with CMS (the "10/12 CMS Agreement").

128.    Under the 10/12 CMS Agreement, CMS agreed to advance $500,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $749, 050 (the "Purchased Amount") was repaid.

129.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $8,999 (a "Daily Payment") such that the Purchased Amount would be repaid in 16 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily

collections, like the 9/21 CMS Agreement, the Specified Percentage in the 10/12 CMS Agreement by an addendum, was replaced with the fixed $8,999 Daily Payment. Thus, on its face, the 10/12 CMS Agreement charged an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

130.    On information and belief, the Enterprise's intent was to make a 16 week term loan. On information and belief, internal approval for this transaction relied on ten weeks, not a percentage of receivables, as a critical factor for approval.

131.    But, once again, CMS did not advance the full Purchased Amount to FTE. Instead, CMS advanced FTE only $185,000 because it used the proceeds of the new MCA Agreement to pay off the prior one.

132.    CMS also charged FTE an Origination and ACH Program Fee of $30,000.

133.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

134.    When the fees are taken into consideration, the actual interest rate exceeded 400% per annum.

135.    On or about October 12, 2018, FTE entered into a second agreement with CMS (the "10/12 CMS Agreement").

136.    Under the 10/12 CMS Agreement, CMS agreed to advance $500,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $749,050 (the "Purchased Amount") was repaid.

137.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $8,999 (a "Daily Payment") such that the Purchased Amount would be repaid in 16 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, like the 9/21 CMS Agreement, the Specified Percentage in the 10/12 CMS Agreement by an addendum, was replaced with the fixed $8,999 Daily Payment.  Thus, on its face, the 10/12 CMS Agreement charged an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

138.    On information and belief, the Enterprise's intent was to make a 16 week term loan.  On information and belief, internal approval for this transaction relied on 16 weeks, not a percentage of receivables, as a critical factor for approval.

139.    But, once again, CMS did not advance the full Purchased Amount to FTE. Instead, CMS advanced FTE only $185,000 because it used the proceeds of the new MCA Agreement to pay off the prior one.

140.    CMS also charged FTE an Origination and ACH Program Fee of $30,000.

141.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

142.    When the fees are taken into consideration, the actual interest rate exceeded 400% per annum.

143.    On or about November 28, 2018, FTE entered into a second agreement with CMS (the "11/28 CMS Agreement").

27

144.    Under the 11/28 CMS Agreement, CMS agreed to advance $750,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $1,199,250 (the "Purchased Amount") was repaid.

145.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $29,891 (a "Daily Payment") such that the Purchased Amount would be repaid in 8 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, like the 10/12 CMS Agreement, the Specified Percentage in the 11/28 CMS Agreement by an addendum, was replaced with the fixed $29,891 Daily Payment.  Thus, on its face, the 10/12 CMS Agreement charged an annual interest rate of more than 300% per annum or more than 16 times the maximum 25% rate permitted under New York Penal Law.

146.    On information and belief, the Enterprise's intent was to make a 8 week term loan.  On information and belief, internal approval for this transaction relied on 8 weeks, not a percentage of receivables, as a critical factor for approval.

147.    But, once again, CMS did not advance the full Purchased Amount to FTE. Instead, CMS advanced FTE only $176,412 because it used the proceeds of the new MCA Agreement to pay off the prior one.

148.    CMS also charged FTE an Origination and ACH Program Fee of $97,500.

149.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

150.    When the fees are taken into consideration, the actual interest rate exceeded 500% per annum.

E.      **Green Capital Funding**

151.    Over a fourteen-month period between September 14, 2017 and November 27, 2018, FTE entered into a series of transactions with Green Capital pursuant to which Green Capital advanced FTE just $813,173 in actual cash but collected an astounding $2,120,025.

152.    On or about September 14, 2017, FTE entered into its first agreement with Green Capital (the "9/14 Green Agreement").

153.    Under the Agreement, Green Capital agreed to advance $75,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $112,125 (the "Purchased Amount") was repaid.

154.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $1,875 (a "Daily Payment") such that the Purchased Amount would be repaid in just 12 weeks which, on its face, translates into an annual interest rate of more than 300% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

155.    On information and belief, the Enterprise's intent was to make a 12 week term loan.  On information and belief, internal approval for this transaction relied on 12 weeks, not a percentage of receivables, as a critical factor for approval.

156.    Even worse, Green did not advance FTE the full Purchased Amount.  Instead, Green advanced only $64,837, after deducting an Origination and ACH Program Fee in the amount of $2,625.

157.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

158.    When the fees are taken into consideration, the actual interest rate under exceeded 325% per annum.

159.    On or about October 20, 2017, FTE entered into a second agreement with Green (the "10/12 CMS Agreement").

160.    Under the 10/12 Green Agreement, Green agreed to advance $200,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $299, 000 (the "Purchased Amount") was repaid.

161.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $3,323 (a "Daily Payment") such that the Purchased Amount would be repaid in 18 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, the Specified Percentage in the 10/20 Green Agreement by an addendum, was replaced with the fixed $3,323 Daily Payment.  Thus, on its face, the 10/20 Green Agreement charged an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

162.    On information and belief, the Enterprise's intent was to make a 18 week term loan.  On information and belief, internal approval for this transaction relied on 18 weeks, not a percentage of receivables, as a critical factor for approval.

163.    But, once again, CMS did not advance the full Purchased Amount to FTE. Instead, CMS advanced FTE only $100,875 because it used the proceeds of the new MCA Agreement to pay off the prior one.

164.    Green also charged FTE an Origination and ACH Program Fee of $7,000.

165.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Green performed little or no due diligence

and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

166.    When the fees are taken into consideration, the actual interest rate exceeded 125% per annum.

167.    On or about October 12, 2018, FTE entered into a third agreement with Green (the "10/12 Green Agreement").

168.    Under the 10/12 Green Agreement, Green agreed to advance $500,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $749, 050 (the "Purchased Amount") was repaid.

169.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $8,999 (a "Daily Payment") such that the Purchased Amount would be repaid in 16 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, the Specified Percentage in the 10/12 Green Agreement by an addendum, was replaced with the fixed $8,999 Daily Payment.  Thus, on its face, the 10/12 Green Agreement charged an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

170.    On information and belief, the Enterprise's intent was to make a 16 week term loan.  On information and belief, internal approval for this transaction relied on 16 weeks, not a percentage of receivables, as a critical factor for approval.

171.    But, once again, Green did not advance the full Purchased Amount to FTE. Instead, Green advanced FTE only $470,000 because Green charged FTE an Origination and ACH Program Fee of $30,000.

172.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

173.    When the fees are taken into consideration, the actual interest rate exceeded 125% per annum.

174.    On or about November 27, 2018, FTE entered into a fourth agreement with CMS (the "11/27 Green Agreement").

175.    Under the 11/27 Green Agreement, Green agreed to advance $600,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $959,400 (the "Purchased Amount") was repaid.

176.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $24,999 (a "Daily Payment") such that the Purchased Amount would be repaid in 8 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, the Specified Percentage in the 11/27 Green Agreement by an addendum, was replaced with the fixed $29,999 Daily Payment.  Thus, on its face, the 11/27 Green Agreement charged an annual interest rate of more than 300% per annum or more than 16 times the maximum 25% rate permitted under New York Penal Law.

177.    On information and belief, the Enterprise's intent was to make a 8 week term loan.  On information and belief, internal approval for this transaction relied on 8 weeks, not a percentage of receivables, as a critical factor for approval.

178.    But, once again, Green did not advance the full Purchased Amount to FTE. Instead, Green advanced FTE only $177,461 because, among other things, it used the proceeds of the new MCA Agreement to pay off the prior one.

179.    Green also charged FTE an Origination and ACH Program Fee of $133,900.

180.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, CMS performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

181.    When the fees are taken into consideration, the actual interest rate exceeded 500% per annum.

**E.    Midnight Capital Funding**

182.    Over a fourteen-month period between December 6, 2017 and January 19, 2018, FTE entered into a series of transactions with Midnight Capital pursuant to which Midnight Capital advanced FTE just $737,671 in actual cash but collected an astounding $2,323,450.

183.    On or about December 6, 2017, FTE entered into its first agreement with Midnight Capital (the "12/6 Midnight Agreement").

184.    Under the Agreement, Midnight agreed to advance $200,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $299,800 (the "Purchased Amount") was repaid.

185.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $9,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just 6 weeks which, on its face, translates into an annual interest rate of more than 400% per annum or more than 16 times the maximum 25% rate permitted under New York Penal Law.

186.    On information and belief, the Enterprise's intent was to make a 6 week term loan.  On information and belief, internal approval for this transaction relied on 6 weeks, not a percentage of receivables, as a critical factor for approval.

187.    Even worse, Midnight did not advance FTE the full Purchased Amount.  Instead, Midnight advanced only $176,500, after deducting an Origination and ACH Program Fee in the amount of $23,500.

188.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Midnight performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

189.    When the fees are taken into consideration, the actual interest rate exceeded 425% per annum.

190.    On or about December 18, 2017, FTE entered into a second agreement with Midnight (the "12/18 Midnight Agreement").

191.    Under the 12/18 Midnight Agreement, Midnight agreed to advance $500,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $749, 000 (the "Purchased Amount") was repaid.

192.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $15,999 (a "Daily Payment") such that the Purchased Amount would be repaid in less than 10 weeks.  While the Daily Payments purportedly represented a Specified Percentage of FTE's daily collections, the Specified Percentage by an addendum, was replaced with the fixed $15,999 Daily Payment.  Thus, on its face, the 12/18 Midnight Agreement charged an annual

interest rate of more than 300% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

193.    On information and belief, the Enterprise's intent was to make a 10 week term loan.  On information and belief, internal approval for this transaction relied on 10 weeks, not a percentage of receivables, as a critical factor for approval.

194.    But, once again, Midnight did not advance the full Purchased Amount to FTE. Instead, Midnight advanced FTE only $225,005 because it used the proceeds of the new MCA Agreement to pay off the prior one.

195.    Midnight also charged FTE an Origination and ACH Program Fee of $25,000.

196.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Green performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

197.    When the fees are taken into consideration, the actual interest rate exceeded 400% per annum.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

198.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

199.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

200.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

201.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

202.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

203.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

204.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

205.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

206.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

207.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

### B.    Culpable Persons.

208.    Glass, Stern, Davis and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

209.    At all relevant times, each of Glass, Stern, Davis and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

210.    Glass has an ownership interest in Yellowstone and is the mastermind of the Enterprise.  During the relevant time period, Glass (jointly with Stern) controlled transactions within the Enterprise.

211.    Stern has an ownership interest in Yellowstone, and was the Chief Executive Officer of Yellowstone at all relevant times.  To this day, even though he no longer has the title CEO, Stern still exercises authority over the Enterprise and has authority to execute contracts on behalf of the Enterprise. During the relevant time period, Stern (jointly with Glass) controlled transactions within the Enterprise.

212.    Davis has an ownership interest in Yellowstone, and was the Director of Underwriting at Yellowstone.  On information and belief, his status with Yellowstone changed in August 2018, though he continued assisting with collections after that date.  To this day, Davis continues to hold a distribution-generating ownership interest in Yellowstone's parent company.

213.    Through their operation of Yellowstone, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

C.      **The Enterprise.**

214.    Yellowstone, Capital Merchant Services, Green Capital Funding, and Midnight Capital, and MCA Recovery, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

215.    Yellowstone, Defendants and MCA Recovery are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

216.    Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

217.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

218.    Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

219.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).  *See, e.g.,* Exs. 2-3.

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

220.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.      David Glass**

221.     Glass is an owner and the mastermind of the Enterprise.  Together with Stern and Davis, Glass is responsible for the day-to-day operations of the Enterprise and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.  *See, e.g.*, Exs. 9-15.

222.     An individual who worked for Yellowstone from 2011 to 2018 submitted an affidavit in connection with another matter describing the roles of Glass and Stern.  *See* Ex. 10. He worked directly for both Stern and Glass.  He writes:

> 10. Mr. Glass was the money man. Anything to do with money had to go directly through Mr. Glass.
>
> 11. Among other things, Mr. Glass was responsible for approving the maximum loan amounts that could be funded per loan transaction. For example, on December 23, 2016, I texted David Glass seeking approval to increase my lending limit from $20,000 per loan to $25,000 to $30,000 per loan. In response, Mr. Glass requested a copy of my profit and loss statements. A true and correct copy of the text message is attached as *Ex. A.* Mr. Glass requested my own financial information because Yellowstone provided the funding for some of the loans, and charged me interest for use of their money. If a merchant failed to perform under a loan, my own personal money was at stake and I was personally responsible for any losses.

223. It was Glass who disseminated financial information, as shown by internal email. *See* Exs. 11, 14.

224. It was Glass who knew when a wire had been received from an ISO. *See* Ex. 13.

225. It was Glass who had the authority to increase the funding limit of the Yellowstone funders. *See* Ex. 12.

226. And it was Glass who had the authority to lower a funder's funding limit again if the funder behaved in a way Glass did not like:

> **From:** glassysc@gmail.com
> **Sent:** Thursday, April 13, 2017 12:28:50 AM (UTC-05:00) Eastern Time (US & Canada)
> **To:** Isaac D. Stern
> **Cc:** Desmond Miller; Chris Clarke; Jeff Reece
> **Subject:** Re: Urgent-▆▆▆▆▆▆▆▆▆▆
>
> Yellowstone would have no way to know who the deposit belonged to as it was not clear from the payment.
>
> Normally a funder would be looking for a deposit that large and it would not be sitting in a holding account for over a month.
>
> I have nothing against changing last months pnl to reflect the deposit but I think the limit raise should be rolled back. Clearly a funder that sleeps on a 64k deposit doesn't have a good handle on his book.
>
> Sent from my iPhone

227. In his capacity as the mastermind of the Enterprise, Glass, together with Stern, is responsible for creating, approving and implementing the policies, practices and instrumentalities

used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

228.    For instance, when Yellowstone's corporate counsel approved a switch from a loan form to a merchant cash advance form, corporate counsel sent the change to two people: Glass and Stern.  *See* Ex. 1.

229.    Glass has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

230.    While Glass purports to have divested from Yellowstone prior to the transactions at issue, Glass in fact maintained an interest, operating the company through Stern.

231.    Additionally, Glass's continued involvement in the management of Yellowstone is evidenced by a January 17, 2019 text message exchange with Davis, regarding Davis's desire to divest himself of Yellowstone equity.  *See* Ex. 16:

> DAVIS: Hey I'm looking to get rid of my equity of Yellowstone. I'm looking into my options of selling it and have some intrest [sic] from some people. Any intrest [sic] in taking it over and saving all the trouble?
> Glass: Are you familiar with a local governmental employee call [sic] the NEW YORK STATE ATTORNEY GENERAL?

> DAVIS: lol
> DAVIS: Yes
> GLASS: I'm on a flight
> GLASS: Call u after
> DAVIS: Ok what's the prob with all of that?
> DAVIS: I don't think it's in anyone's best intrest [sic] for me to have eq
> DAVIS: So I got to see what my options are to sell it
> GLASS: we are living on different planets. you are trying to cash out and we are hoping to not be charged
> GLASS: I doubt you have any options right now
> GLASS: Let's see if we can get thru this
> DAVIS: Not looking to cash out and win the lottery. Looking to cut ties and get discounted price for it. Or try to get someone else to buy in which obviously you have first right and tag along options but looking at all options and not looking to wait months to do it
> GLASS: Probably best u wait for the IPO no?
> DAVIS: Lol
> DAVIS: I'm not a fan of penny stocks
> GLASS: The company is up to its *** in lawsuits and government investigations. The industry is under a microscope. There is no market for these shares at all. All there is now is unlimited personal liability all around.

232.    This same text message also provides evidence of Glass's financial interest and contractual rights in the company ownership structure:  Davis, looking to divest, notes that "obviously you have first right."

233.    Glass has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, Stern, Davis, MCA Recovery and to the Investors of the deals in which he has personally participated.

**ii.    Yitzhak Stern**

234.    Stern is an owner of Yellowstone and was its Chief Executive Officer at all relevant times.  Together with Glass, Stern is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which

of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan. *See, e.g.,* Exs.. 1, 10, 17, 18, 19.

235.    In an affidavit submitted in connection with another matter, an individual who worked for both Stern and Glass from 2011 to 2018 described Stern as follows:

> 9.    Mr. Stern was directly responsible for the everyday operations at Yellowstone, which included, among other things, the form of loan agreements funders were required to use. Mr. Stern was also directly responsible for distributing leads to funders and brokers.

236.    When the Enterprise shifted from a loan form to an MCA form for use in California by Yellowstone West, it was Stern who forwarded it down the ranks using his authority as CEO:

> **From:** Isaac D. Stern
> **Sent:** Monday, June 19, 2017 4:43 PM
> **To:** Funders <Funders@yellowstonecapllc.com>
> **Subject:** Fwd: California
>
>
> See below, this is effective immediately!
>
> **Isaac D. Stern – Chief Executive Officer**
> **Yellowstone Capital LLC**
> **Ph: (800) 955-2411 X 1060**
> **Fax (888) 315-8546**
> **Cell: (917) 743-8369**
> **Email: Isaac@Yellowstonecap.com**
> **www.Yellowstonecap.com**

237.    Like Glass, Stern also had authority to raise a funder's funding limit. *See* Ex. 17.

238.    And like Glass, Stern could adjust the funder's funding limit downward when displeased. *See* Ex. 19.



239.    In his capacity as the day-to-day leader of the Enterprise, Stern, together with Glass, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans.

44

240.    Stern has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

241.    Indeed, when a funder received an email alleging fraud and theft, the funder forwarded it to Stern, who he acknowledged as an authority, even though Stern was on vacation. The email further shows that Stern, although purportedly on vacation, replied only 9 minutes later.  See Ex. 15.

242.    Stern has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, MCA Recovery, Glass, Davis and to the Investors of the deals in which he, upon information and belief, has personally participated.

**iii.    Tsvi Davis**

243.    Tsvi Davis is an owner of Yellowstone and was its Director of Underwriting at all relevant times.  Davis was responsible for the day-to-day funding operations of the Enterprise and had final say on the funding decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.  *See, e.g.,* Ex. 6, 20.

244.    In his capacity as the day-to-day funder of the Enterprise, Davis was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable

purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans.

245.    Davis has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

246.    In its complaint against Davis, Yellowstone alleges that Davis is responsible for multiple companies under his control that operate as IFOs, which generated a large volume of business including over 150 merchant accounts in New Jersey alone.  Yellowstone increased the profit share of the Davis-controlled IFOs to 60% from the normal 50%.

247.    Also, according to Yellowstone, Davis was exempt from posting security on the deals from the IFOs he controlled because he purchased a non-controlling minority membership interest in Yellowstone and later its parent company Pinnex through Caporly, LLC (a Davis-controlled entity).  According to Yellowstone, Davis was exempt from the posting security for deals by IFOs under this control because Yellowstone used Caporly's equity interest and right to receive distributions as collateral.

248.    According to Yellowstone, Davis and the entities he controlled did not observe corporate formalities.  Davis used the entities as an extension of himself.

249.    Davis had full control over the portion of the Enterprise made up of his controlled entities.  The scope of the Davis-controlled portion of the Enterprise was substantial:  a portfolio with $40 million in outstanding receivables as of August 2018.

250.    According to Yellowstone, Davis used assets and funds of the IFOs he controlled for his personal benefit, including to pay off gambling markers in Atlantic City, personal rent, family member "salaries," and luxury automobiles.

251.    According to Yellowstone, Davis used his companies as vehicles to shuffle money around, and directed Yellowstone to move monies from his "page" (i.e. his account at Yellowstone) to an off-shore collection company, "Nomas," that was ostensibly operated by his nephew in Puerto Rico.  Nomas purportedly performed collection work on the MCA deals by Davis-controlled IFOs.

252.    Yellowstone claims in its complaint against Davis that Davis and Yellowstone were operating under a "Wind Down Agreement" from August 2018 through December 2018, under which Davis's entities took 100% of the profits on all MCA agreements managed by Davis entities, a portfolio with $40 million in outstanding receivables as of August 2018, in exchange for a $5,000,000 flat fee payable over ten months.

253.    Although Yellowstone alleges Davis and his controlled entities did not fund new MCA agreements after August 2018, Yellowstone's complaint against Davis indicates that as of 2021 he continued to hold an ownership stake in Yellowstone and/or parent company Pinnex and continued to claim entitlement to a distribution from the profits generated by the Enterprise.

254.    Nor are Yellowstone's allegations (if credited) that Davis operated companies separate from Yellowstone inconsistent with his holding a leadership role in Yellowstone itself. The New Jersey Attorney General's complaint alleged that Yellowstone partnered with IFOs and

ISOs that were either former employees or management of Yellowstone and/or current employees or management of Yellowstone.

255.    Davis has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, MCA Recovery, Glass, and to the Investors of the deals in which he, upon information and belief, has personally participated.

256.    Davis – through his company Caporly LLC – was an investor in the Pinnex Agreement.

257.    Davis continues to hold an ownership interest in Yellowstone's parent company. In fact, Yellowstone's lawsuit against Davis seeks to gain access to the distributions generated by Davis's ownership interest, which indicates that Davis continues to benefit financially from the Enterprise.

258.    In Yellowstone's complaint against Davis, it alleges substantial misconduct by Davis, including cutting side-deals with merchants and diverting receivables belonging to Yellowstone,

### iv.    Yellowstone and Defendants Capital Merchant Services, Green Capital, and Midnight Capital

259.    Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of MCA Recovery and the Investors.  Capital Merchant Services, Green Capital, and Midnight are wholly owned and controlled by Yellowstone.

260.    Glass, Stern, Davis and the Investors have operated Yellowstone as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Yellowstone has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund

the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

261.    In this case, Yellowstone, through Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of FTE.

### v.    The Investors

262.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Yellowstone, Defendants and MCA Recovery.

263.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

264.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### viii.    MCA Recovery

265.    MCA Recovery is a debt collection company.  It is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of the Investors, Defendants and Yellowstone.

266.    Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the direction of Defendants, MCA Recovery prepares affidavits for execution by employees of Defendants that falsely represent the transactions constitute the sale and purchase of future receivables in order to conceal the usurious and unlawful nature of the transactions and induce Courts of New York and elsewhere to enter judgments in favor of Yellowstone.

267.    Together with these affidavits and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, MCA Recovery has filed thousands of Affidavits of Confessions with the Clerks of the Courts of New York.  In reliance upon the false affidavits of Davis and other employees of Yellowstone and Defendants, the Clerks of the Courts of New York enter judgments in favor of Yellowstone that, based upon the representations made in the supporting affidavits, include not only the outstanding sums of principal and usurious interest allegedly due and owing under the loans, but also fees for attorneys' services that have not, and may never be, rendered.

268.    Specifically, as alleged by the New Jersey Attorney General, on at least one occasion, MCA Recovery refused to accommodate a merchant's request to lower daily payments due to a cash flow issue, indicating that MCA Recovery treated the agreements as absolutely repayable.

**E.    Interstate Commerce**

269.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

270.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

271.    In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

272.    In addition, at the direction of Defendants, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New Jersey via Federal Express using labels prepared by Defendants.

**F.    Injury and Causation.**

273.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

274.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited

to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

275.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

276.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

277.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

278.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

279.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

280.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

281.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

282.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

283.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

284.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

285.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

286.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
**(Fraud)**

287.    Plaintiffs and the Classes repeat and re-allege the allegations set forth above.

288.    Each of the MCA loans was executed through an instrument drafted and authorized by Defendants.

289.    Defendants were aware of the language used in the form MCA loans used by Yellowstone through Defendants.

290.    In connection with each of the MCA loans, Defendants represented that an origination fee would be charged "to cover underwriting and related expenses."

291.    Contrary to this material, intentional misrepresentation, no due diligence was performed on the FTE or its subsidiaries.

292.    In connection with each of the MCA loans, Defendants represented that "the ACH program is labor intensive and is not an automated process, requiring [Defendants] to charge this fee to cover related costs."

293.    Contrary to these material, intentional misrepresentations, the ACH program was, in fact, an automated process, and required no labor at all.  Instead, these were sham fees fraudulently charged by Defendants.

294.    Plaintiffs reasonably relied upon these knowingly false representations by agreeing to pay these fees.

295.    Plaintiffs have, in fact, paid substantial fees as a direct and proximate result of these knowingly false representations by Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek a judgment:

a)    Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)    Awarding treble damages;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.


Dated:  February 15, 2022


                                        WHITE AND WILLIAMS LLP

                                        By:_____
                                        Shane R. Heskin
                                        7 Times Square, Suite 2900
                                        New York, NY 10036-6524
                                        (215) 864-6329
                                        heskins@whiteandwilliams.com
                                        *Attorneys for Plaintiffs*


28470901v.2