UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_9/30/2022__
```

-------------------------------------------------------------------X
:
LATERAL RECOVERY, LLC *et al.*,                  :
:
Plaintiffs,           :
:                        21-cv-9336 (LJL)
-v-                          :
:                        OPINION AND ORDER
CAPITAL MERCHANT SERVICES, LLC *et al.*,         :
:
Defendants.           :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiffs Lateral Recovery LLC ("Lateral"); Benchmark Builders, Inc. ("Benchmark");

FTE Networks, Inc. ("FTE Networks"); Jus-Com LLC ("Jus-Com"); and Focus Wireless, LLC

("Focus Wireless," and together with Benchmark, Jus-Com, and FTE Networks, "FTE")

(collectively, "Plaintiffs") bring this action against Defendants Capital Merchant Services, LLC

("Capital Merchant"); Green Capital Funding, LLC ("Green Capital"); Midnight Capital, LLC

("Midnight Capital"); Yitzhak Stern ("Stern"); David Glass ("Glass"); and Tsvi Davis ("Davis")

(collectively, "Defendants"),[1] alleging violations of the Racketeering Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962; RICO conspiracy; and fraud. *See* Dkt. Nos. 1,

20.

Defendants have filed three separate motions to dismiss the amended complaint (the

"Amended Complaint") brought against them, all pursuant to Federal Rule of Civil Procedure

_____

[1] Plaintiffs also sued "Jane and John Doe Investors," described in their Amended Complaint as
"individuals and business entities organized under various state laws," Dkt. No. 20 ¶ 21, and
identified by name certain individuals and entities that are "potential John and Jane Doe
investors that provided funding to Enterprise," *id.* ¶ 53.

12(b)(6): Capital Merchant, Green Capital, Midnight Capital, and Stern (together, the "Capital Defendants") jointly filed one, Dkt. No. 21; Glass filed a second, Dkt. No. 24; and Davis filed a third, Dkt. No. 26.

For the following reasons, the motions to dismiss are granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the Court assumes the truth of the factual allegations of the Amended Complaint as supplemented by the documents referred to in the Amended Complaint and incorporated by reference therein.

## I.     The Parties

### A.     Plaintiffs

FTE Networks was a corporation organized under the laws of Nevada with its principal place of business located in Naples, Florida.  Dkt. No. 20 ¶ 10.  It was the sole owner of Benchmark, a New York corporation with its principal place of business in New York, New York.  *Id.* ¶¶ 10, 11.  FTE Networks was also the sole owner and managing member of Jus-Com, a limited liability company organized under the laws of Indiana with its principal place of business in Naples, Florida, *id.* ¶¶ 10, 12, and Focus Wireless, a limited liability company organized under the laws of Florida with its principal place of business also in Naples, Florida, *id.* ¶¶ 10, 13.

At all times material to this case, FTE Networks and its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures, and buildings.  *Id.* ¶ 111.  They provided end-to-end design, construction management, and built and supported solutions for state-of-the-art networks, data centers, residential and commercial properties, and services for Fortune 100/500 companies.  *Id.*  FTE Network's operations were generally divided into three sections—construction, telecommunication design and solutions, and

wireless equipment installation—and each section was managed by Benchmark, Jus-Com, or Focus Wireless. *Id.* Benchmark was a construction manager and general contractor serving clients in the telecommunications, retail, professional-services, industrial, technology, and financial-services industries, *id.* ¶ 112; Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry, *id.* ¶ 113; and Focus Wireless provided wireless solutions, including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site, and other turnkey solutions to major wireless carriers, *id.* ¶ 114.

On or about October 28, 2016, Lateral, as administrative agent for lenders, entered into a Credit Agreement (the "Credit Agreement") with Jus-Com, FTE Networks, and Benchmark as borrowers and Focus Wireless and other subsidiaries of FTE Networks as guarantors. *Id.* ¶ 115. Pursuant to the Credit Agreement, lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time; that amount was approximately $50 million as of July 2019. *Id.* FTE's obligations under the Credit Agreement were secured by an interest in substantially all of FTE's assets, *id.* ¶ 116, and Lateral properly perfected its interests in the collateral by making appropriate and timely Uniform Commercial Code ("UCC") filings in the relevant jurisdictions, *id.* ¶ 117.

In or around July 2019, FTE defaulted under the terms of the Credit Agreement. *Id.* ¶ 118. Thereafter, Lateral declared a default and, pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turn over its interest in the collateral allegedly including, without limitation, the claims asserted herein. *Id.*

### B.  Defendants

Plaintiffs allege that certain acts were taken by the "Enterprise," which they define to be comprised of Yellowstone and MCA Recovery, and Defendants Capital Merchant Services,

Green Capital Funding, Midnight Capital (the "Entity Defendants"). *Id.* ¶ 214.   (The Court understands the Amended Complaint to refer to Yellowstone and the Entity Defendants as the Enterprise MCA Companies. *Id.* ¶ 108.) Yellowstone is a company organized under the laws of New York that was founded in 2009 and includes multiple Merchant Cash Advance ("MCA") companies that operate under its management and control. *Id.* ¶¶ 37, 259.  Its parent company is Pinnex. *Id.* ¶¶ 247, 253.  Defendants Capital Merchant, Green Capital, and Midnight Capital are wholly owned and controlled by Yellowstone. *Id.* ¶ 259; *see also id.* ¶ 37.  MCA Recovery is a debt-collection company that is organized under the laws of New York and maintains officers, books, records, and bank accounts that are independent of Yellowstone and the Defendants. *Id.* ¶ 265.  Upon default of a borrower's obligations under usurious loan agreements, and at the direction of Defendants and in furtherance of the Enterprise's goal of collecting the debts owed, MCA Recovery prepares affidavits for execution by Defendants' employees that misrepresent the true nature of the transactions, *id.* ¶ 266; it has filed thousands of affidavits of confessions with New York courts, *id.* ¶ 267.

Plaintiffs allege that Yellowstone, MCA Recovery and the Entity Defendants are associated in fact and through relations of ownerships, and that these entities—the Enterprise— share a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under New York law. *Id.* ¶ 215.  Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations relating to and for the purpose of collecting upon fraudulent fees through electronic wires. *Id.* ¶ 218.  Defendants Glass, Stern, Davis, and other investors ("Individual Defendants") have operated Yellowstone as part of an unlawful Enterprise to collect upon unlawful debt and commit wire fraud. *Id.* ¶ 260.  Through their close coordination, frequent communications, and

business relationships with one another, each of the Defendants knew the nature of the Enterprise, knew that the Enterprise extended beyond its individual role, and knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts. *Id.* ¶ 279.

As part of Yellowstone's membership in the Enterprise, Yellowstone: (1) entered into contracts with brokers to solicit borrowers for usurious loans and agreements with investors for funding those loans; (2) pooled investor funds to finance the usurious loans; (3) underwrote and set the interest rate for each usurious loan; (4) entered into merchant agreements on behalf of the Enterprise; (5) serviced the usurious loans; (6) set up and implemented the ACH withdrawals used to collect upon the unlawful debts; and (7) obtained judgments to further collect upon the debts. *Id.* ¶ 260. In this case, through Defendants, Yellowstone: (1) solicited borrowers; (2) pooled investor funds to fund the agreements; (3) underwrote the agreements; (4) entered into the agreements; and (5) collected the debts owed under the agreements by effecting daily ACH withdrawals from FTE's bank accounts. *Id.* ¶ 261.

Many of the companies that fall under Yellowstone's umbrella, including Capital Merchant and Green Capital, use the same location of 30 Broad Street, 14th Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters in Jersey City, New Jersey. *Id.* ¶ 37. Although they operate in New Jersey, these companies were strategically organized under the laws of New York to allow them to take advance of New York's confession-of-judgment statute and post-judgment collection devices. *Id.* ¶ 38. Like Capital Merchant and Green Capital, Midnight Capital is a limited liability company organized under the laws of New York with its principal place of business in New Jersey. *Id.* ¶ 17.

Stern, Glass, and Davis each have an ownership interest in Yellowstone, and each has benefited from the Enterprise's funneling of usurious loan proceeds to Yellowstone, MCA

Recovery, and the other Individual Defendants. *Id.* ¶¶ 210–212, 233, 242, 255. Stern was the

Chief Executive Officer ("CEO") of Yellowstone at all relevant times. *Id.* ¶¶ 211, 243. Even

though he is no longer the CEO, Stern still exercises authority over the Enterprise and has

authority to execute contracts on its behalf. *Id.* ¶ 211. Glass was the "mastermind" of the

Enterprise. *Id*. ¶ 210. He and Stern controlled transactions within the Enterprise during the

relevant time period. *Id.*; *see also id.* ¶ 211. At all relevant times, Davis was Yellowstone's

Director of Underwriting. *Id.* ¶ 243. While Davis's status with Yellowstone changed in August

2018, he continued assisting with collections after that time and continues to hold a distribution-

generating ownership interest in Yellowstone's parent company. *Id.* ¶ 212; *see also id.* ¶¶ 7, 253,

257.

Stern and Glass are, and Davis was, responsible for creating, approving, and

implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish

its common goals, such as the form of merchant agreements used by the Enterprise, the method

of collecting daily payments, and the form affidavits of confession used by the Enterprise, all of

which were used in connection with the FTE transactions. *Id.* ¶¶ 227, 239, 244; *see also id.*

¶ 228. Stern and Glass have, and Davis had, final say on the financial decisions of the

Enterprise, including with respect to the details of the funding of loans and the ultimate terms of

those loans, *id.* ¶¶ 221, 234, 243; *see also id.* ¶¶ 222–226, 235, 237–238, and they directed other

members of the Enterprise to take actions necessary to accomplish its goals, including directing

members to collect upon unlawful loans, *id.* ¶¶ 229, 240, 245. Glass purports to have divested

from Yellowstone prior to the transactions at issue, but he has actually maintained an interest in

it, operating the company through Stern. *Id.* ¶ 230; *see also id.* ¶ 231.

On January 16, 2015, the Enterprise, through Stern, entered into an agreement (the "Pinnex Agreement") with various investors to fund the Enterprise's loan business. *Id.* ¶ 45. Of the $55 million the Pinnex Agreement provided to fund the Enterprise, Stern personally contributed over $20 million. *Id.* ¶¶ 46–47. Davis and his company, Caporly, *id.* ¶¶ 247, 256, contributed $4,230,000. *Id.* ¶ 49. The Pinnex Agreement does not identify Glass as an investor, but Plaintiffs allege, on information and belief, that Glass is a silent investor through Stern. *Id.* ¶ 48.

## II.     The MCA Agreements

The Enterprise offers MCA agreements, and the Plaintiffs entered into such agreements with the Entity Defendants. *Id.* ¶ 74. Central to this dispute is whether the agreements are properly characterized as loans. The Amended Complaint contains allegations regarding the form of the loans and the intent of the Defendants and other members of the Enterprise in support of Plaintiffs' allegation that the agreements are actually loans. And viewed as such, the interest rates on these "loans" are routinely far in excess of the rates permitted by usury laws. *See id.* ¶ 100.

### A.     Form of the MCA Agreements

Plaintiffs allege that the agreements "contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans." *Id.* ¶ 75. There are a number of such "one-sided terms" in these agreements alleged in the Amended Complaint:

> (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to

litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone, and (15) a power of attorney authorizing the MCA company to take any action or execute any instrument or document to settle all obligations due.

*Id.* ¶ 76 (internal quotation marks omitted).

Plaintiff also allege that the MCA agreements contain a number of knowingly false statements, including: "(1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee." *Id.* ¶ 77.  For example, an Appendix to the MCA agreements which states the amount of the Origination Fee contains a parenthetical that it is "to cover underwriting and related expenses." *Id.* ¶ 290.  The same appendix which also states the ACH Program Fee contains a parenthetical that reads: "the ACH program is labor intensive and is not an automated process, requiring us to charge this fee to cover related costs." *Id.* ¶ 292.

The agreements are also "designed to result in a default in the event that the merchant's business suffers any downturn in sales," in that they (1) force the merchant to wait until the end of the month before it is entitled to invoke the reconciliation provision, (2) prevent the merchant from obtaining other financing, and (3) require the merchant "to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership" of the merchant. *Id.* ¶ 78.  And they contain penalties, including (1) a requirement that "the merchant . . . sign a confession of judgment entitling the

MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment," (2) acceleration of the entire debt upon an event of default, and (3) a requirement that the merchant turn over all of its receivables if it misses just one daily payment.  *Id.* ¶ 79.

The MCA agreements contain reconciliation provisions, which Plaintiffs allege are "sham" provisions used to give the appearance that the loans do not have a definite term and to evade state usury laws.  *Id.* ¶ 80.  Under a legitimate reconciliation provision, if a merchant pays more through its daily payments than it actually received in receivables, the merchant may seek repayment of the excess money paid, meaning that if sales decrease, the payments owed decrease as well.  *Id.* ¶ 81.  To ensure that a merchant can never use the sham reconciliation provision, the agreements falsely represent that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased when it is not, such that if sales decrease, the fixed daily payment amount stays the same.  *Id.* ¶ 83; *see also id.* ¶ 84.  Rather than representing a good-faith estimate of the receivables purchased, the daily payment amount is calculated by dividing the payback amount by the intended duration of the loan.  *Id.* ¶ 85.  This "term" of the loan is a vital part of approving the transaction.  *Id.* ¶ 86.  Plaintiffs allege, on information and belief, that "the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision."  *Id.* ¶ 94.

Plaintiffs identify nine "hallmarks of a loan" that the MCA agreements contain, alleging that "[d]espite their documented form, the transactions are, in economic reality, loans that are absolutely repayable," *id.* ¶ 95:

(a) The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury law.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b) The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c) While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d) The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e) The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f) The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g) The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h) The Enterprise required that the merchants . . . undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables[;] [and]

(i) The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners

personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

*Id.*

### B.   Treatment of MCA Agreements by Yellowstone and Defendants

### 1.   Internal Communications and Practices

Plaintiffs allege that usurious intent underlying the MCA agreements "can be discerned from internal negotiations, practices, and underwriting practices of Yellowstone which determine the payback based on the number of days in which Yellowstone wants to be paid back." *Id.* ¶ 96. Internal emails show that the daily payment disguises a finite term for repayment, *id.* ¶ 97, and internal emails authorizing transactions use the length of payback as a critical factor often omit references to the percentage of receivables and sometimes expressly refer to the "term" of the agreement, *id.* ¶ 98. On information and belief, the Enterprise MCA companies systemically offer refinancing to merchants to address cash-flow problems so that the MCA companies can reap additional benefits from the loans and avoid any reconciliation. *Id.* ¶ 103.

The Enterprise MCA companies also use underwriting practices that Plaintiffs say indicate the agreements are loans, not purchases of accounts receivables. *Id.* ¶ 105. When underwriting new transactions, the companies do not evaluate the merchants' receivables, instead they focus on factors like the credit ratings and bank balances of the merchants, if they perform any due diligence at all. *Id.* This is in contrast to the extensive due diligence undertaken by banks and other institutions that purchase accounts receivable, which look into the creditworthiness of the account debtors whose receivables they are purchasing. *Id.*

When the companies collect upon the agreements, they treat them like loans in that they require a merchant to make fixed daily payments and to grant security interests to the companies in substantially all of the merchant's assets. *Id.* ¶ 106. They also require merchants to execute

confessions of judgments that may be filed if the merchant fails to make as few as two daily payments under its agreement.  *Id.* ¶ 107.  Moreover, the form of contract Yellowstone used for a loan is largely the same as the form agreement that Stern directed be used for MCA agreements.  *Id.* ¶¶ 3–4.

### 2.     Government Investigations and Actions

Defendants have been sued in the past for conduct like that at issue here.  *Id.* ¶ 6.  The New Jersey Attorney General's Office ("NJAG") and the Federal Trade Commission ("FTC") each filed actions against Defendants and others, alleging that, for years, they had engaged in deceptive conduct to conceal the true nature of their transactions with merchants.  *Id.*

The NJAG conducted an investigation of Yellowstone, in which it found that Yellowstone customers were unable to modify daily payments through reconciliation.  *Id.* ¶ 90.  The investigation found that merchants were frequently induced to "refinance" rather than engage in reconciliation, a practice that would result in double the interest on the same principal amount.  *Id.* ¶¶ 93, 101–102.  In its complaint against Yellowstone, the NJAG noted that some merchants were unable to reach Yellowstone to request a reconciliation, while Yellowstone refused to adjust the amount for other merchants, citing specific instances of this refusal.  *Id.* ¶¶ 91, 92.

### 3.     The Enterprise's Description of the Agreements

In or around early 2016, Yellowstone and other MCA companies responded to litigation and regulatory scrutiny by conforming their advertising materials with the language in their agreements.  *Id.* ¶ 54.  Prior to this time, however, Yellowstone admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are actually loans.  *Id.* ¶ 56.  For example, Yellowstone targeted small businesses that were in need of a "loan" through print advertising, *id.* ¶ 57, and it retained a professional marketing company to create

promotional videos that appeared on a YouTube channel Yellowstone created for those videos called "EZBusinessLoans," *id.* ¶¶ 60–61.  The actors in all of the videos were employees of Yellowstone, and the premise of each video was that "anyone with a pulse" can get a loan from Yellowstone, even those who cannot get approved for a loan from a traditional bank. *Id.* ¶¶ 62–63.  For example, in one video titled "Bad Credit Business Loans ™ | 855-455-9649," an actor explains that he needed a business loan but was denied one at the bank so he "went online and found Yellowstone Capital[,] . . . applied for a loan on Monday based on [his] monthly sales and on Wednesday they gave [him his] money." *Id.* ¶ 67 (emphasis omitted).  As the video played, subtitles explained:

> Yellowstone Capital makes it easy to obtain an unsecured bad credit business loan if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.

> We keep our application process super short, and super easy.  Once you submit your application, your business funding offer can be approved in the same day.  Many of your [sic] clients receive their bad credit business loans in as little as three days.

> Been turned away for a small business credit card?  Apply at Yellowstone Capital for a bad credit business loan, also known as a business cash advance, or a merchant cash advance.

> Need money for remodeling, upgrades, or to buy a new location?  Our small business loans are easy to obtain for these things.

> Our business loans are unsecured.  There are no set minimum monthly payments, which means there are never any late fees.  So what are you waiting for?  Click the link at the top of the description to get started with your bad credit business loan application today!

*Id.* ¶ 69 (emphasis omitted).

In their direct communications with merchants, the Enterprise MCA companies consistently describe their products as "loans," and they describe themselves as "lenders" and the merchants as "borrowing" funds. *Id.* ¶ 104.

### C.      Other Bad Behavior

The Enterprise MCA companies engage in other unscrupulous behavior toward the merchants with whom they transact.  *Id.* ¶ 108.  For example, they often fail to advance merchants the full amounts that are provided for in their agreements; over-collect the daily payments due under the relevant agreements so that merchants end up paying more than is actually owed under the agreement; fail to properly record payments, resulting in this overpayment, and fail to give credit to the merchant or to repay the merchant upon demand;  and charge high fees for services never provided and costs never incurred.  *Id.* ¶¶ 108, 110.  In its complaint against Yellowstone, the FTC recited evidence of misrepresentations about the financing amount that would be provided to merchants, noting that merchants may only learn the funding that they are to receive after the documents have been signed.  *Id.* ¶ 109.

## III.      FTE's Funding Agreements

Beginning in 2017, FTE received financing from certain of the Defendants through various transactions.  These transactions were ostensibly for a purchase of FTE's receivables; Defendants "purportedly paid lump sums to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments."  *Id.* ¶ 1.  Plaintiffs allege that the terms and conditions of these agreements and the Defendants' actions demonstrate that no sale of receivables ever took place.  *Id.*  They allege, on information and belief, that the lenders' intentions behind these transactions were to make term loans and that internal approval for the transaction relied on the weekly terms associated with the agreements, not the percentage of receivables.  *Id.* ¶¶ 138, 146, 155, 162, 170, 177, 186, 193.

In connection with these transactions, the relevant funder agreed to advance FTE a certain sum, but they invariably advanced a lower amount than agreed due to an "Origination Fee and ACH Program Fee" that was deducted in each transaction.  While the Origination and ACH

(Automated Clearing House) Program Fees purportedly related to the costs of due diligence and withdrawing the daily payments owed in connection with the transactions, the lenders performed little, if any, due diligence, and the actual costs of the ACH withdrawals were a fraction of the fees, making the Origination and ACH Program Fees "additional disguised interest." *Id.* ¶¶ 124, 133, 157, 165, 172, 180, 188, 196.  Specifically, Plaintiffs allege that Defendants represented that an origination fee would be charged in connection with each of the MCA loans "to cover underwriting and related expenses," *id.* ¶ 290, but in fact, no due diligence was performed on FTE, *id.* ¶ 291.  And Defendants represented that "the ACH program is labor intensive and is not an automated process, requiring Defendants to charge this fee to cover related costs," *id.* ¶ 292 (alteration adopted), but the ACH program was actually an automated process and required no labor at all, *id.* ¶ 293.

The agreements underlying each of the transactions are similar to one another.  *See* Dkt. Nos. 23-13–23-21.[2]  As a result of the transactions, detailed below, FTE received $2,146,844 from Defendants and paid back $6,766,975, all in the span of only fourteen months.  Dkt. No. 20 ¶ 8.  They paid substantial fees in reliance on the false representations Defendants made regarding the origination and ACH processes.  *Id.* ¶¶ 294–295.

A.    **Capital Merchant Transactions**

Over a three-month period from September 21, 2018 to November 28, 2018, FTE entered into a series of three transactions with Capital Merchant, pursuant to which Capital Merchant advanced FTE $596,000 in cash and collected $2,323,500.  *Id.* ¶ 120.  FTE entered into the

---

[2] The actual agreements are attached to a declaration submitted in support of a motion to dismiss. *See* Dkt. Nos. 23; 23-12–23-21.  Because they are incorporated by reference in the Amended Complaint, they may be considered in connection with the motions to dismiss.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020).

second transaction to satisfy its obligations under the first transaction; it entered into the third transaction to satisfy its obligations under the second transaction. *See id.* ¶¶ 131, 139.

In connection with the first transaction, entered into on September 21, 2018, Capital Merchant advanced FTE $235,000, for a "purchase price" of $250,000, reduced by a deducted Origination and ACH Program Fee in the amount of $15,000, in exchange for $374,750 to be collected. *Id.* ¶ 123; Dkt. No. 23-19 at 1. On or about October 12, 2018, FTE entered into a second agreement with Capital Merchant to pay off its obligations under the first transaction. Pursuant to the second transaction, Capital Merchant agreed to advance $500,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until such time as the amount of $749,050 was repaid. Dkt. No. 20 ¶¶ 127–128, 136. In connection with this second transaction, Capital Merchant charged FTE an Origination and ACH Program Fee of $30,000. *Id.* ¶¶ 132, 140.

The $749,050 owed under the October transaction was to be repaid through daily ACH withdrawals in the amount of $8,999 such that the $749,050 would be repaid in sixteen weeks. *Id.* ¶¶ 129, 137. The daily payments owed purportedly represented a specified percentage of FTE's daily collections, but in both the September 21st and October 12th agreements, the specified percentage was replaced with a fixed $8,999 daily payment. *Id.* Thus, on its face, the October 12th agreement charged an annual interest rate of more than 100% per year. *Id.* However, when the $30,000 Origination and ACH Program Fee charge is taken into account, the actual interest rate on the sums paid to FTE exceeded 400% per year. *Id.* ¶¶ 134, 124. After taking into account the sums used to pay off the prior transaction, Capital Merchant advanced FTE only $185,000 in cash. *Id.* ¶ 139.

On or about November 28, 2018, FTE entered into a third agreement with Capital Merchant.  *Id.* ¶ 143.  Under it, Capital Merchant agreed to advance $750,000 to FTE in exchange for the purported purchase of all of FTE's future receipts, until such time as the amount of $1,199,250 was repaid.  *Id.* ¶ 144.  The amount was to be repaid through daily ACH withdrawals in the amount of $29,891 for eight weeks. *Id.* ¶ 145.  As in the prior agreements, even though the daily payments purportedly represented a specified percentage of FTE's daily collections, the "specified percentage" in the November agreement was replaced with the fixed daily payment amount of $29,891.  *Id.*[3]  Ultimately, Capital Merchant advanced FTE only $176,412 in connection with the November transaction because the proceeds of this agreement were used to pay off the prior transaction and because Capital Merchant charged FTE an Origination and ACH Program Fee of $97,500.  *Id.* ¶¶ 147–148.  Taking the fees into account, the actual interest rate exceeded 500% per year.  *Id.* ¶150.

## B.      Green Capital Transactions

Over a fourteen-month period between September 14, 2017 and November 27, 2018, FTE entered into a series of transactions with Green Capital, pursuant to which Green Capital advanced FTE $813,173 in cash but collected $2,120,025.  *Id.* ¶ 151.

Under the first agreement between FTE and Green Capital, entered into on or about September 14, 2017, Green Capital agreed to advance $75,000 to FTE in exchange for the

---

[3] After setting forth the terms of the November 28th agreement, Plaintiffs allege: "Thus, on its face, the *10/12 CMS Agreement* charged an annual interest rate of more than 300% per annum or more than 16 times the maximum 25% rate permitted under New York Penal Law."  *Id.* ¶ 145 (emphasis added).  From the context of the Amended Complaint, including the rest of this paragraph and the prior paragraphs alleging that the facial interest rate of the October 12th agreement was more than 100%, *id.* ¶¶ 129, 137, it appears that Plaintiffs intended to allege that the facial interest rate of the November agreement—not the October agreement—was more than 300% per annum.  In any event, an independent calculation of the interest owed in connection with the November 28th agreement—$1,199,250 owed on $750,000, to be paid back in eight weeks—yields an annual interest rate of over 300%.

purported purchase of all of FTE's future receipts until $112,125 was repaid. *Id.* ¶ 153. The $112,125 would be repaid through daily ACH withdrawals in the amount of $1,876, resulting in repayment in twelve weeks. *Id.* ¶ 154. This translates to an annual interest rate of more than 300% per year. *Id.* In connection with this agreement, Green Capital advanced FTE $64,837—not $75,000—after deducting a $2,625 Origination and ACH Program Fee, *id.* ¶ 156; when this fee is taken into consideration, the actual interest rate exceeded 325% per year, *id.* ¶ 158.

On or about October 20, 2017, FTE entered into a second agreement with Green Capital, pursuant to which Green Capital agreed to advance $200,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until $299,000 was repaid. *Id.* ¶ 160. The $299,00 sum was to be repaid through daily ACH withdrawals in the amount of $3,323 such that the sum would be repaid in eighteen weeks. *Id.* ¶ 161. The daily payment amounts purportedly represented a specified percentage of FTE's daily collections, but by addendum the specified percentage was replaced with the fixed $3,323 figure. *Id.* On its face, the October 20th agreement charged an annual interest rate of more than 100% per year. *Id.* But taking into account the Origination and ACH Program Fee of $7,000, the actual interest rate exceeded 125% per year. *Id.* ¶¶ 164, 166.

Approximately one year later, on or about October 12, 2018, FTE entered into a third agreement with Green Capital, pursuant to which Green Capital agreed to advance $500,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until $749,050 was repaid. *Id.* ¶ 168. The $749,050 was to be repaid through daily ACH withdrawals in the amount of $8,999 such that the total sum was to be repaid in sixteen weeks. *Id.* ¶ 169. In this agreement, as with the other agreements, the daily payments were purported to represent a specified percentage of FTE's daily collections, but the specified percentage was replaced by addendum

with the fixed $8,999 daily payment amount. *Id.* On its face, the October 12th Green Capital agreement charged an interest rate of more than 100% per year, *id.* ¶ 169, but after accounting for an Origination and ACH Program Fee of $30,000 deducted from the $500,000 that Green Capital agreed to advance, the actual interest rate was above 125% per year, *id.* ¶¶ 171, 173.

On or about November 27, 2018, FTE entered into another agreement, pursuant to which Green Capital agreed to advance $600,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until such time as $959,400 was repaid. *Id.* ¶¶ 174, 175. The $959,400 was to be repaid in eight weeks through daily ACH withdrawals in the amount of $24,999. *Id.* ¶ 176. Again, the daily payments owed pursuant to the agreement purportedly represented a specified percentage of FTE's daily collections, but by addendum the specified percentage was replaced in the agreement with the fixed $29,999 daily payment. *Id.* On its face, the agreement charged an annual interest rate of over 300% per year, *id.*, but after accounting for an Origination and ACH Program Fee of $133,900, the actual interest rate exceeded 500% per year, *id.* ¶¶ 179, 181. In connection with this transaction, Green Capital only advanced FTE $177,461 because, among other things, the proceeds of this agreement were used to pay off the prior agreement. *Id.* ¶ 178.

### C.    Midnight Capital

Over a fourteen-month period between December 6, 2017 and January 19, 2018, FTE entered into a series of transactions with Midnight Capital. *Id.* ¶ 182. Pursuant to these transactions, Midnight Capital advanced FTE $737,671 in cash but collected $2,323,450. *Id.*

Plaintiffs make specific allegations with respect to two of these transactions. On or about December 6, 2017, FTE entered into its first agreement with Midnight Capital; under this agreement, Midnight agreed to advance $200,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until $299,800 was repaid. *Id.* ¶ 184. The amount due under this

agreement—$299,800—was to be repaid through daily ACH withdrawals in the amount of $9,999 for six weeks.  *Id.* ¶ 185.  On its face, the December 6th agreement thus charged more than 400% per year.  *Id.*  However, Midnight Capital only advanced $176,500 after deducing an Origination and ACH Program Fee of $23,500, making the actual interest rate over 425% per year.  *Id.* ¶¶ 187, 189.

On or about December 15, 2017,[4] FTE entered into a second agreement with Midnight Capital, pursuant to which Midnight Capital agreed to advance $500,000 to FTE in exchange for the purported purchase of all of FTE's future receipts until $749,000 was repaid.  *Id.* ¶¶ 190–191.  The $749,000 was to be repaid through daily ACH withdrawals in the amount of $15,999 such that $749,000 would be repaid in less than ten weeks.  *Id.* ¶ 192.  This daily amount of $15,999 purportedly represented a specified percentage of FTE's daily collection, but by addendum the specified percentage was replaced with the fixed daily payment.  *Id.*  On its face, the December 15th agreement charged an interest rate of more than 300% per year, *id.*, but after accounting for the Origination and ACH Program Fee of $25,000 that was charged, the actual interest rate exceeded 400% per year, *id.* ¶ 197.  Midnight Capital only advanced $225,005 pursuant to the December 15th agreement because it used the proceeds of this agreement to pay off the prior one.  *Id.* ¶ 194.

---

[4] The Amended Complaint alleges that this transaction took place on December 18, 2017.  The parties appear to agree that the correct date for this agreement is December 15, 2017, which is the date on the underlying agreement that the Capital Defendants submitted in connection with its motion to dismiss.  *See* Dkt. No. 23 ¶ 13 ("The three [Midnight Capital] Agreements (dated 12/16/17, 12/15/17, and 1/19/18) alleged in the Complaint are collectively attached hereto as Exhibit K."); Dkt. No. 31 at 10.

Plaintiffs make no allegations with respect to the agreement between FTE and Midnight Capital of January 19, 2018, except that the sums from this transaction appear to be included in the total amount Plaintiffs alleged to be advanced and collected by Midnight Capital.[5]

### D.    The Alleged Loan Agreements

The terms of the agreements FTE entered into with Capital Merchant, Green Capital, and Midnight Capital[6] generally take three forms, such that the agreements that take one form are identical in nearly all material respects to the other agreements that take that form.[7]  The Court will review the relevant terms of two such agreements for the first form ("Form One") and then will review the terms of an agreement that takes the second form ("Form Two") and third form ("Form Three").  It refers back to this discussion later in its analysis of whether the agreements constitute loans.

#### 1.    Form One

The September 21, 2018 agreement and the October 12, 2018 agreement between FTE and Capital Merchant each states that FTE, as "Merchant" "sells, assigns and transfers" to Capital Merchant a

> Specified Percentage . . . of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers[] and/or other third party payors . . . defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of merchant's business[], for the payment of

---

[5] Plaintiffs state that the amounts from the January 19, 2018 transaction were "erroneously include[d] . . . in totaling the amounts of the [Midnight Capital] loans."  Dkt. No. 31 at 44 n.23.
[6] The agreements between FTE and Midnight Capital—sued here as "Midnight Capital, LLC"— are on the paper of "Midnight Advance Capital, LLC."  *See* Dkt. Nos. 23-12–23-14.  The parties assume that Midnight Advance Capital, LLC and Midnight Capital, LLC are the same entity, *see* Dkt. No. 22 at 9 (naming as a defendant "Midnight Advance Capital, LLC . . . i/s/h/a Midnight Capital, LLC"), and the Court will do so as well.
[7] There are differences in the agreements with respect to the date, the funding entity, and the amounts funded and "purchased" under the agreements.  These characteristics are not material for the inquiry whether the agreements are actually loans; the characteristics that are material are recited herein.

Merchant's sale of goods or services until the amount specified below has been delivered by Merchant to [Capital Merchant].

Dkt. No. 23-19 at 1; Dkt. No. 23-20 at 1. They require FTE to authorize one depositing account, acceptable to Capital Merchant, to remit the specified percentage of the settlement amounts due from each transaction until Capital Merchant receives the full "Purchased Amount"—the total amount due in connection with the relevant agreement. *Id.* The agreements also authorize Capital Merchant to debit, by ACH, the specified amounts from FTE's bank account on a daily basis and recite that "Merchant understands that it is responsible for ensuring that the specified percentage to be debited by [Capital Merchant] remains in the account." *Id.* They permit Capital Merchant to, "upon Merchant's request, adjust the amount of any payment due under this Agreement at [Capital Merchant's] sole discretion and as it deems appropriate." *Id.* Importantly, in the event there is a violation of a provision contained in the "Merchant Agreement Terms and Conditions" or the occurrence of an "Event of Default" under the same, the "Specified Percentage" automatically is defined to equal 100%. *Id.*

In the "Merchant Agreement Terms and Conditions," the agreements disavow that they are loans or that the amounts charged therein are interest and states that the "Purchase Price" is in exchange for receipts and equals the fair market value of the receipts. *See* Dkt. No. 23-19 § 1.8; Dkt. No. 23-20 § 1.8.[8] They contain "protections against default," which may be invoked

---

[8] The agreements also provide: "In the event that a court determines that [Capital Merchant] has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and [Capital Merchant] shall promptly refund to Merchant any interest received by [Capital Merchant] in excess of the maximum lawful rate . . . ." *Id.* Such a clause would not save an otherwise usurious loan. *See Am. E Grp. LLC v. Livewire Ergogenics Inc.*, 2022 WL 2236947, at *1 (2d Cir. June 22, 2022) (summary order) (concluding that section of loan instrument "which purports to cap the interest rate at 20%, does not save the Note from being usurious" and voiding the loan).

by Capital Merchant without notice to FTE in the event that: (1) FTE takes certain actions that would interfere with the payment processor; (2) "interrupts the operation of this business (other than adverse weather, natural disasters or acts of God)[,] transfers, moves, sells, disposes, transfers [sic] or otherwise conveys its business or assets without (i) the express prior written consent of [Capital Merchant], and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to [Capital Merchant];" or (3) "takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Marchant's services with any means other than checks that are settled through Processor."  Dkt. No. 23-19 § 1.10; Dkt. No. 23-20 § 1.10.  The eight "protections against default," which are "in addition to any other remedies available to [Capital Merchant] at law, in equity or otherwise pursuant to this Agreement," set out in the agreements are:

> **Protection 1:**  The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately.  **Protection 2.**  [Capital Merchant] may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s).  **Protection 3.** Merchant shall, upon execution of the Agreement, deliver to [Capital Merchant] an executed confession of judgment in favor of [Capital Merchant] in the amount of the Purchase Amount stated in the Agreement, plus attorneys' fees calculated at twenty-five percent (25%) of the balance due hereunder at the time of breach.  Upon breach of any provision in this paragraph 1.10, [Capital Merchant] may enter that confession of judgment as a judgment with the Clerk of the Court, without notice, and execute thereon.  **Protection 4.**  [Capital Merchant] may enforce its security interest in the Collateral identified in the Security Agreement herein.  **Protection 5.** [Capital Merchant] may proceed to protect and enforce its rights and remedies by lawsuit.  In any such lawsuit, in which CMA shall recover judgment against Merchant, Merchant shall be liable for all of CMS's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs . . . .  **Protection 6.** Merchant shall upon execution of this Agreement, delivery [sic] to [Capital Merchant] an executed assignment of lease of Merchant's premises in favor of [Capital Merchant].  Upon breach of any provision in this paragraph 1.10, [Capital Merchant] may exercise its rights under such assignment.  **Protection 7.**  [Capital Merchant] may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on

Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage. **Protection 8.** [Capital Merchant] shall have the right, without waiving any of its rights and remedies and without notice to Marchant and/or Guarantor(s) to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payments to [Capital Merchant] of all or any portion of the amounts received by such credit card processor on behalf of Merchant.  Merchant hereby grants to [Capital Merchant] an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints [Capital Merchant] or any of [Capital Merchant] representatives as Merchant's attorney-in-fact, to take any and all action necessary to direct such new or additional credit card processor to may payment to [Capital Merchant] as contemplated by this Section.

Dkt. No. 23-19 § 1.10; Dkt. No. 23-20 § 1.10.  The agreements also require FTE to maintain business-interruption insurance, naming Capital Merchant as loss payee and additional insured; the insurance shall be "in amounts and against risks as are satisfactory to [Capital Merchant]." Dkt. No. 23-19 § 2.4; Dkt. No. 23-20 § 2.4.

The agreements set forth a number of events, the occurrence of which will constitute an "Event of Default."  Dkt. No. 23-19 § 3.1; Dkt. No. 23-20 § 3.1.  Such an event occurs where:

(a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Guarantor(s) prior to the Purchased Amount being paid to [Capital Merchant]; (d) Except for: (i) as a result of an Act of God, (ii) filing for protection under applicable bankruptcy law, (iii) an assignment for the benefit of creditors, and (iv) similar protection; (e) Merchant shall transfer or sell all or substantially all of its assets; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depositor[y] accounts without the prior written consent of [Capital Merchant]; (h) Merchant shall change its depositing account  without the prior written consent of [Capital Merchant]; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) Merchant shall default under any of the terms, covenants and conditions of any other agreement with [Capital Merchant]; or (k) Merchant shall fail to deposit its Receipts into the Account.

*Id.*

Upon an "Event of Default" or a violation of Section 1.10 of the agreement by FTE, Capital Merchant may settle obligations due to it from FTE including collection of 100% of the

Specified Percentage  by: (1) obtaining and adjusting insurance; (2) collecting "monies due or to become due under or in respect of any of the Collateral"; (3) receiving, endorsing, and collecting "any checks, notes, drafts, instruments, documents, or chattel paper in connection with" (1) or (2); (4) signing FTE's "name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to [Capital Merchant];" and (5) filing any claims or taking any action or instituting any proceeding that Capital Merchant "may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to the payment of the Purchased Amount."  Dkt. No. 23-19 § 1.9; Dkt. No. 23-20 § 1.9.

In the case of an Event of Default, Capital Merchant may enforce its rights, again including collection of 100% of the Specified Percentage "by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal equitable right or remedy."  Dkt. No. 23-19 § 3.2; Dkt. No. 23-20 § 3.2.  The agreements further provide that "[a]ll rights, powers and remedies of [Capital Merchant] in connection with this Agreement," such as the acceleration in the "Protections against Default" section, "may be exercised at any time by [Capital Merchant] after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity."  *Id.*

The filing of bankruptcy does not constitute an "Event of Default" under the agreements. However, if FTE makes a filing under Title 11 of the United States Code—the Bankruptcy Code—it must give Capital Merchant written notice within 24 hours of the filing.  Dkt. No. 23-

19 § 3.4; Dkt. No. 23-20 § 3.4.  FTE must also give Capital Merchant seven days' written notice before the closing of any sale of all or substantially all of its assets or stocks.  *Id.*

The agreements as a whole each consist of a number of other documents attached to the main agreement.  One is a "Security Agreement," by which FTE grants to Capital Merchant "a security interest in all assets now owned, or hereafter acquired, including without limitation: (a) all accounts . . . , chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the [UCC], now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC." Dkt. No. 23-19 at 6; Dkt. No. 23-20 at 6.  There is also a "Guaranty," which provides that the undersigned Guarantors:

> guarantee[] to [Capital Merchant] Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Security Agreement and Guarantee, and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified . . . .  Guarantor's obligations are due . . . at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement . . . .

*Id.*  The Guaranty also states that "[i]n the event that CMS must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount."  Dkt. No. 23-19 at 7; Dkt. No. 23-20 at 7.

"Appendix A" contains a "Fee Structure" which sets forth the amounts of the "Origination Fee" and "ACH Program Fee."  Dkt. No. 23-19 at 8; Dkt. No. 23-20 at 8.  Next to the Origination Fee, it says "to cover underwriting and related expenses," and next to the ACH Program Fee, it says "the ACH program is labor intensive and is not an automated process,

requiring us to charge this fee to cover related costs." *Id.* There are also various fees for rejected ACH debits, for defaults under the agreement, and for insufficient funds. *Id.*

An "Addendum" to the agreements states that the "Specified Percentage" shall instead be a fixed sum "per business [d]ay," referred to as the "Daily Payment," which the Addendum recites "the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's prior receipts due to [Capital Merchant] pursuant the [sic] Agreement." Dkt. No. 23-19 at 12; Dkt. No. 23-20 at 9. The Addendum contains a "reconciliation provision"; it provides:

> At the Merchant's option, within five (5) business [sic] following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby [Capital Merchant] shall ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage (the "Reconciliation"). However, in order to effectuate the Reconciliation, upon submitting the request for the Reconciliation to [Capital Merchant]—but in no event later than give (5) business days following the end of the calendar month— the Merchant must produce any and all evidence and documentation requested by [Capital Merchant] in its sole and absolute discretion, necessary to identify the appropriate amount of—and effectuate—the Specified Percentage.

Dkt. No. 23-19 at 12(c); Dkt. No. 23-20 at 9(c). After setting forth the "reconciliation provision," the Addendum provides:

> The Merchant specifically acknowledges that the Daily Payment in lieu of the Specified Percentage is being provided to the Merchant as a courtesy, and if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then [Capital Merchant] shall not be obligated to effectuate the Reconciliation discussed in Section (c) herein. Additionally, as the Daily Payment is being provided to Merchant as a courtesy, the Merchant may elect, upon timely notice as outlined above to [Capital Merchant], to remit receipts via Specified Percentage instead of the Daily Payment.

Dkt. No. 23-19 at 12(d).

In addition to appearing in the two Capital Merchant agreements, the above terms appear in the December 6, 2017 Midnight Capital agreement, Dkt. No. 23-12, and the September 21, 2018 Green Capital agreement, Dkt. No. 23-17.

### 2.    Form Two

With a few material exceptions that will be analyzed in more detail below,[9] the same terms as appear in Form One generally also appear in Form Two agreements, [10] which are found at Dkt. No. 23-13 (December 15, 2017 agreement with Midnight Capital), Dkt. No. 23-15 (September 14, 2017 agreement with Green Capital), and Dkt. No. 23-16 (October 20, 2017 agreement with Green Capital).[11]   The important differences are as follows:  First, in the section titled "Events of Default"; the language "(d) Except for: (i) as a result of an Act of God, (ii) filing for protection under applicable bankruptcy law, (iii) an assignment for the benefit of the creditors, and (iv) similar protection" has been deleted and is replaced with the following "Event of Default": "Merchant shall transport, move interrupt, suspend, dissolve or terminate its business."  Dkt. No. 23-13 § 3.1 (d).  Thus, the exception for a filing under the Bankruptcy Code is eliminated.  Second, the Guaranty in the Form Two agreements provides that the Guarantors' obligations are due not only upon breach of the agreement but also "at the time Merchant admits

---

[9] The non-material exceptions are as follows: "Protection 3" in these agreements state that the confession of judgment is only in the amount of the "Purchase Amount" stated in the agreement and not the Purchase Amount plus attorneys' fees, *see* Dkt. No. 23-13 § 1.10; "Protection 5" does not contain the language "in addition to any remedies pursuant to Protection 3 of this section 1.10," *id.*; due to the numbering of some of the agreements, the internal cross-references vary; and minor grammatical and word changes were made, none of which changes the meaning of the terms.

[10] The second page of the Security Agreement and Guaranty appears not to have been included in the exhibit attaching this agreement, but the pages that are included indicate that the agreement is identical to the other Form Two agreements in all relevant respects.

[11] The January 19, 2018 agreement between FTE and Midnight Capital—submitted in connection with the Capital Defendants' motion to dismiss, *see* Dkt. No. 23-14—also appears to be a "Form Two" agreement, but the Amended Complaint alleges no details of that transaction and Plaintiffs do not base their claims on that transaction.  *See* Dkt. No. 31 at 44 ("Plaintiffs base no claim on [the January 19, 2018] agreement.").  Because Plaintiffs do not base any claim on this agreement or make allegations such that the agreement could be properly deemed incorporated by reference or integral to the Amended Complaint and because it is not a document publicly filed in another action, *see* "Legal Standard" *infra*, the agreement is not properly before the Court, and the Court will not consider it in connection with this motion.

its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts." Dkt. No. 23-13 at 6.  And third, "Appendix A" to Form Two agreements, which sets forth the relevant fee structure, provides that the nonsufficient funds fee is "$35.00 fee each occurrence (*up to two occurrences before a default is declared*)."  Dkt. No. 23-13 at 8 (emphasis added).

There is also a significant difference between the "reconciliation" provisions in the addenda to the Form One and Form Two agreements.  Like the Form One agreements, the Form Two agreements provide that the "Specified Percentage" is revised to a fix sum per business day and that the merchant may request a reconciliation.  The Form Two agreements does not state that the funder "*shall* ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage," *see, e.g.*, Dkt. No. 23-20 at 9 (emphasis added)—instead, it states that the funder "*may* ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage," *see, e.g.*, Dkt. No. 23-13 at 10 (emphasis added).  Indeed, the Form Two agreements goes on to state:

> The Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that [Midnight Capital] is under no obligation to provide same, and (ii) if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then [Midnight Capital] shall not effectuate the reconciliation discussed above.

*Id.*

### 3.    Form Three Agreements

The third form of an agreement—referred to herein as a "Form Three" agreement—was entered into by FTE on November 27, 2018, with Green Capital, and on November 28, 2018,

with Capital Merchant.  Pursuant to these agreements, FTE, as "Seller" "sells, assigns, transfers and conveys . . . unto" Green Capital or Capital Merchant, whatever the case may be (and referred to in the descriptions of the Form Three agreements as the "Funder") "all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to" the Funder.  Dkt. No. 23-18 § 3.  The agreements state that "[b]y virtue of this Agreement, Seller transfers to [Funder] full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein." *Id.* Under the agreements, ECF is required to deposit all future receipts—defined as "all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of the Agreement," *id.* § 1(c)—into one Funder-approved bank account.  *Id.* § 7.  The Funder is authorized to debit a set daily amount from that bank account each "Workday"—Monday through Friday except for bank holidays—and the Seller is required to deliver that daily amount on each Workday.  *Id.* §§ 1(h), 6, 8.

The agreements disavow that the full amount purchased under them is absolutely collectable.  They state: "[t]his Sale of the Purchased Future Receipts is made without express or implied warranty to [Funder] of collectability of the Purchased Future Receipts by [Funder] and without recourse against Seller and/or Guarantor(s) except as specifically set forth in this Agreement."  *Id.* § 3.  They also recite that:

> Seller hereby acknowledges that it full understands that: (i) [Funder's] ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to [Funder] in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business [Funder's] receipt of the full or any portion of the Purchased Amount may be delayed indefinitely.

*Id.* § 5.  They also disavow that the agreements are loans, stating that the agreements

"consummate[] the sale of the Purchased Future Receipts at a discount, not the borrowing of

funds by Seller from [Funder].  [Funder] does not charge Seller and will not collect from Seller

any interest on the monies used by [Funder] for the purchase of the Purchased Future Receipts."

*Id.* § 16(a)(ii); *see also id.* § 16(d) (reciting that "payment of the Purchase Price by [Funder] is

not intended to be, not shall it be construed as, a loan . . . that requires absolute and unconditional

repayment on a maturity date").  They state that the "period of time that it will take [Funder] to

collect the Purchased Amount is not fixed . . . and will depend on how well or not well Seller's

business will be performing following the Effective Date."  *Id.* § 16(a)(ii).

> The agreements contain reconciliation provisions; those provisions state:

> If at any time during the term of this Agreement Seller will experience unforeseen
> decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and
> absolute discretion, but subject to the provisions of Section 11 below, to request
> retroactive reconciliation of the Initial Daily Installments for one (1) full calendar
> month immediately preceding the day when such request for reconciliation is
> received by [Funder] (each such calendar month, a "Reconciliation Month") . . . .
> Such reconciliation of the Seller's Initial Daily Installment for a Reconciliation
> Month shall be performed by Funder within five (5) Workdays following its receipt
> of the Seller's request for Reconciliation by either crediting or debiting the
> difference back to, or from, the Approved Bank Account so that the total amount
> debited by [Funder] from the Approved Bank Account during the Reconciliation
> Month at issue is equal to the Specific Percentage of the Future Receipts that Seller
> collected during the Reconciliation Month at issue.

*Id.* § 10(a), (b).  According to the agreements, as a result of a reconciliation, the "effective Initial

Daily Installment amount during the Reconciliation Month" may be reduced or increased "in

comparison to the one set forth" earlier in the agreements, "and, as the result of such reduction,

the term of this Agreement during which [Funder] will be debiting the Approved Bank Account

may get shortened or extended indefinitely."  *Id.* § 10(c).  Seller has the sole responsibility and

right to initiate the reconciliation process by sending a request to the Funder, and the Seller must

provide specific information to the Funder and make the request so that it is received "within five

(5) Workdays after the last day of the Reconciliation Month." *Id.* § 11(b).  If Seller makes a

request after that period, the reconciliation request is nullified for that month.  *Id.* § 11 (c).

The reconciliation provisions by themselves do not "modify the amount of the Initial

Daily Installment for any calendar month during the term of th[e] Agreement other than during

the Reconciliation Month(s) as the result of the Reconciliation."  *Id.* § 11(e).  However, in

addition to a reconciliation process, the agreements provide for a possible adjustment of the daily

payment due thereunder.  They state:

> (a) If at any time during the term of this Agreement Seller experiences a steady
> decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute
> discretion, but subject to the provisions of Section 13 below, to request
> modification ("Adjustment") of the amount of the Initial Daily Installment that
> Seller is obligated to deliver daily to [Funder] in accordance with the provisions
> of Section 6 above.  Such Adjustment shall become effective as of the date it is
> granted and the new adjustment amount of the Initial Daily Installment (the
> "Adjusted Daily Installment") shall replace and supersede the amount of the
> Initial Daily Installment set forth in Section 1 above.
>
> (b) The Adjustment of the Initial Daily Installment shall be performed by [Funder]
> within five (5) Workdays following its receipt of the Seller's request for
> Adjustment by modifying the amount of the Initial Daily Installment that shall
> be debited from the Approved Bank Account until the Purchased Amount is
> paid in full.  Notwithstanding anything to the contrary set forth in Sections 12
> and 13 hereof, no Adjustment shall take place until and unless Reconciliation
> for at least one (1) Reconciliation Month takes place resulting in the reduction
> of the total amount debited from Seller's Approved Bank Account during the
> Reconciliation Month by at least fifteen percent (15%) in comparison to the
> amount that would have been debited during that month without Reconciliation.

*Id.* § 12.  As with the reconciliation, it is Seller's sole responsibility and right to initiate an

adjustment by requesting one from the Funder.  Such a request must be in writing and

accompanied by certain documents, *id.* § 13(a), and it must be received by the Funder by email

within five Workdays "after the date that is the later of (i) the last day of the latest bank

statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card

processing statement enclosed with the Adjustment Request," *id.* § 13(b); if the request is not

made within that time period, the request is nullified, *id.* § 13(c).  The Seller does not have a right under the agreement to request a retroactive adjustment.  *Id.* § 13(e).

The Seller's declaring bankruptcy or otherwise stopping operations does not constitute a default or a breach under the agreements.  Rather, the agreements provide:

> [I]f the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

*Id.* § 16(a)(v).  In a similar vein, they provide that

> Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons:
>
> i.    adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligence mishandling of its business;
>
> ii.   loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;
>
> iii.  bankruptcy of Seller; and/or
>
> iv.   natural disasters or similar occurrences beyond Seller's control.

*Id.* § 16(b) (the "Valid Excuses").

The Form Three agreements do share some characteristics with the Form One and Form Two agreements.  For example, the Form Three agreements require FTE to maintain "business-interruption insurance naming [Funder] as a loss payee and additional insured in the amounts and against risks as are satisfactory to [Funder] and shall provide [Funder] proof of such insurance upon request."  *Id.* § 21(g).  FTE is also prohibited from transferring or selling all or substantially all of its assets without the Funder's prior consent and from making or sending notice of its intended bulk sale or transfer.  *Id.* § 21(k). If FTE does sell, dispose, transfer or convey all or

substantially all of its business or assets, it must first obtain the express written consent of the

Funder and provide the Funder "with a written agreement of a purchaser or transferee of Seller's

business or assets to assume all of Seller's obligations under this Agreement pursuant to

documentation satisfactory to" the Funder.  *Id.* § 21(*l*).  Additionally, under the Form Three

agreements, FTE granted the Funder "a continuing, perfected and first priority lien upon and

security interest in . . . a. all accounts . . ., chattel paper, documents, equipment, general

intangibles, instruments, and inventory, as those terms are defined by Article 9 of the [UCC],

now or hereafter owned or acquired by Seller; and b. all Seller's proceeds, as such term is

defined by Article 9 of the UCC."  *Id.* § 22.

As with the other forms of agreements, there are enumerated "Events of Default" under

the Form Three agreements.  They differ from those under the other two forms of agreement.

They are:

a. Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) to [Funder], and timely and in full payment to [Funder] of any other sums due for any reasons whatsoever other than as a result of the Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

b. Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

c. Seller shall default under any of the terms, covenants and conditions of any other agreement with [Funder] (if any) which is related to the instant Agreement.

d. Seller uses multiple depository accounts without obtaining prior written consent of [Funder] in each instance.

e. Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

f. Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of [Funder] in each instance.

    g.  Seller interferes with [Funder] collection of Initial Daily Installments (or Adjusted Daily Installments, as the case may be).

    h.  Four (4) or more ACH transactions attempted by [Funder] are rejected by Seller's bank.

    i.  The Guaranty shall for any reason cease to be in full force and effect.

*Id.* § 27.

To reiterate, a "Valid Excuse" is defined to include that "Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons: . . . adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligence mishandling of its business; [and/or] bankruptcy of Seller." *Id.* § 16(b).

Upon an Event of Default, Seller must immediately deliver to the Funder the entire unpaid portion of the "Purchased Amount"—the total amount due to Funder under the agreement—and the agreement entitles the Funder to additional amounts in the form of damages and interest on the unpaid portion upon default. *Id.* § 29. Upon default, the Funder may "protect and enforce its rights" under the agreement by: enforcing its rights as a secured creditor under the UCC, enforcing the personal guaranty of performance against the guarantors without first seeking to be made whole from the Seller, filing an affidavit of confession of judgment executed by the guarantor, directing Seller's credit card processor to make payment to the Funder of any all or any portion of the amounts received by the processor on behalf of the Seller, and filing suit for specific performance or to enforce the Seller's obligations under the agreement (including the personal guaranty). *Id.* § 30.  In an Event of Default, the Funder may also "perform any and all obligations of Seller" under the agreement, including obtaining insurance on the collateral securing the agreement; collecting money due with respect to that collateral; signing Seller's name on invoices, bills of lading, or assignments directing customers or account debtors to make

payment directly to the Funder; or filing claims or taking actions the Funder deems necessary to collect the unpaid amount. *Id.* § 32. The "Personal Guaranty of Performance" provides that, if Seller defaults or breaches in the obligations under the agreement, the guarantors shall pay or perform the obligations and other amounts stipulated in the agreement. *Id.* at 13 § 2.

A rider to the agreements provides for a "Due Diligence Fee," described as follows: "the cost of the due diligence of Seller'[s] business performed by [Funder]. As a general rule, the Due Diligence Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc." *Id.* at 16 § 3(a). It also provides for an "ACH Program Fee" "to cover the expense of ACH processing program." *Id.* at 16 § 3(b). Another rider permits the charging of an "Origination Fee." *Id.* at 18.

## PROCEDURAL HISTORY

Lateral initially filed this lawsuit on November 11, 2021. Dkt. No. 1. After some of the Defendants moved to dismiss the complaint, Dkt. No. 10, Plaintiffs filed the instant Amended Complaint, Dkt. No. 20. In their Amended Complaint, Plaintiffs bring three causes of action: (1) a substantive violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962; (2) RICO conspiracy, in violation of 18 U.S.C. §1962(d); and (3) fraud. *See id.* ¶¶ 198–295.

On February 25, 2022, Defendants filed three separate motions to dismiss all claims. Dkt. Nos. 21, 24, 26. The Capital Defendants move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "the applicable statutes of limitations, N.Y. Jud. Law §489(1), documentary evidence, and lack of standing."[12] Dkt. No. 21 at 1. Glass moves for dismissal on

---

[12] It does not appear that the Capital Defendants are contending that Plaintiffs lack Article III standing and that the Court therefore does not have subject-matter jurisdiction to hear this case.

the same basis.  *See* Dkt. No. 24.  Davis moves to dismiss pursuant to Rule 12(b)(6).  Dkt. No.

26.  Plaintiffs filed a memorandum of law in opposition to the motions to dismiss on April 1,

2022.  Dkt. No. 31.  On April 22, 2022, Defendants filed their reply memoranda of law and

supporting affirmations.  *See* Dkt. Nos. 32–36.

On August 23, 2022, the Court issued an Order inviting the parties to submit letter briefs

addressing what effect, if any, the Court's decisions in *Fleetwood Services, LLC v. Ram Capital*

*Funding, LLC*, No. 20-cv-5120 (LJL) (S.D.N.Y.) have on the motions pending in this case.  Dkt.

No. 38.  On August 30, 2022, the Capital Defendants, Glass, Davis, and Plaintiffs each submitted

letter briefs addressed to this question.  Dkt. Nos. 39–42.[13]

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 554, 557 (2006)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.*  This "does not impose a probability requirement at the

pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556.  That is, a complaint

need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds

---

[13] On August 31, 2022, the Capital Defendants filed a letter motion for leave to file a response to
the letter filed by Plaintiffs or, in the alternative, to strike misrepresented contract terms.  Dkt.
No. 43.  The Court is capable of reading the contracts at issue, and it will consider the
contractual provisions as written, not as restated by either party.  The motion is therefore denied,
and the Court will not consider the arguments made therein or in the response to that letter filed
by Plaintiffs at Dkt. No. 44.

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is in inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, and a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive dismissal, *Twombly*, 550 U.S. at 555.

In considering a Rule 12(b)(6) motion, which "challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, [a court] do[es] not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alterations adopted) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n. 2 (2d Cir. 2016)). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Id.*; *see also Nam v. Permanent Mission of Republic of Korea to United Nations*, 581 F. Supp. 3d 643, 647 (S.D.N.Y. 2022) (Nathan, J.) ("The Court may consider only the allegations in the complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or 'documents either in plaintiff's possession or of which plaintiffs

had knowledge and relied on in bringing suit.'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

"To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)). Documents that are "integral" to a complaint such that they can be considered on a motion to dismiss despite not being incorporated by reference are those "where the complaint relies heavily upon [their] terms and effect." *Goel*, 820 F.3d at 560 (quoting *Chambers*, 282 F.3d at 153). "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, in determining whether a document is integral to a complaint, a court will consider whether the contents of the document "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'" *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)). "[A] necessary prerequisite" to a finding that materials are integral to a complaint "is that the 'plaintiff[] *rel*[y] on the terms and effect of [the] document in drafting the complaint . . . ; mere notice or possession is not enough.'" *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)). And "[w]hen a court takes judicial notice of a document on a motion to dismiss, it should generally do so only 'to determine what statements the documents contain not for the truth of the matters asserted.'" *McKeefry*, 2019 WL 6498312, at *3 (alterations adopted) (quoting *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011)). However, courts have recognized that "it is proper to consider public documents on a motion to dismiss to determine whether claims are barred by

prior litigation." *Cowan v. Ernest Codelia, P.C.*, 2001 WL 856606, at *1 (S.D.N.Y. July 30, 2001); *see also Lucky Brand Dungarees Inc. v. Ally Apparel Resources LLC*, 2006 WL 3771005, at *1 (S.D.N.Y. Dec. 20, 2006) (same).

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). "The following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *LeChase Constr. Servs., LLC v. Escobar Constr., Inc.*, 2019 WL 2743637, at *6 & n.4 (N.D.N.Y. July 1, 2019) (citing cases); *see also Semente v. Empire Healthchoice Assurance, Inc.*, 147 F. Supp. 3d 117, 120 (E.D.N.Y. 2015) (providing that the "four corners" requirement "has been interpreted broadly" to include the four exceptions outlined above).

## DISCUSSION

Defendants make overlapping arguments for why they are entitled to dismissal. The Capital Defendants argue that (1) the action must be dismissed because the assignment to Lateral is void under New York Judiciary Law § 489(1) and, in any event, did not include statutory claims like Plaintiffs' RICO causes of action, which are based on unassignable usury claims; (2) *res judicata* and a settlement agreement compels dismissal of claims arising from the first two Green Capital agreements and all of the Midnight Capital agreements; (3) the RICO claims fail because there was no substantive RICO violation (including because that the agreements did not

violate New York's usury laws), the facts are not pleaded with sufficient particularity, and because the claims are at least partially time barred; and (4) Plaintiffs' fraud claim fails because Plaintiffs do not allege transaction causation (or reliance), a fraud claim cannot arise out of a misrepresentation made within a contract, and the fraud claim is at least partially time barred. *See* Dkt. No. 22.  Glass argues that (1) Plaintiffs fail to plead a distinct RICO enterprise; (2) the transactions are not loans and thus cannot charge usurious interest; and (3) Plaintiffs pleaded no wrongdoing by Glass.  *See* Dkt. No. 25.  Davis argues that (1) Plaintiffs have not made factual allegations that could support a fraud claim against him; (2) Plaintiffs' RICO claim fails because Plaintiffs cannot pursue a civil usury claim pursuant to New York law and thus cannot sustain a RICO claim, the claims are time barred, and the alleged facts do not establish Davis's role in the Enterprise or that he agreed to further its illicit goals; and (3) the RICO conspiracy claim fails because Plaintiffs have not sufficiently alleged a substantive violation of RICO or that Davis agreed to the alleged conspiracy.  Dkt. No. 27.

The Court will consider the motions together, as Plaintiffs did in their opposition.  *See* Dkt. No. 31.  It will first address the assignment of the claims to Lateral, followed by the contracts that may form the basis of Plaintiffs' claims; it will then address the RICO claims and the claims of the Individual Defendants.  Finally, it will address the fraud claim.  It addresses only those issues necessary to decide the present motions.

## I.    Lateral's Assignment

The Capital Defendants argue that Plaintiffs' action must be dismissed as "illegal, champertous, and void" under New York Judicial Law § 489(1), asserting that the "primary purpose of the assignment was Lateral's intent to sue on the assigned claims."  Dkt. No. 22 at 2–3.  In addition, they argue that Lateral lacks standing for the statutory claims of RICO and usury because FTE, as assignors, did not assign any statutory claims to Lateral.  *Id*. at 4–5.  Finally,

they assert that the usury claims and defenses are not assignable.  *Id.* at 6.  Plaintiffs argue that

this is a "largely academic point" as "the Amended Complaint added the assignors . . . as

Plaintiffs."  Dkt. No. 31 at 46–47.  Plaintiffs further argue that Section 489(1) is not applicable to

the assignment to Lateral and that ambiguity in the assignment of claims must be resolved by

ascertaining the parties' intent.  *Id.* at 48–49.

For the reasons stated below, the Court cannot consider the assignment contract to Lateral

or the Capital Defendants' affirmative defense of champerty at this stage because "material

disputed issues of fact regarding the relevance of the document" prevent the argument from

being addressed on a Rule 12(b)(6) motion to dismiss.  *See Faulkner v. Beer*, 463 F.3d 130, 134

(2d Cir. 2006).  Consideration of the Foreclosure Agreement is, however, appropriate for

determining whether Plaintiffs assigned statutory claims to Lateral because no material disputed

issues of fact exist for that issue.  After review, the Court concludes that the terms of the

Foreclosure Agreement includes the RICO claims.  Because the Capital Defendants have not met

their burden of proving champerty at this stage and the Foreclosure Agreement is otherwise

presumed valid, Lateral has both prudential and constitutional standing to assert its claims.

## A.    Champerty

New York courts have described champerty as an affirmative defense.  *See Bluebird

Partners, L.P. v. First Fid. Bank, N.A.*, 94 N.Y.2d 726, 729 (2000) (describing champerty as a

"an affirmative defense").  The defense of champerty can be found in New York Judicial Law

§ 489(1), titled "Purchase of claims by corporations or collection agencies," which provides:

> *No person or co-partnership*, engaged directly or indirectly in the business of
> collection and adjustment of claims, *and no corporation or association*, directly or
> indirectly, itself or by or through its officers, agents or employees, *shall solicit, buy
> or take an assignment of*, or be in any manner interested in buying or taking an
> assignment of a bond, promissory note, bill of exchange, book debt, or other *thing
> in action, or any claim or demand*, *with the intent and for the purpose of bringing
> an action or proceeding thereon*; provided however, that bills receivable, notes

receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise.

N.Y. Judiciary Law § 489(1) (emphasis added).  The New York Court of Appeals has interpreted Section 489 as "restrict[ing] individuals and companies from purchasing or taking an assignment of notes or other securities 'with the intent and for the purpose of bringing an action or proceeding thereon.'"  *Justinian Cap. SPC v. WestLB AG*, 65 N.E.3d 1253, 1256 (N.Y. 2016) (quoting N.Y. Judiciary Law § 489).  In addition, "to constitute the offense of champerty[,] the *primary purpose* of the purchase must be to enable one to bring a suit, and the intent to bring a suit must not be merely incidental and contingent"  *Id.* (quoting *Moses v. McDivitt*, 88 N.Y. 62, 65 (1882)) (alterations adopted) (emphasis in original).  In other words, the assignment of a claim is champertous when "the lawsuit was not merely an incidental or secondary purpose of the assignment, but its very essence."  *Id.* at 1257.  New York courts thus distinguish "between acquiring a thing in action in order to obtain costs[, which is champerty,] and acquiring it in order to protect an independent right of the assignee."  *Id.* at 1256 (quoting *Tr. for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*, 918 N.E.2d 889, 894 (N.Y. 2009)).[14]  The defendant bears the burden of proving champerty.  *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2020 WL 1285783, at

---

[14] There is a safe harbor provision from champerty if the assignee pays, or has a "binding and *bona fide* obligation" to pay a "'purchase price of at least five hundred thousand dollars' . . . . independent of the successful outcome of the lawsuit."  *Id.* at 1258; *see also* N.Y. Judiciary Law § 489(2); *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2020 WL 1285783, at *11 (S.D.N.Y. Mar. 18, 2020) (describing the safe harbor provision).  This provision is immaterial to this Court's decision given the Court's conclusion that the defense of champerty may not be resolved on the pleadings.

*11 (S.D.N.Y. Mar. 18, 2020).  Further, it is "presum[ed] that a debt is purchased for legitimate purposes."  *Elliott Assocs., L.P. v. Republic of Peru*, 948 F. Supp. 1203, 1209 (S.D.N.Y. 1996).

The Capital Defendants argue that the assignment of claims to Lateral constitutes champerty based on exhibits including an affidavit submitted by Richard de Silva, a managing member of Lateral, in a separate suit in New York state court.  That affidavit includes an attached copy of the Foreclosure Agreement.  Dkt. No. 23-4.  Defendants also submit as an attachment the LLC registration of Lateral in Delaware.  Dkt. No. 23-5.  As a preliminary matter, the Court must determine whether it may properly consider these materials, which the Capital Defendants submitted as Exhibits C and D of a declaration submitted in support of their motion to dismiss.  Dkt. No. 22 at 3; Dkt. Nos. 23-4–23-5.  While neither of the parties has addressed the issue, the Court may not consider any of these materials—and particularly the Foreclosure Agreement—for the purposes of resolving Capital Defendants' affirmative defense of champerty.  Such materials must be considered on a motion for summary judgment as to the champerty defense.  Fed. R. Civ. P. 12(d).

The Foreclosure Agreement, the Delaware registration, and de Silva's affidavit do not qualify for any of the four means by which a court may consider materials outside the complaint.  First, none of the materials are attached to the Amended Complaint.  Second, the Foreclosure Agreement is not incorporated by reference in the Amended Complaint.  The sole mention of the Foreclosure Agreement occurs in Paragraph 118 of the Amended Complaint, which describes Lateral's interest in the collateral of the other Plaintiffs following the default of FTE.  The paragraph states that:

> In or around July 2019, FTE defaulted under the terms of the Credit Agreement [dated October 28, 2016 and thereafter amended or supplemented].  Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE

44

agreed to surrender and turn over its interest in the collateral including, without limitation, the claims asserted herein.

Dkt. No. 20 ¶ 118.  Prior to Paragraph 118, the Amended Complaint states that:

Lateral, as administrative agent for the lenders, entered into a Credit Agreement . . . pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount . . . , which was approximately $50 million as of July 2019.

*Id*. ¶ 115.  There is no mention of the "Foreclosure Agreement" in the Amended Complaint aside from Paragraph 118.  For the purposes of incorporation by reference, "[a] mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself."  *SEC v. Medallion Fin. Corp.*, 2022 WL 3043224, at *1 (S.D.N.Y. Aug. 2, 2022).  "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents."  *Helprin v. Harcourt*, Inc., 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003).  The Amended Complaint does not quote or even base its primary allegations on the Foreclosure Agreement, and it references the Foreclosure Agreement only once—hardly enough to constitute "substantial" reference.  *Cf. Helprin*, 277 F. Supp. 2d at 331 (finding that document was related when it "makes several substantial references to the Agreement, . . .  quot[es] certain paragraphs of the Agreement verbatim[,] and the Complaint is based mainly on interpreting specific terms of the Agreement").  This lone paragraph is insufficient to conclude that the Amended Complaint incorporates the Foreclosure Agreement by reference.  In addition, there is no reference in the Amended Complaint to de Silva's affidavit. Finally, while there is a single reference to the fact that "[a]t all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware," Dkt. No. 20 at ¶ 14, there is no reference specifically to Lateral's registration statement, let alone a quotation from it. That single paragraph—otherwise immaterial to the claims asserted in the Amended Complaint—is not enough to show that Lateral's registration statement was incorporated by

reference.  *See Medallion Fin. Corp.*, 2022 WL 3043224, at *1; *Berkley v. City of New Rochelle*, 2022 WL 784018, at *2 (S.D.N.Y. Mar. 15, 2022) (concluding that a limited reference, let alone quotation, to a single phone call was not incorporated by reference).

Third, while the Foreclosure Agreement is arguably "integral" with respect to Plaintiff Lateral's claims, material issues of fact prevent the Court from considering the Foreclosure Agreement at the motion to dismiss stage with respect to the champerty defense.  The registration statement and de Silva's affidavit are not integral to the Amended Complaint. "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  "A 'necessary prerequisite' for taking into account materials extraneous to the complaint 'is that the plaintiff rely on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough.'" *Id.*  (quoting *Global Network* Commc'ns, 458 F.3d at 156).  "This generally occurs when the material considered is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* (quoting *Global Network Commc'ns, Inc.*, 458 F.3d at 157).  All of Lateral's claims "stand[] or fall[]" on the obligations in the Foreclosure Agreement.  If the assignment is void, Lateral itself has no claims.  *Id.*  Lateral thus relies on the terms and effect of the Foreclosure Agreement to sustain its claims—as evinced by Paragraph 118 of the Amended Complaint—and clearly had notice of the Foreclosure Agreement.  And the Foreclosure

Agreement bears a signature from Lateral's Manager, de Silva.  *Cf. Chambers*, 282 F.3d at 154

(finding that certain Codes were not integral when "the Amended Complaint does not refer to the

Codes, plaintiffs apparently did not rely on them in drafting it, and none of the Codes submitted

to the court were signed by the Record Companies.").

Despite the Foreclosure Agreement's "integral" nature, however, Lateral should "have an

opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The

exception for materials "integral" to a complaint does not apply where there are "material

disputed issues of fact regarding the relevance of the document."  *Faulkner*, 463 F.3d at 134.

"This principle is driven by a concern that a plaintiff may lack notice that the material will be

considered to resolve factual matters."  *Nicosia*, 834 F.3d at 231.  Here, the affirmative defense

of champerty requires an assessment of more than the terms contained within the four corners of

the contract—the analysis entails looking at the "actual purpose and intent" of the parties

involved.  *Justinian Cap. SPC*, 65 N.E.3d at 1255 (internal quotation marks and citation

omitted); *see also* N.Y. Judiciary Law § 489(1) (containing specific requirement of "with the

intent and for the purpose" for champerty defense).  For that reason, resolution of the champerty

defense generally occurs after some discovery and on summary judgment.  *See*, *e.g.*, *Phoenix

Light SF Ltd.*, 2020 WL 1285783, at *3 (considering champerty on summary judgment after

previously denying motion to dismiss on the basis of champerty without prejudice so that more

discovery could take place); *CIBC Bank & Tr. Co. (Cayman) v. Banco Cent. do Brasil*, 886 F.

Supp. 1105, 1111 (S.D.N.Y. 1995) (noting that courts "on occasion" have found a champertous

assignment on a motion to dismiss but declining to do so); *Justinian Cap. SPC*, 65 N.E.3d at

1255 (explaining that summary judgment was granted only after "champerty-related discovery

was complete").

This case requires "champerty-related discovery." *Justinian Cap. SPC*, 65 N.E.3d at 1255. Plaintiffs have presented clear "questions of fact surrounding [Lateral]'s actual purpose and intent in purchasing the [claim] that require further discovery to resolve." *Id.* (internal quotation marks and citation omitted). This includes their assertion that Lateral, as an agent for the lenders, had entered into a "Credit Agreement" with the other Plaintiffs nearly three years earlier in October 2016, Dkt. No. 20 ¶ 115, where FTE's obligations "were secured by the grant of a security interest in substantially all of FTE's assets," *id.* ¶ 116, and that Lateral had perfected those interests, *id.* ¶ 117. Plaintiffs' statement in the Amended Complaint that Lateral existed in 2016 is in conflict with Capital Defendants' assertion—based on Lateral's Delaware registration statement—that Lateral did not exist until shortly before it had signed the Foreclosure Agreement in 2019, Dkt. No. 22 at 3. Plaintiffs' additional allegations regarding Lateral's behavior are material and possibly show that Lateral's "purpose and intent" of its assigned claim was to "protect an independent right" rather than simply "obtain costs," *Justinian Cap. SPC*, 65 N.E.3d at 1256 (citation omitted). Even the quoted excerpt from de Silva's affidavit in Capital Defendants' memorandum in support of their motion is not as unambiguous as they make it seem: "Lateral Recovery was organized, *among other reasons*, for the specific purpose of taking possession of and pursuing certain commercial claims." Dkt. 24-3 at ECF 2 (emphasis added). Those "other reasons" could provide a basis for showing that Lateral's assignment did not constitute champerty. Because material disputes of fact exist with respect to the relevance of the Foreclosure Agreement for assessing the champerty defense, the Court declines to consider the Foreclosure Agreement at the motion to dismiss stage despite its "integral" nature.

Finally, while the Court can take judicial notice of Exhibits C and D, it may not rely on them for the truth of the matter asserted. Defendants attempt to introduce the Foreclosure

Agreement by submitting an affidavit supporting a motion in an action in New York state court involving assorted members of Plaintiffs and Defendants, including other parties not involved in the current suit.  Dkt. No. 23-4.  "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (stating that it is proper to take judicial notice of regulatory filings as long as it is not for the truth of the matter asserted).  Here, Defendants attempt to assert the truth of the matter asserted in all three documents.  They argue, based on de Silva's affidavit, that "Lateral Recovery . . . was organized, among other reasons, for the specific purpose of taking possession of and pursuing certain commercial claims."  Dkt. No. 23-4 at ECF 2.  The motion to dismiss cites the Foreclosure Agreement to claim that "Lateral took nothing under the alleged assignment," Dkt. No. 22 at 3, "Lateral did not pay for the assignment," *id.*, "[t]he assignment contract states that Lateral will be entitled to any recovery under $25 million dollars, and any recovery in excess of $25 million shall be paid over to the Assignors," *id*.  Similarly, Defendants rely on the date of registration in Lateral's registration document as truth.  *Id*.  While the Court may take judicial notice that the contract, affidavit, and registration document were filed and contain certain information, it may not rely on truth of the matters asserted within them, as Defendants urge the Court to do.  In short, the Court may not consider the Foreclosure Contract, affidavit, or registration statement, in this manner to support the Capital Defendants' motion to dismiss.

Because Defendants have not met their burden on their affirmative defense, and because the assignment is presumed valid, Lateral has an interest in this dispute.  Thus, at this stage, Lateral also has standing to bring its claims.

### B.      Assignment of Statutory Claims

Because there are no material disputed issues of fact over the scope of the Foreclosure Agreement with respect to the claims it assigned to Lateral, the Court may consider the Foreclosure Agreement for that purpose.  That is, while the defense of champerty requires an exploration of the intent and purpose of the assignment contract, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" for contract interpretation under New York law. *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).  Moreover, under New York law, "the question of whether a written contract is ambiguous is a question of law for the court."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  And when "interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions."  *Id.* (quoting *Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998)).  "However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered."  *Id.* "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) (quoting *Am. Home. Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006)).  The Court has already

determined that the Foreclosure Agreement is integral to Lateral's claims.  But as opposed to

champerty, no discovery (unless the contract is ambiguous) is required to interpret the contract—

there are no "material disputed *issues of fact* regarding the relevance of the document" with

respect to its coverage.  *Faulkner*, 463 F.3d at 134 (emphasis added).

The Foreclosure Agreement includes the assignment of statutory claims because

"commercial tort claims," as defined in this context, does not specifically exclude torts rooted in

statute.[15]  As an agreement concerning security interests in foreclosure, the Foreclosure

Agreement clearly contemplates that the term "commercial tort claim" or "commercial tort

litigation claim" will resemble its usage as a defined term in Article 9 of the UCC as part of the

"customs, practices, usages and terminology," *Nippon Yusen Kaisha*, 977 F. Supp. 2d at 349, of

agreements governing secured interests.[16]  *See, e.g.*, *Breckenridge Edison Dev., L.C. v. Sheraton

Operating Corp.*, 2015 WL 5459833, at *3 (S.D.N.Y. June 2, 2015) (describing references to

"commercial tort claims" when discussing collateral); *see also* N.Y. U.C.C. § 9-109(d)(12)

(providing that Article 9 does not apply to "an assignment of a claim arising in tort, other than a

---

[15] To the extent that the Capital Defendants assert that Lateral's UCC-1 financing statement
"states that the commercial tort claims were limited to claims against 'certain officers and
directors' of FTE," they are mistaken.  Dkt. No. 22 at 5.  The UCC-1 financing statement is not
limited to claims *against* the directors and officers—it includes claims "*arising from* the actions
of certain officers and directors of Debtor . . . taken in connection with alleged prior defaults of
the Credit Agreement."  Dkt. No. 23-6 at 2 (emphasis added).  That language includes, within its
scope, claims "against . . . various lenders."  Dkt. No. 23-4 at ECF 6.

[16] For those reasons, the cases cited by the Defendants that torts are limited to common law
claims are inapposite.  The cases that Defendants cite refer to the Notice of Claim requirement to
file a tort claim against municipalities in New York State.  *See, e.g.*, *Cirigliano v. Vill. of Afton,
N.Y.,* 2012 WL 2752867, at *9 (N.D.N.Y. July 9, 2012).  And even one of the cases cited in
*Cirigliano* indicates that the Notice of Claim requirement can apply to tort duties arising from
federal statute.  *See Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir.
1999) (applying New York Notice of Claim requirement to the Emergency Medical Treatment
and Active Labor Act).  Similarly, *Treanor v. Metro. Transp. Auth.*, 414 F. Supp. 2d 297
(S.D.N.Y. 2005), is inapposite because the Court there found that the discrimination claims at
issue bear no similarity to traditional tort claims.  *Id.* at 303.

commercial tort claim"); *id*. cmt. 15 (providing that "[t]his Article now applies to assignments of "commercial tort claims" (defined in Section 9-102) as well as to security interests in tort claims that constitute proceeds of other collateral"); *see also* N.Y. U.C.C. §§ 9-108, 9-204, 9-702, 9-319–9-322 (all making reference, in some form, to "commercial tort claims").  Article 9 specifically defines a "commercial tort claim" as "a claim arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual."  N.Y. U.C.C. § 9-102.  It is clear that the Plaintiffs are all "organizations" for the purposes of Article 9.  The relevant question is thus whether the claims "aris[e] in tort."  *Id*.

The Court does not find that the source of the tort—be it from statute or common law—bears on whether it is a claim that "aris[es] in tort" within the meaning of the Foreclosure Agreement.  While torts are typically rooted in common law, such torts can also be codified in statute.  All kinds of tort obligations are defined in statute.[17] Civil RICO—the primary claim that Plaintiffs assert here—is often described as one such "statutory tort."  *See*, *e.g.*, *Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989) ("Civil RICO is a statutory tort, so causation principles that generally apply in tort cases apply in civil RICO cases."); *see also Kaufman v. BDO Seidman*, 984 F.2d 182, 185 (6th Cir. 1993) (same); *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1988) ("Civil RICO is of course a statutory tort remedy—simply one with particularly drastic remedies."), *abrogated on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996); *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 340 (S.D.N.Y. 2009),

---

[17] *See generally* Guido Calabresi, Common Law Courts in the Age of Statutes (1982); Mark A. Geistfeld, *Tort Law in the Age of Statues*, 99 Iowa L. Rev. 957 (2014).

*aff'd sub nom. Maersk, Inc. v. Sahni*, 450 F. App'x 3 (2d Cir. 2011) ("A civil RICO claim closely resembles an action sounding in tort that would have been recognized as legal in 18th-century England."); *NSC Int'l Corp. v. Ryan*, 531 F. Supp. 362, 363 (N.D. Ill. 1981) (stating that RICO "resembles an action for tortious interference with economic relations"). There is no indication that Article 9 of the UCC intended to exclude commercial tort claims if they were rooted in statute. That would disallow security interests in commercial tort claims that a legislature has chosen to codify—a conclusion that would make no sense.

Moreover, courts often consider "commercial tort claims" to include violations of statute. *See*, *e.g.*, *Kenney v. Independent Order of Foresters*, 744 F.3d 901, 907 (4th Cir. 2014) (explaining that West Virginia unfair trade practices act claim "sounds in tort" given type of relief available under statute and sought in complaint); *In re JMF CAB, Inc.*, 614 B.R. 648, 651 (Bankr. D. Mass. 2020) ("[T]here are no allegations that JMF or any of the other plaintiffs in the Uber litigation contracted with Uber; rather, the claims are based on Uber's alleged violation of statutory, regulatory, and common law. Accordingly, the claims asserted in the Uber litigation are commercial tort claims."); *In re Connolly Geaney Ablitt & Willard, P.C.*, 585 B.R. 644, 653 (Bankr. D. Mass. 2018) ("Count IV of the Plaintiff's Complaint is a commercial tort claim as the Plaintiff alleges tortious conduct in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11."); *Ins. Co. of N. Am. v. Della Indus., Inc.*, 998 F. Supp. 159, 163 (D. Conn. 1998), *vacated on other grounds*, 229 F.3d 1135 (2d Cir. 1999) (construing the term "*arising* out of tort" to indicate the language "must be construed to cast a broader penumbra than torts alone" to encompass an unfair competition statutory claim (emphasis in original)); *see also In re Peaslee*, 91 N.E.2d 387, 390 (N.Y. 2009) (stating that it is New York's policy that the "UCC 'be liberally construed and applied to promote its underlying purposes and policies'" (citation omitted)). The first and

second causes of action—for RICO and RICO conspiracy—were thus assigned to Lateral in the Foreclosure Agreement.[18]  It is undisputed that the third cause of action for fraud was assigned to Lateral.[19]

## II.   Contracts Considered

In their memorandum of law in support of their motion to dismiss, the Capital Defendants argue that the Court should dismiss Plaintiffs' claims that arise from "the first two [Green Capital] Agreements and all of the [Midnight Capital] Agreements based upon *res judicata* and a settlement agreement with release."  Dkt. No. 22 at 19.  They explain that, after FTE breached

---

[18] The Foreclosure Agreement also assigns the RICO conspiracy claim to Lateral.  The Supreme Court has analogized common law civil conspiracy to RICO conspiracy as well.  *See Beck v. Prupis*, 529 U.S. 494, 504 (2000) ("We presume, therefore, that when Congress established in RICO a civil cause of action for a person "injured . . . by reason of" a "conspir[acy]," it meant to adopt these well-established common-law civil conspiracy principles").  Like RICO conspiracy, civil conspiracy is a claim recognized at New York common law as long as there is an underlying (tort) offense.  *See, e.g.*, *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010).

[19] Defendants also assert that usury claims are not assignable as a matter of law in New York. Dkt. No. 22 at 6.  The argument overstates New York law and misunderstands the claim in the Amended Complaint.  Under New York law, "[u]sury is a personal defense and may be asserted only by the borrower or those in privity with him." *Edelman v. Cymberg*, 27 N.Y.S.2d 151, 152 (3d Dep't 1941); *see also Thorer & Hollander v. Fuchs*, 272 N.Y.S. 350, 354 (1st Dep't 1934) ("A mere stranger cannot insist upon the invalidity of a usurious security, * * * but the defense of usury may be set up by any one who claims under the mortgagor, and in privity with him. . . ." (quoting *Williams v. Tilt*, 36 N.Y. 319, 325 (N.Y. 1867))).  The Amended Complaint alleges facts that would establish that the original "borrowers" here are in privity with Lateral—FTE's obligations under the Credit Agreement were secured by an interest in substantially all of FTE's assets, *id.* ¶ 116; Lateral properly perfected its interests, *id.* ¶ 117., and following FTE's default, FTE agreed to surrender and turn over its interest in the collateral including, without limitation, allegedly the claims asserted herein, *id.* ¶ 118.  More importantly, this case does not involve the assertion of usury as a defense, but the allegation of a violation of RICO as a claim, and RICO is not addressed to the mere collection of a loan that is usurious but to the operation of "the 'business of lending money' at a usurious rate," *Fleetwood Servs., LLC*, 2022 WL 1997207, at *18.  There is no dispute that RICO claims, unlike claims for usury, can be assigned.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2020 WL 1166055, at *2 (S.D.N.Y. Mar. 11, 2020), *vacated on other grounds*, 843 F. App'x 413 (2d Cir. 2021); *Zap Cellular, Inc. v. Kurland*, 2015 WL 8207315, at *6 (E.D.N.Y. Dec. 6, 2015); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 213, 217 (E.D.N.Y. 1999).

the Midnight Capital agreements, a judgment was entered against FTE in New York Supreme

Court, Richmond County, Dkt. No. 23-7, leading to litigation, a settlement agreement (the

"Settlement Agreement"), Dkt. No. 23-8, and a satisfaction of that judgment, Dkt. No. 23-9.  The

Capital Defendants contend that New York's transactional *res judicata* rule precludes these

claims in light of the judgment entered in Richmond County and that, "[w]here a New York

judgment has been entered that upholds a contract, *res judicata* explicitly bars subsequent claims

seeking to hold that contract void for usury."  Dkt. No. 22 at 20.  They also argue that the

Settlement Agreement, entered into on February 21, 2018, released Midnight Capital and

affiliated persons and entities from claims arising from or related to the Midnight Capital

agreements and the first two Green Capital agreements.  *Id.* at 21.

      Plaintiffs respond that the Settlement Agreement only applies to one transaction with

Midnight Capital, dated January 19, 2018, and that, by its terms, the Settlement Agreement's

release only applies to claims arising out of or relating to that January 19, 2018 transaction.  Dkt.

No. 31 at 44–46.  Because the Amended Complaint does not allege violations of law in

connection with this transaction, Plaintiffs argue, the Settlement Agreement's release does not

cover the claims asserted in the Amended Complaint.  *Id.*

      In reply, the Capital Defendants call Plaintiffs' argument "nonsensical," explaining for

the first time that the January 2018 Midnight Capital agreement superseded all prior agreements,

including the December 15, 2017 Midnight Capital agreement, which had itself superseded the

prior agreement.  Dkt. No. 34 at 26.  The Capital Defendants' position appears to be that, since

the prior agreements were superseded by the agreement that was the subject of the release, any

claims related to those superseded agreements are released as well.  And as to the Green Capital

agreements, the Capital Defendants read the Settlement Agreement's release language to include

Green Capital, an affiliate of Midnight Capital, from claims relating any *agreements* that are related.  Dkt. No. 34 at 27.  In support of their argument, the Capital Defendants point out that Plaintiffs' RICO claims are premised upon the contention that the agreements are related.  *Id.*  The Capital Defendants also reiterate that the any dispute over the Midnight Capital agreements is barred by *res judicata* and argue that Plaintiffs do not dispute that *res judiciata* bars challenges to the Midnight Capital agreements.  *Id.* at 26.

The Capital Defendants' argument based on the Settlement Agreement's release and on *res judicata* invokes affirmative defenses.  They do not challenge the sufficiency of Plaintiffs' allegations but argue that those claims cannot be pursued based on release and preclusion.  But, as noted above, "a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion [only] if the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Jones v. Bloomingdale's*, 2018 WL 1281819, at *3 (S.D.N.Y. Mar. 8, 2018) ("Affirmative defenses may be considered on a motion to dismiss 'only where the defense appears on the face of the pleading and the documents incorporated therein.'" (quoting *Levine v. Columbia Labs., Inc.*, 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004))).  "An affirmative defense of release may be raised under a Rule 12(b)(6) motion to dismiss provided that 'all relevant facts are shown by the court's own records.'"  *Nam*, 581 F. Supp. 3d at 647 (quoting *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005)).  Similarly, "[t]he affirmative defense of *res judicata* may be the basis of a motion to dismiss a pleading when it is clear from the records properly before the Court that the doctrine applies."  *Lucky Brand Dungarees Inc.*, 2006 WL 3771005, at *1 (S.D.N.Y. Dec. 20, 2006) (citing *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992)).

The Settlement Agreement upon whose release the Capital Defendants rely is neither attached to the Amended Complaint, nor it is incorporated by reference in it or integral to it.  As to its possible incorporation by reference, "[t]he fundamental difficulty here [for the Capital Defendants] is that the release is not referred to in the [Amended Complaint]."  *Levine v. Columbia Labs., Inc.*, 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004).  There is no mention in the Amended Complaint of the Settlement Agreement or the lawsuit that gave rise to the it.  *See id.* ("Although the complaint contains a passing reference to the Separation and Consulting Agreement [that contains the subject release], it would be inappropriate to regard it as incorporating that document by reference."); *Sahu*, 548 F.3d at 67 (explaining that "limited references are insufficient to incorporate documents or exhibits into the complaint").  Nor does the Amended Complaint rely on the Settlement Agreement such that it can be said to be integral to the Amended Complaint.  The Settlement Agreement does not impose obligations upon which Plaintiffs' claim rises or falls and is not "necessary" to the Plaintiffs' entitlement to relief— Plaintiffs are not, for example, alleging a breach of the Settlement Agreement in their claims.  *See*, *e.g.*, *Gallo v. Inter-Con Security Sys. Inc.*, 2021 WL 391539, at *2 n.2 (S.D.N.Y. Sept. 1, 2021) (concluding thata settlement agreement was integral to the complaint where the plaintiff claimed that the defendant had not adhered to obligations under the settlement agreement and "relie[d] heavily" on the agreement); *see also Goel*, 820 F.3d at 559 ("In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." (quoting *Global Network Commc'ns*, 458 F.3d at 157)).

There is also no basis to conclude that the Settlement Agreement is a publicly filed document or document filed in other litigation for which judicial notice can be taken. *See Wolson v. Rees Elsevier Inc.*, 2010 WL 334919, at *1 (S.D.N.Y. Jan. 29, 2010) (Chin, J.) (taking judicial notice of settlement agreement filed in another action but concluding that the determination whether instant claims are barred by the settlement agreement "will depend on further proceedings in this case"). The Settlement Agreement itself states that "[t]his Settlement Agreement, its terms and information contained herein is confidential." Dkt. No. 23-8 § 14. There is no stamp that indicates it was filed on the docket in a prior action, much less that it was publicly filed. *See Cowan*, 2001 WL 856606, at *1; *cf. Williams v. N.Y.C. Housing Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020) (summary order) (noting that "the district court accurately cited caselaw holding that it may consider public records that may be judicially noticed in ruling on motions made pursuant to Rule 12(b)(6)" and holding that "[t]he district court did not err in considering [plaintiff's] Article 78 petition and state court decision because they were public records, and thus appropriate for judicial notice"); *Byrd v. City of New York*, 2005 WL 1349876, at *1 (2d Cir. 2005) (summary order) (stating that, while stipulation of settlement that was "so ordered by the court" was permissibly considered as part of a Rule 12(c) motion to dismiss, it was "less clear whether the Release, which does not appear to have been filed with the court, would have been subject to judicial notice").[20] Because the Settlement Agreement does not

---

[20] Even if the Settlement Agreement had been filed with another court, it is not at all clear that the Court would be able to consider it for the purposes offered by the Capital Defendants. As the Second Circuit has repeatedly recognized, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Global Network Commc'ns.*, 458 F.3d at 157(quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

satisfy any of the categories of documents that the Court is permitted to consider on a motion to

dismiss, the Capital Defendants' arguments based on release must be denied.[21]

The Capital Defendants' *res judicata* argument also is not cognizable on this Rule

12(b)(6) motion to dismiss.  Even if the Court were to take judicial notice of the filings submitted

by the Capital Defendants, the relevant filings from the Richmond County litigation state only

that (1) FTE confessed judgment to Midnight Capital in the amount of $1,214,092.36 and such

judgment by confession was filed and docketed with the Richmond County Clerk on February 1,

2018, Dkt. No. 23-7; and (2) that judgment was wholly paid and fully satisfied on or before

February 23, 2018, Dkt. No. 23-9.  "Under both New York law and federal law, the doctrine of

*res judicata*, or claim preclusion, provides that [a] final judgment on the merits of an action

precludes the parties . . . from relitigating issues that were or could have been raised in that

action."  *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (summary order)

(quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir.

2010)).  "[U]nder New York's transactional analysis approach to res judicata, 'once a claim is

brought to a final conclusion, all other claims arising out of the same transaction or series of

transactions are barred, even if based upon different theories or if seeking a different remedy.'"

*In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005) (quoting *O'Brien v. City of Syracuse*, 429 N.E.2d

1158, 1159 (N.Y. 1981)).  The documents submitted by Defendants provide no basis from which

the Court could determine conclusively that the claims brought in this action "aris[e] out of the

same transaction or series of transactions."  *In re Hunter*, 827 N.E.2d at 274.

---

[21] Of course, this conclusion is without prejudice to the Capital Defendants renewing the
argument at a later stage of the proceedings better suited to the "fact-sensitive inquiry" of
whether a release is valid.  *Malaney v. Elal Israel Arilines*, 331 F. App's 772, 774 (2d Cir. 2009)
(summary order) ("[T]he validity of a release is a peculiarly fact-sensitive inquiry." (internal
quotation marks and citation omitted)).

Thus, at this juncture, the Capital Defendants cannot bar consideration of the two Midnight Capital agreements at issue in this dispute or the first two Green Capital agreements by invoking the affirmative defenses of release and *res judicata*.

## III.   RICO Claims

RICO Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). It further makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." *Id.* § 1962(d).

"Section 1964(c) of RICO . . . provides a private right of action to any person injured in its business or property by reason of a violation of the activities prohibited by section 1962." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *see also* 18 U.S.C. § 1964(c). As the statutory language suggests, "RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as a pattern of racketeering activity." *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). Plaintiffs allege that Defendants violated RICO in both ways. *See* Dkt. No. 20 ¶¶ 216–219, 260. They further allege that each Defendant "agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts," *id.* ¶ 280, and in order to commit wire fraud through a pattern of racketeering activity, *id.* ¶ 281, thereby violating 18 U.S.C. § 1962(d).

All Defendants seek dismissal of Plaintiffs' RICO and RICO conspiracy claims. They advance a variety of arguments. The Capital Defendants and Davis argue that at least some of the facts underlying Plaintiffs' RICO claims are time barred. The Capital Defendants also argue generally that Plaintiffs have not pleaded their RICO claims with sufficient facts—instead

making conclusory allegations and allegations "upon information and belief"—to make out

RICO claims, an argument that is considered in connection with each of the specific arguments

regarding RICO.  The Capital Defendants and Glass contend that Plaintiffs have not adequately

pleaded a RICO enterprise that consists of entities and individuals distinct from one another.

They further assert that a RICO claim cannot be sustained on the theory that the Defendants

participated in the collection of an unlawful debt because the agreements at issue here were not

loans and therefore could not violate the usury laws of New York.  Glass argues there was no

wrongdoing by him, and Davis argues he did not participate in the conduct that is objectionable.

### A.  Timeliness of RICO Claims

The Capital Defendants argue that, because RICO claims have a four-year statute of

limitations, Lateral's RICO claims from before November 11, 2017—four years before the initial

complaint was filed by Lateral "as assignee" of FTE—and FTE's RICO claims from before

February 17, 2018—four years before the Amended Complaint was filed by all Plaintiffs—are

time barred.  Dkt. No. 22 at 19.   Davis argues that the claims related to the purchase agreements

that were entered into more than four years before the initial complaint was filed on November

11, 2021 are time barred.  Dkt. No. 27 at 11–12.

Plaintiffs respond that the claims are not time-barred because of the relation-back rule

and the discovery rule.  Dkt. No. 31 at 32–35.  With respect to the relation-back rule, Plaintiffs

argue that the claims of the Plaintiffs other than Lateral in the Amended Complaint relate back to

the initial complaint filed by Lateral as assignee and that the claims of all Plaintiffs should relate

back to an arbitration that was previously filed and which case was deemed related to this one.

As to the discovery rule, Plaintiffs argue that FTE was unaware of the RICO injury through at

least late 2018 "and mistakenly thought it was paying on a valid contract."  *Id.* at 35.  The

Capital Defendants respond that: (1) Plaintiffs knew about the basis for their injury at the time

they entered into the agreements; (2) statutes of limitations are not tolled by the commencement and termination of an action, such as the arbitration, if the action is voluntarily dismissed and the arbitration was not consolidated with the case and just marked as related; and (3) there has not been a substitution of parties under Federal Rule of Civil Procedure 17(a), just a joinder, and thus the assignor Plaintiffs cannot take advantage of the date of Lateral's earlier-filed action.  Dkt. No. 34 at 24–25.

Defendants' arguments are premature.  For the most part, they are directed to a litigation in which the assignors, including FTE, are asserting claims and not to one in which Lateral is asserting claims and seeking damages.  But the Court has concluded that the motion to dismiss Lateral's claim must be denied and, as a result, the Amended Complaint cannot be dismissed because the claims of the other Plaintiffs are untimely—an issue that may well be moot if Lateral's claim continues to survive and that the Court therefore declines to consider at this stage.  The RICO statute of limitations is satisfied so long as an overt act that is part of the violation and injures the plaintiff occurs within the four years prior to the filing of a complaint asserting the RICO claim. *See Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725–26 (2d Cir. 2003) (summary order) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188–89 (1997)).

The initial complaint was filed by Lateral on November 11, 2021.  A collection of unlawful debt (as well as a RICO predicate act) is alleged to have occurred after November 11, 2017.  Accordingly, the motion to dismiss the Amended Complaint based on the statute of limitations is denied.[22]

---

[22] Because Lateral is still properly in this suit, the Court need not consider whether the claims should be measured from the date that other plaintiffs entered the suit through the Amended Complaint.  And because there is one of each relevant form of agreement that was entered into after this date, the Court need not consider at this juncture whether an earlier accrual date for

### B.      Merits of RICO

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18

U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the

violation of Section 1962." *Cruz v. FX DirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)

(quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)).  To plead a violation of Section

1962, a complaint must allege that the defendant engaged in (1) conduct (2) of an enterprise (3)

through either: (a) a pattern of racketeering activity—requiring a pleading both of pattern and

racketeering activity; or (b) collection of an unlawful debt.  *See id.*; *Lateral Recovery LLC v.*

*Queen Funding, LLC*, 2022 WL 2829913, at *2 (S.D.N.Y. July 20, 2022); 18 U.S.C. § 1962(c).

Because RICO "contemplate[s] that a *person* violates the statute by conducting an enterprise

through a pattern of criminality," *Cruz*, 720 F.3d at 120, a plaintiff must also plead "the existence

of two distinct entities: (a) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

referred to by a different name," *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017)

(quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 61 (2001)).

The Court first considers whether Plaintiffs have adequately pleaded the collection of an

unlawful debt.  Concluding that Plaintiffs have pleaded the collection of an unlawful debt, the

Court then considers whether the Amended Complaint alleges that Defendants engaged in

"conduct" of an "enterprise" through this collection and that there are "two distinct entities."

*Cruz*, 720 F.3d at 121 (internal quotation marks omitted).  Because the Court concludes that

Plaintiffs have pleaded a predicate RICO violation through a collection of an unlawful debt, it is

---

statute of limitations purposes would be appropriate either under the discovery rule or by relating
back the filing of the initial complaint in this action to the commencement of the arbitration-
related suit.

unnecessary for the Court to examine whether Plaintiffs have pleaded a pattern of racketeering activity.

### 1.      Predicate RICO Violation – Collection of Unlawful Debt

As explained above, Section 1962(c) of RICO makes it unlawful for a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."  18 U.S.C. § 1962(c).  An "unlawful debt" for the purposes of RICO means, in relevant part:

> a debt (A) . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

*Id.* § 1961(6).

Although violation of the unlawful-debt-collection provision of RICO "may be predicated on a single instance of collection of unlawful debt," *Grote*, 961 F.3d at 119, RICO "does not reach the collection of a loan that is made occasionally and not as part of the 'business of lending money' at a usurious rate," *See Fleetwood Services, LLC v. Ram Capital Funding, LLC*, 2022 WL 1997207, at *18 (S.D.N.Y. June 6, 2022).  "That is, '[t]he first part of § 1961(6) requires that "unlawful debt" either (1) be incurred or contracted in some form of illegal gambling activity or (2) be enforceable by virtue of state or federal usury laws.  The second part—subsection (B)—further narrows the definition, requiring, *inter alia*, that the "unlawful debt" be incurred in connection with an illegal "business."'"  *Id.* at *18 (quoting *United States v. Persico*, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011); *see also Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).

"[T]o prove that what was collected was an unlawful debt within the meaning of RICO, [a plaintiff] would have to show that [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate." *Durante Bros.*, 755 F.2d at 248; *see also Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018) (summary order).  "Under New York law, a loan is criminally usurious if it has an annual interest rate exceeding 25%, N.Y. Pen. L. § 190.40, and such a usurious loan is void and unenforceable, *see Adar Bays, LLC*, 179 N.E.3d at 616." *Fleetwood*, 2022 WL 1997207, at *20.

Defendants dispute only that the agreements are loans that could be subject to usury laws. Plaintiffs have alleged that, on their faces, the relevant agreements have interest rates that are more than twice the enforceable rate under New York law; Defendants do not dispute that this would be true if the agreements are loans.  Plaintiffs have also alleged facts from which it can be inferred that Defendants' transactions are not merely episodic but reflect that Defendants are in the business of lending money at usurious rates, and Defendants do not dispute that entering into the types of transactions at issue here is a regular part of their business.  Thus, the dispositive issue for the purposes of Plaintiffs' RICO claims is whether a collected debt was a loan subject to usury laws.

### a.      Legal Principles

The Capital Defendants and Glass contend that the agreements cannot form the basis of collection of unlawful debt RICO violation because the agreements are not loans but rather are sales of future receivables.  If they are not loans, Defendants argue, the agreements cannot be usurious.  That is because under New York law, "[i]f the transaction is not a loan, 'there can be

no usury, however unconscionable the contract may be.'"  *Seidel v. 18 E. 17th Street Owners,*

*Inc.*, 598 N.E.2d 7, 11–12 (N.Y. 1992) (quoting *Orvis v. Curtiss*, 52 N.E. 690, 691 (N.Y. 1899)).

      The Court has recently considered the principles applicable to whether a funding

agreement constitutes a loan or is a sale of future receivables.  *See Fleetwood*, 2022 WL

1997207.  The analysis "usually is guided by examining three factors to 'determine whether

repayment is absolute or contingent: (1) whether there is a reconciliation provision in the

agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse

should the merchant declare bankruptcy.'"  *Id.*, at *9 (quoting *LG Funding, LLC v. United Senior

Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dep't 2020)).  "The three factors provide only

a guide to [the] analysis[;] [t]hey do not dictate the conclusion," and they operate in tandem.  *Id.*

(citing cases); *see also Haymount Urgent Care PC v. GoFund Advance,* --- F. Supp. 3d ---, 2022

WL 2297768, at *7 (S.D.N.Y. June 27, 2022) (explaining that "while these three factors may be

relevant to the analysis, they are far from dispositive," and citing with approval *Fleetwood*'s

language that "[t]he three factors provide only a guide to [the] analysis.  They do not dictate the

conclusion.").  The Court applies familiar principles of contract interpretation.  It reads the

agreement as a whole, and "substance—not form—controls."  *Adar Bays, LLC v. GeneSYS ID,*

*Inc.*, 179 N.E.3d 612, 621–22 (N.Y. 2021).  It thus is not sufficient that that agreement is stated

to have a reconciliation provision, an indefinite term, and be non-recourse if those provisions are

illusory.  *See Queen Funding*, 2022 WL 2829913, at *5–6 (holding that complaint pled that an

agreement was a loan because it sufficiently and plausibly alleged that a reconciliation provision

was a "sham" and that, while the agreement had a "seemingly indefinite term," "a de facto fixed

term plausibly exists"); *Haymount*, 2022 WL 2297768, at *7 (holding that an agreement was a

loan notwithstanding a reconciliation provision because "the actual structure of the provision

makes it often impossible to use and leaves the lender with substantial discretion to prevent adjustment"); *Fleetwood*, 2022 WL 1997207, at *13 (holding that an agreement was a loan where, while it nominally had a reconciliation provision, that provision was largely illusory); *Davis v. Richmond Capital Grp., LLC*, 150 N.Y.S.3d 2, 4 (1st Dep't 2021) (holding that a complaint sufficiently alleged that agreements were loans subject to usury laws based on, among other things, the discretionary nature of the reconciliation provisions and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's inability to pay or bankruptcy). The Court judges the agreement "by its real character, to determine whether it constitutes a loan." *Fleetwood*, 2022 WL 1997207, at *9 (alterations adopted) (internal quotation marks omitted) (quoting *LG Funding, LLC*, 122 N.Y.S.3d at 313). Ultimately, the three guides reduce to one overarching principle. "The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all circumstances,' or put otherwise, the 'principal sum is repayable absolutely.'" *Id.* at *9 (internal quotation marks omitted) (quoting *LG Funding, LLC*, 122 N.Y.S.3d at 312). The root of the analysis involves the question of "whether the transaction involves a transfer of risk." *Id.* at *10; *see Haymount*, 2022 WL 2297768, at *7 (stating that "the *LG Funding* decision's holding is ultimately about whether the transaction represented a real transfer of risk"); *Queen Funding*, 2022 WL 2829913, at *4 ("[W]hen determining whether a transaction was a true sale of receivables or a loan, '[t]he root of [the analysis] is the transfer of risk.'" (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995))). As the New York Court of Appeals recognized just last year, "parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors." *Adar Bays, LLC*, 179 N.E.3d at 622; *see also OriginClear Inc. v. GTR Source, LLC*, 2021 WL 5907878, at *5 (W.D.N.Y. Dec. 14, 2021) ("[T]he primary indicator of a loan is the

debtor's absolute obligation to repay the principal sum without risk to the creditor of the debtor's business failure.").

The Court rejects the argument of the Capital Defendants that this Court in *Fleetwood*—and presumably the courts in *Haymount* and *Queen Funding*—misconstrued New York law. Dkt. No. 39 at 1–2. The argument rests on the premise that "the Court held that a buyer of accounts receivable must prove that a transaction is a 'true sale' under *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995)." *Id.* at 2. That argument is mistaken. Rather than holding that a merchant "must prove that a transaction is a 'true sale' under *Endico Potatoes*," *id.* at 2, the Court explained that "the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances,'" *Fleetwood*, 2022 WL 1997207, at *9 (quoting *LG Funding*, 122 N.Y.S.3d at 312). The Court noted that the three factors set forth in *LG Funding* usually guides the analysis but that the factors set forth under *Endico Potatoes* may also help the Court conclude whether the debt was repayable absolutely or whether the purported purchaser actually took on some risk that the merchant would be unable to pay. *Id.* at *9–10. The Court did not base its conclusion solely on the *Endico Potatoes* factors; it expressly stated that under either sets of factors, the agreement was a loan: "*Whether the Court looks to the* LG Funding *or* Endico Potatoes *factors, the result here is the same.*" *Id.* at *10 (emphasis added).[23]

---

[23] Nor do the New York cases appended in the Capital Defendants' supplemental briefing letter support their proposition that *Fleetwood* is contrary to New York law. The first, *National Risk Experts, LLC v. GHI Funding, LLC*, Index No.: 616193/2021, Nassau Cnty. (Aug. 12, 2022), simply states that court's view that the particular agreement at issue there was a loan and that "the binding precedents [of New York] indicate" that the case will not be kept alive by "a Southern District case." Dkt. No. 39-1 at 6. It says nothing about the mode of analysis employed in *Fleetwood*. The second, *Spin Capital v. Texas Medical Center*, Index No.:130439-2021, Monroe Cnty. (Aug. 29, 2022), says nothing more than that the defendants' "post-reply

Indeed, just last month, the analysis employed in *Fleetwood*, *Haymount*, and *Queen Funding* was endorsed by one New York court, which reconsidered its prior decision denying a motion to vacate a default judgment on the grounds that an agreement giving rise to judgment the was really a usurious loan.  *See Hi Bar Capital LLC v. Parkway Dental Servs., LLC*, 2022 WL 3757589 (Sup. Ct. Kings Cnty. Aug. 25, 2022).  On reargument, the court granted a motion to vacate the default judgment, explaining that "the specific provisions challenged"—including a reconciliation provision that defendants asserted was "functionally impossible to implement"— "do not by themselves raise any issues concerning the agreement," but that "there are other arguments presented which raise significant defenses whether the agreement in this case is really a high-interest loan."  *Id.* at *3.  The court continued: "Recently, Federal courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling."  *Id.*  The court cited heavily from *Fleetwood* and compared provisions in agreement at issue there to the provisions this Court found relevant in *Fleetwood*, including provisions that a default occurs upon only a limited number of instances of insufficient funds and granting a security interest in all assets.  *Id.* at *3–4.  It then concluded: "[i]n this case, there are surely questions raised whether the agreement comports with the requirements necessary to be considered a genuine cash advance agreement."  *Id.*[24]

---

submissions," which the Court assumes for present purposes to include *Fleetwood* "do not convince this Court to abandon" a case where an attempt to set aside a confession of judgment based upon the argument that a merchant cash advance agreement was really a usurious loan was rejected.  Dkt. No. 39-2 at 8–9.  It too does not say anything about *Fleetwood*'s analysis.

[24] In his dissenting opinion in *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, Judge Wilson expressed similar views:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring agreements, in that

**b.        Application**

The Court considers each form of the agreements to determine whether the agreement is a

loan.  Considering each relevant agreement "in its totality" and "judging [it] by its real

character," *LG Funding*, 122 N.Y.S.3d at 312 (internal quotation marks omitted), the Court

concludes that the Form Two agreements are loans on their face, the Form Three agreements are

not loans, and it is ambiguous whether the Form One agreements are loans and thus the issue

cannot be decided as a matter of law and parol evidence must be taken.  Accordingly,

Defendants' motion based on the argument that the Amended Complaint fails to allege the

unlawful collection of debt is denied.

**i.        Form Two Agreement**

There are three "Form Two" agreements alleged, but only one that was entered into after

November 2017: the December 15, 2017 agreement with Midnight Capital, Dkt. No. 23-13.  This

agreement is a loan.  And as a loan, the 300% annual interest rate on its face renders it usurious.

The Form Two agreements share certain characteristics with the other forms of

agreements.  In both Form One and Form Two agreements, FTE, not the account debtors, is

understood to be responsible "for ensuring the specified percentage"—which is initially set as

fixed daily amount—is "debited by [the funder] remains in the account."  *See, e.g.*, Dkt. No. 23-

13 at 1; Dkt. No. 23-20 at 1; *see also Fleetwood*, 2022 WL 1997207, at *10.  In both, the

---

FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS
did not collect any receivables; GTR and CMS received fixed daily withdrawals
from FutureNet's bank account regardless of whether or how much FutureNet
collected from or billed to its clients; and GTR and CMS did not bear the risk of
nonpayment by any specific customer of FutureNet.  The arrangements FutureNet
entered with GTR and CMS appear less like factoring agreements and more like
high-interest loans that might trigger usury concerns.

183 N.E.3d 1185, 1196 (N.Y. 2021) (Wilson, J. dissenting).

funder's remedies for a failure by FTE in its obligation under the agreements include the enforcement of a Personal Guaranty of Performance against guarantors, a security interest in FTE's assets, and the filing of a confession of judgment with the court.  *See, e.g.*, Dkt. No. 23-13 § 1.10; Dkt. No. 23-20 § 1.10 ("Protections against Default").  Also, in all forms of agreements, the funders themselves "ha[ve] no obligation, or (ordinarily no) right, to collect on the 'receivables.'  That obligation rests entirely on [FTE] . . . [The relevant funder] has no responsibility to contact [FTE's] customers; indeed, it is given the right to collect directly from them only in the event of a default" or violation of a specified subsection of the agreement. *Fleetwood*, 2022 WL 1997207, at *11; *see, e.g.*, Dkt. No. 23-13 § 1.9 (granting the funder the power of attorney to settle obligations due from merchant "in case of a violation by Merchant of Section 1.12 or on the occurrence of an Event of Default"); Dkt. No. 23-20 § 1.9 (granting the funder the power of attorney to settle obligations due from merchant "in the case of a violation by Merchant of Section 1.10 or the occurrence of an Event of Default"); Dkt. No. 23-18 § 32 (granting the funder power of attorney to, "upon occurrence of an Event of Default to perform any and all obligations of [merchant] under this Agreement").

Those features of the agreements are not alone dispositive of their characterizations as a loan or a sale of receivables.  A legitimate agreement for the sale of receivables can, and in many cases will, place the obligation to collect the receivables on the merchant in the first place and provide remedies such as those set forth in the agreements if the merchant fails in its obligations.

The critical features of the Form Two agreements, which dictate its characterization, are those that relate to the operation of the reconciliation provision, the de facto term of the agreement, and the recourse should the merchant declare bankruptcy.  In the case of the Form Two agreements, the effect of the agreements is that if either the merchant terminates or

interrupts its business or the merchant fails to make its fixed daily payments more than twice, the obligation to pay the full unpaid Purchased Amount accelerates and the funder is made whole for that amount.  And if the merchant declares bankruptcy, it is still bound by its obligations under the agreement, and the guarantor's obligations become due.  The effect is that the agreement has a "de facto fixed term," *Queen Funding*, 2022 WL 2829913, at *6, the lender is absolutely entitled to repayment under all circumstances, and the only risk that the lender takes on is the credit risk of the borrower and the guarantor.  There is no transfer of risk.

As in the other agreements, the Form Two agreements define the "Specified Percentage" as a fixed amount—of $15,999 per business day in the December 15th agreement— and define it as the obligation of the merchant (FTE) for ensuring that such amount remains in the designated account so as to pay the funder on a daily basis.  The Form Two agreement, however, provides both that the merchant "understands that it is responsible for ensuring that the specified percentage to be debited by [the funder] remains in the account," Dkt. No. 23-13 at 1—language that, as explained in connection with the Form One agreement, may be read to impose a covenant that there shall never be insufficient funds—and also that a default occurs after there are insufficient funds in the merchant's bank account for a withdrawal just three times.  *Id.* at 8 ("**D. NSF Fee: $35.00 each occurrence** (up to two occurrences before a default is declared)").  And upon a violation of "any term or covenant in" that agreement or a default "under any of the terms, covenants and conditions of any other agreement with [the funder]," the "Specified Percentage" becomes 100% of the Purchased Amount and an "Event of Default" takes place. The funder may exercise "all rights, powers and remedies of [the funder] in connection with" the agreement.  *Id.* §§ 3.1(a), (j); 3.2.  In particular, the "full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement [become]. . . due and

payable in full immediately." *Id.* § 1.10.  In addition, the funder may: enforce "the provisions of the Personal Guarantee of Performance against the Guarantor"; enforce the funder's "security interest in the Collateral identified in the Security Agreement herein"; and enter "[a] confession of judgment [in favor of the funder in the amount of the Purchase Amount] as a judgment with the Clerk of the Court and execute theron." *Id.*  Thus, in the event that for any three business days the merchant fails to make a payment owed—regardless of the receivables it receives—the funder can accelerate the full Purchase Amount and collect it not from the account debtors but from the merchant itself.  A merchant cannot avoid a default because they do not have sufficient funds to pay by temporarily or permanently shutting down its business.  Both instances constitute an Event of Default under the agreement. *See id.* §§ 3.1 (naming as "Events of Default" interrupting, suspending, dissolving, or terminating the business); *See id.* §§ 1.10(d) (allowing "Protections against Default," including the full uncollected Purchased Amount becoming automatically due and payable, to be invoked if the merchant interrupts the operation of the business without the express written consent of the funder *and* the written agreement of a purchaser or transferee of the assumption of merchant's obligations).  And if the merchant declares bankruptcy, the funder still does not take on any risk; the guarantors' obligations, which includes a guarantee of FTE's "performance of all of the representations, warranties, [and] covenants made by Merchant in this Agreement and the Merchant Agreement," are due "at the time Merchant admits its inability to pay its debts, or makes a general assignment for the benefits of creditors, *or any proceeding shall be instituted by or against the Merchant seeking to adjudicate it bankrupt* or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts." *Id.* at 6 (emphasis added).

The combination of a default after just three missed payments and the inability of the merchant to relieve itself from its obligations by temporarily shutting down its business make the reconciliation provision illusory.  In any event, the reconciliation provision is wholly discretionary; it provides: "At the Merchant's option, within five (5) business days following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby [the funder] *may* ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage."  *Id.* at 10 (emphasis added).  If the "may" language were not enough to suggest discretion, the addendum where the provision appears goes on to state: "The Merchant specifically acknowledges that . . . the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant as a courtesy, and that [the funder] is under no obligation to provide same."  *Id.*  The plain import of this language is not only that the revision of the "specified percentage" to a fixed daily sum per day is a courtesy, but also that the reconciliation itself, which the funder "may" provide, is a courtesy and is not obligatory.[25]  The funder can ignore a request for reconciliation if it so chooses.  The discretionary nature of the reconciliation provision is reinforced by the language earlier in the agreement that the funder "may, upon Merchant's request, adjust the amount of any payment due under this Agreement at [the funder's] sole discretion and as it deems appropriate"—language that appears in Form One agreements but takes on added significance in

---

[25] The Court is aware that a New York court has read a substantially similar provision differently.  *See Merchant Funding Servs. LLC v. Micromanos Corp.*, 2017 N.Y. Misc. LEXIS 2451, at *7 (Sup. Ct. Orange Cnty. May 4, 2017) ("Contrary to Defendants' assertion, the gist of paragraph "d" is that the institution of the fixed Daily Payment plus month-end reconciliation mechanism as a substitute for Micromanos' daily payment of 15% of its actual receipts was a non-obligatory courtesy").  With all due respect to the *Micromanos* court, the Court finds this reading difficult to reconcile with the discretionary language in the reconciliation provision itself and declines to adhere to the same reading.

the absence of *any* mandatory language with respect to the reconciliation provision.  *See LG Funding*, 122 N.Y.S.3d at 312 (reciting same language and referring to it as a "reconciliation provision").  But even if the reconciliation provision were not purely hortatory, it would be illusory.  The reconciliation provision is effective when the merchant can continue in business.  It permits the funder and the merchant after-the-fact to adjust the payments due if the merchant has paid more than the generation and collection of receivables would support.  In the situation where the merchant is unable to continue to generate and collect receivables—where it cannot generate the funds to put in the account—the reconciliation provision is meaningless.  The circumstances permitting the funder to call an Event of Default and to require the merchant to pay 100% of the uncollected Purchased Amount will occur long before a reconciliation could take place.

This understanding of the reconciliation provision—that it is illusory in practice—is further informed by Plaintiffs' allegation "[o]n information and belief," that the Enterprise "does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provisions."  Dkt. No. 20 ¶ 94.  The Amended Complaint provides a basis for that belief.  The New Jersey Attorney General alleged, after an investigation taken into the matter and based on a review of business records and interviews with merchants, that Yellowstone—the company with which the Defendants are affiliated—ignored reconciliation requests in multiple situations and induced merchants to refinance rather than engage in reconciliation.  *Id.* ¶¶ 86–93.  This alleged fact does not go just to whether the funder satisfied its contractual obligations under the agreements; it is also relevant evidence with respect to the funder's contemporaneous understandings of its contractual obligations.  *See Blum v. Spaha Cap. Mgmt.* 44 F. Supp. 3d 482, 491 (S.D.N.Y. 2014) ("Once an

ambiguity in the agreement is found, a court may consider evidence such as 'exchanges between the contracting parties during the course of negotiations, as well as post-execution conduct of the parties in performing the contract, admissions by the parties and—in appropriate circumstances—industry usage or practice.'" (quoting *Fitzpatrick v. Am. Int'l Grp., Inc.,* 2013 WL 5427883, at *3 (S.D.N.Y. Sept. 27, 2013)); *see also Davis*, 150 N.Y.S. 3d at 4 (explaining that allegations that the funders refused to permit reconciliation counseled in favor of a finding that a transaction was a loan).  It thus further supports the claim that the funder always understood the reconciliation provision to be illusory—it would never be invoked because it could never be invoked.  And without a mandatory reconciliation provision or a provision that could require the funder to convert the fixed daily sum into a different amount, the term of the agreement is fixed to the number of days that it would take for the fixed daily sum to pay off the Purchased Amount.  As in *Queen Funding*, the Form Two agreements thus have a "de facto fixed term."  In the case of the December 15, 2017 agreement with Midnight Capital, that fixed term is just over nine weeks; it would take approximately 47 business days for FTE to pay off the Purchased Amount of $749,500 by making fixed payments of $15,999 per day.  Aside from the title, the agreement is indistinguishable from a loan.

The effect of these features, when considered as a whole, is to eliminate any risk on the part of the funder and to give it the right to repayment under all circumstances.  Although the agreement is nominally one for the sale of receivables, that is a matter of label or form only; the substance is a loan.  The merchant has to pay a fixed amount on a daily basis.  If it fails to do so just three times, a default is declared and the funder suddenly has access to all rights and remedies provided in the agreement, including filing a confession of judgment for the full Purchased Amount, enforcing security interests it had perfected in all of FTE's assets, and going

after the guarantors for the amount it is owed.  The agreement nominally has a reconciliation provision pursuant to which the fixed amount could be changed and adjusted based on the receivables the merchant receives, but that provision is purely illusory.  It can be invoked only at the discretion of the funder and, even then, because it can be invoked only five business days after the end of the calendar month, the provision may well become meaningless.  In the event that the receivables that the funder ostensibly is purchasing are insufficient to satisfy the merchant's obligations, the funder would have long since accelerated the entire amount due from the merchant itself.  As in *LG Funding*, the funder does "not assume the risk that [the merchant] would have less-than-expected or no revenues." *LG Funding*, 122 N.Y.S.3d at 313.  Because the agreement as pleaded is a loan and the interest rate on the face of the agreement is alleged to be more than twice that enforceable under New York law, Plaintiffs have adequately alleged the collection of an unlawful debt.

### ii.   Form Three Agreements

The Form Three agreements are those entered into on November 27, 2018 with Green Capital, Dkt. No. 23-18, and November 28, 2018 with Capital Merchant, Dkt. No. 23-21.

The Form Three agreements, by contrast, are agreements for the purchase of receivables when viewed in their totality.  The funder agrees to purchase a specified amount of receivables in exchange for a purchase amount to be satisfied by the debit from an account to which the funder has access of a fixed initial daily installment that, as in the other agreements, is represented to be "a good faith approximation of the Specified Percentage of Seller's Daily Future Receipts." Dkt. No. 23-18 § 1(g).  As with the other agreements, the Seller (or merchant) generally is obligated to make the fixed payments, and the failure to do so on a timely basis may give rise to an "Event of Default," triggering the Seller's obligation to immediately deliver to the funder the entire unpaid portion of the Purchased Amount and the funder's right to avail itself of all of its legal

rights or remedies.  *See id.* § 27.  Such rights and remedies include enforcing its rights as a secured creditor, filing an affidavit of confession of judgment, or enforcing the professions of a personal guarantee.  *Id.* § 30.  And, as with the other agreements, the merchant generally is required to continue its business, *id.* § 21(*l*), its failure to do so again constituting an Event of Default, *id.* § 27(a).  Those provisions protect the funder in getting access to the receivables and prevent the merchant from defeating the funder's rights, and its interests in the receivables, by the expedience of closing its business or selling, disposing, transferring, or otherwise conveying its business and assets, *id.* § 21(*l*).

A reconciliation and an adjustment provision help ensure that, on a retrospective basis, the merchant has not paid an amount that is disproportionate to the receivables that the funder has actually acquired, and going forward, where the merchant has experienced "a steady decrease in its Daily Receipts," the merchant has the right to request a modification of the amount of the fixed daily payment.  *Id.* §§ 10–13.

Those provisions, read in isolation, share some of the same characteristics that render similar provisions problematic in the context of the other agreements.  While reconciliation requires supporting documentation—the composition of which is not left to the discretion of the funder—and works in tandem with an adjustment provision that can lead to a revised daily payment upon a successful reconciliation, the reconciliation and associated adjustment may only be requested at limited times.  The reconciliation request must be made after the close of the reconciliation month—during the first five business days of the month, *id.* §§ 10–11—and the adjustment requests must be made within five business days after the date of certain financial statements and may only take place following a reconciliation showing a 15% dip in receivables relative to what the fixed payment would expect, *id.* §§ 12–13.  Those provisions thus

necessarily raise the prospect that the merchant will have failed to make a fixed payment the requisite number of times and will have defaulted, triggering the acceleration of the full unpaid Purchased Amount, prior to the time within which the merchant can take advantage of the reconciliation provision.

However, there is a significant, and dispositive, difference between Form Two and Form Three. In the case of Form Two agreements, the merchant is placed between a rock and a hard place in the event the continuing stream of receivables is not sufficient to pay off the Purchased Amount on the implied timetable set forth in the agreements. It can either close its business and file for bankruptcy, triggering an event of default which will make the full unpaid Purchased Amount immediately payable and making the guarantor's obligations due. Or it can fail in its covenant to make the fixed daily payments (without ever having the opportunity ever to avail itself of the reconciliation provision) triggering an event of default making the full unpaid Purchased Amount immediately payable. The merchant in the case of Form Three agreements is confronted with no such choice. It has a way out of the obligations to either continue to make the fixed daily payments or to accelerate repayment of the full unpaid Purchased Amount, and a way therefore to put the funder at risk that the continuing stream of receivables will not be sufficient to satisfy the repayment of the Purchased Amount. The merchant's covenant not to close its business is qualified by the exception that the "Seller shall have the right to close its business temporarily . . . . or if such closing is necessitated by circumstances outside Seller's reasonable control."[26] *Id.* § 21(*l*). The Form Three agreements expressly contemplate

---

[26] The merchant is required to provide ten business days of advance notice before it temporarily closes its business. *See id.*

circumstances in which the merchant is forced to go out of business and thus is is unable to generate and continue to collective receivables.  The agreements provide:

> [I]f the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

Dkt. No. 23-18 § 16(a)(v).  The agreement to remit the fixed daily amount is qualified by the provision that the amounts must be paid on a timely basis regardless "of any reason *whatsoever other than as the result of the Seller's business ceasing its operations exclusively due to any of the Valid Excuses*."  *Id.* § 27(a) (emphasis added).  It defines as a Valid Excuse that "Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons: . . . adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligence mishandling of its business; [and/or] bankruptcy of Seller."  *Id.* § 16(b).

Viewed in this context and in light of the agreement as a whole, the reconciliation provision in the Form Three agreements take on an entirely different color than in the other agreements.  They no longer offer the false comfort that if the merchant is required to continue in a business confronted with unforeseen adverse business conditions, lest its failure to do so accelerate its obligations under the funding, the merchant can pass the risk of those unforeseen adverse business conditions back to the funder through reconciliation.  Rather, the reconciliation provisions in the Form Three agreements assume that there is no unforeseen adverse business development outside the control of the merchant that would cause the merchant to cease business; the agreements provide that in that circumstance—the circumstance in which the business is able to continue to operate—the merchant may use the reconciliation provision to align the amount that the merchant has paid with what, during the prior month, it has received.  If

the merchant ceases business, use of the reconciliation provision is not necessary because the obligations do not apply.  The fixed time period in which the reconciliation may be requested is not in the Form Three agreements a sham that creates the illusion of an opportunity for the return of funds that will never be exercised.  It instead reflects the necessary fact that a reconciliation may be made only after the end of the time period during which the receipts are obtained and the payments are made that are to be reconciled.

Thus, the funder takes on risk in the Form Three agreements.  If, as a result of unforeseen circumstances, the merchant is no longer able to generate and collect receivables, the funder will lose.  The merchant can close without owing the funder anything.[27]  In light of this escape route for the merchant and risk accepted by the funder, the Court cannot say that the Form Three agreements are loans.

### iii.      Form One Agreements

The "Form One" agreements include, among others, the first two agreements alleged in the Amended Complaint—hence the moniker "Form One"—and consist of: (1) the December 6, 2017 agreement with Midnight Capital, Dkt. No. 23-12; (2) the September 21, 2018 agreement with Capital Merchant, Dkt. No. 23-19; (3) the September 21, 2018 agreement with Green Capital, Dkt. No. 23-17; and (4) the October 12, 2018 agreement with Capital Merchant, Dkt. No. 23-20.

Despite having some shared characteristics with the Form Two agreement, the proper characterization of the Form One agreements is ambiguous.  The agreement is not at all clear about what happens when a merchant no longer is earning enough to cover its daily payment amount and, thus, whether the funder takes on the risk of that occurrence or the merchant does.

---

[27] This is in contrast to a lender, who may still have a claim against the merchant for amounts unpaid notwithstanding cessation of operations.

This, in turn, also makes the effect of the reconciliation provision and its terms ambiguous.  Its lawfulness cannot be conclusively judged on the papers at the motion to dismiss stage.

Form One agreements contain the general and somewhat ambiguous language that the merchant agrees that it is "responsible for ensuring that the specified percentage to be debited by [the funder] remains in the account." Dkt. No. 23-20 at 1.  This language can be understood as a "covenant" the violation of which on any one day would trigger an "Event of Default," and the full acceleration of the unpaid Purchased Amount.  The merchants may default under the Form One agreements in other ways: unlike the Form Three agreements, there is no language in the Form One agreements that relieve the merchant from exposure to having to pay the full unpaid Purchased Amount if it closes its business temporarily because of circumstances outside of the Seller's reasonable control or if it ceases operations in the ordinary course as the result of non-willful and non-negligent handling of its business.  To the contrary, while FTE's filing for bankruptcy does not itself constitute an "Event of Default" under the Form One agreements, the language of the agreements could be read to permit the occurrence of some other act—such as the interruption of the merchant's business—not to be excused by the filing of a petition for protection under the Bankruptcy Code.  The Form One agreements can be read to permit the funder to take all of the actions permitted by the Protections against Default – including the "full uncollected Purchase Amount plus all fees due . . . becom[ing] due and payable in full immediately," *id.* § 1.10, upon any of those events including the stoppage of business for one day, whether or not that stoppage has anything to do with a bankruptcy filing.

It is thus also plausible to read the reconciliation provision as being virtually illusory.  In the first place, the provision is contingent upon the merchant producing satisfactory documentation to the funder providing the funder a ready means to deny reconciliation—a

feature that other courts have observed places the risk of default on the merchant.  *See AKF, Inc. v. W. Foot & Ankle Ctr.*, 2022 WL 45388869, at *7 (E.D.N.Y. Sept. 28, 2022) (concluding that the reconciliation provision placed risk of default on merchants where the ability to reconcile hinged on ability to produce any information—without limitation—that the funder required and there was a narrow temporal opportunity to request reconciliation); *Haymount*, 2022 WL 2297768, at *7 (explaining that the discretion possessed by funder to request documentation makes it "readily apparent how the [funder] could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation"); *McNider Marine, LLC v. Yellowstone Capital, LLC*, 2019 WL 6257463, at *4 (Sup. Ct. Erie Cnty. 19, 2019) (finding a reconciliation provision in a Yellowstone agreement to be illusory and explaining that "Yellowstone likely could refuse to even consider reconciliation if it contended that [the merchant] McNider Marine failed to sufficiently document a basis for it").  Moreover, although the reconciliation provision ostensibly exists to protect the merchant in the circumstances where its receipts are not sufficient to pay its obligations, that protection may be meaningless if the merchant cannot survive until the provision can be invoked.

As in the other agreements, the daily payment amount is fixed—if the reconciliation is unavailable, the daily payment amount would never change, and the agreement would have a finite term. *See AKF, Inc.*, 2022 WL 4538869, at *8 (discerning definite term from payment structure where, "[b]arring any reconciliation," the agreement mandated the payment of a fixed term); *Queen Funding, LLC*, 2022 WL 2829913, at *6 (explaining that "a de facto term plausibly exists[] [where] [t]he period of payment can be easily calculated by dividing the amount [the merchant] owes by the amount of daily payments").  Under these circumstances, there may be no transfer of risk.

That plausible interpretation is further reinforced by other allegations in the Amended Complaint. As noted, the Amended Complaint alleges "[o]n information and belief," that the Enterprise "does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provisions." Dkt. No. 20 ¶ 94; *see Davis*, 150 N.Y.S. 3d at 4 (explaining that allegations that the funders refused to permit reconciliation counseled in favor of a finding that a transaction was a loan). It also alleges that statements reciting that the daily payment is a "good-faith estimate of the merchant's receivables," are "knowingly false." Dkt. No. 20 ¶ 77; *see Davis*, 150 N.Y.S. 3d at 4 (suggesting that such an allegation counsels in favor of the agreements being a loan).

It may be that Plaintiffs are unable to prove that the Form One agreements are loans. Unlike the Form Two and Form Three agreements, Form One agreements do not contain a provision that provides that a default will be declared after a certain number of debits for which there are insufficient funds, just the ambiguous statement that the merchant understands it is responsible for ensuring sufficient funds are in the account. *See, e.g.*, Dkt. No. 23-20 at 1, 8. Moreover, FTE's filing for bankruptcy does not constitute an "Event of Default"; indeed, it is expressly carved out from the enumerated "Events of Default." *See, e.g.*, Dkt. No. 23-20 § 3.1(d).

At this stage however, given that there is a plausible reading of the Form One agreements that would make them loans, and because findings of usurious loans often turn on factual questions, including the intent of the funders, Plaintiffs' allegations are sufficient to survive Defendants' motion to dismiss. *See Clever Ideas v. 999 Rest. Corp.*, 2007 WL 3234747 (Sup. Ct. N.Y. Cnty. Oct. 12, 2007) ("Due to the absence of an interest of an interest rate and a repayment period, the Court finds the intent of the parties at issue. Therefore, further discovery

is required to delve further into the parties' intent."); *Haymount*, 2022 WL 2297768, at *8 ("Considering all of these factors, as well as the factual questions raised concerning the defendants' alleged usurious intent, the Court concludes that the Complaint has adequately plead that the MCA agreements at issue here function as loans.").

*      *      *

At this juncture, Plaintiffs have adequately pleaded that at least some of the agreements are loans.  "Because the transactions should be treated as loans, at least at this juncture, and because defendants do not dispute that the implied interest rates on these transactions far exceed 50% per annum (twice the New York State criminal usury rate), the Court holds that the Complaint has adequately pled that the debts created by the MCA agreements that the defendants issue are unenforceable, 'unlawful debts' under the RICO statute."  *Id.* at *8.

## 2.      Predicate RICO Violation – Pattern of Racketeering Activity (Wire Fraud)

The Capital Defendants contend that Plaintiffs fail to explain why the transactions at issue constitute wire fraud.  Dkt. No. 22 at 18.  Glass and Davis contend similarly.  Dkt. No. 25 at 6; Dkt. No. 27 at 12 n.7.  Plaintiffs argue that they have pleaded enough facts to show the predicate act of a pattern of racketeering activity vis-à-vis wire fraud.  Dkt. No. 31 at 27–28. Because the Court concludes that Plaintiffs have sufficiently pleaded that there is a valid predicate RICO violation in the collection of unlawful debt, *see Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154 (S.D.N.Y. 2014), the Court need not determine whether the additional wire fraud predicate acts have been adequately pleaded.

## 3.      Distinctness of the RICO Enterprise

The Capital Defendants argue that Plaintiffs have not pleaded "a RICO enterprise distinct from the RICO person."  Dkt. No. 22 at 12.  They argue that the alleged Enterprise is "merely Yellowstone alongside its alleged employees and subsidiaries carrying out business . . . through

its officers, agents, subsidiaries and employees." *Id*. at 13. They further contend that "[t]here are no factual allegations alleging how the actions of the 'enterprise' were distinct from the ordinary business carried out by alleged officers, agents, subsidiaries, and employees." *Id*. Glass makes similar arguments. Dkt. No. 25 at 4. Plaintiffs contend that they adequately plead a distinct RICO Enterprise. Dkt. No. 31 at 29–30. For the following reasons, the Court concludes that Plaintiffs have adequately pleaded a distinct RICO enterprise.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 161 (2001). "A 'person' is defined as 'any individual or entity capable of holding a legal or beneficial interest in property,'" while an "'enterprise' is defined as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Cruz*, 720 F.3d at 120 (quoting *City of New York v. Smokes–Spirits.com, Inc.*, 541 F.3d 425, 447 (2d Cir. 2008), in turn quoting 18 U.S.C. § 1961(3), (4)). The two cannot be one and the same; a "person" is not liable under Section 1962(c) for participating in that same person's "affairs through a pattern of racketeering activity." *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs" (emphasis in original)); *Cruz*, 720 F.3d at 120 ("[A] corporate person cannot violate the statute by corrupting itself."). "A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be both the RICO person and the enterprise." *U1it4less, Inc.*, 871 F.3d at 205.

Plaintiffs' allegations satisfy the Supreme Court's standards.  As for a RICO "enterprise," Plaintiffs allege an association-in-fact consisting of "Yellowstone, Capital Merchant Services, Green Capital Funding, and Midnight Capital, and MCA Recovery."  Dkt No. 20 ¶ 214. Plaintiffs allege that the culpable persons under RICO are "Glass, Stern, Davis, and John and Jane Doe Investors."  *Id.* ¶ 209.  The two are not one and the same.  Glass is alleged to have been "an owner and the mastermind of the Enterprise," *id.* ¶ 221; *see also id.* ¶ 227; while he is alleged to have exercised authority on behalf of the Enterprise and to have had a "financial interest and contractual rights" in portions of the Enterprise, *id.* ¶¶ 221–33, he is not alleged to have comprised part of the association-in-fact that constituted the Enterprise.  Stern was "an owner of Yellowstone and its Chief Executive Officer."  *Id.* ¶ 234.  He is not alleged to have been an employee of any of the other entities that were part of the association-in-fact and is not part of the association-in-fact itself.  Davis was also "an owner of Yellowstone and . . . was its Director of Underwriting at all relevant times."  *Id.* ¶ 243.  He too is not alleged to have been an employee of any other member of the Enterprise or to have been a member of the Enterprise himself.  None of the corporate entities alleged to be part of the Enterprise are alleged to be "persons" liable under RICO.

The Supreme Court's decision in *Cedric Kushner* is squarely on point.  In *Cedric Kushner*, the Supreme Court determined that a "president and sole shareholder" of a "closely held corporation" was a "person" distinct from the enterprise consisting of that corporation. *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 160.  The Court reasoned that as a matter of law a natural person "is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status," that as a linguistic matter, "an employee who conducts the affairs of a corporation through illegal acts comes within the terms

of a statute that forbids any 'person' unlawfully to conduct an 'enterprise,'" and that "the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner," *id.* at 163.  The Court also concluded that the application of RICO to a person who conducts the affairs of the corporation by whom he is employed through a pattern of racketeering activity was "consistent with the statute's basic purposes," *id.* at 164.  "RICO both protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a vehicle through which unlawful . . . activity is committed."  *Id.* (internal citations and quotations omitted).

The Second Circuit's decisions in *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 208 (2d Cir. 2017) and *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994), upon which Defendants rely, are distinguishable.  In those cases, the plaintiff named, as the RICO person, the same company that—along with the company's employees and agents—was also alleged to be the RICO enterprise.  The Circuit held "a plaintiff may not circumvent the distinctness requirement 'by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant.'"  *U1it4less*, 871 F.3d at 206 (quoting *Riverwoods*, 30 F.3d at 344).  Because "[a] corporation can act only through its employees, subsidiaries, or agents. . . . 'if a corporate defendant can be liable for participating in an enterprise comprised only of its agents—even if those agents are separately incorporated legal entities—then RICO liability will attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless.'"  *Id.* (quoting *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013)).

Here, by contrast, Plaintiffs do not seek to hold a corporation liable as a RICO person by virtue of the acts of the corporation and those acting on its behalf.  It seeks to hold the three named individual defendants and various Jane Doe and John Doe defendants liable for using the association-in-fact for their unlawful purposes.  The allegations directly meet the language and purpose of RICO as those have been defined in *Cedric Kushner*.  *See NRO Bos. LLC v. Yellowstone Cap. LLC*, 147 N.Y.S.3d 375, 381 (Sup. Ct. Rockland Cnty. 2021) (concluding similarly in a case involving Yellowstone on the basis that the same persons alleged here—Davis, Glass, and Stern—were all natural persons); *McNider Marine, LLC*, 2019 WL 6257463, at *6 (concluding that there was RICO distinctness in a case involving Yellowstone).

### 4.    Individual Conduct[28]

Glass contends that "Plaintiffs have pled no facts stating a claim against . . . Glass for 'racketeering' based on the collection of 'unlawful debt.'"  Dkt. No. 25 at 6.  Davis also contends

---

[28] For the reasons articulated in this section, the Court denies Defendants' motion to dismiss the RICO Conspiracy count under 18 U.S.C. § 1962(d).  The Capital Defendants argue that there is no underlying offense and that there are no factual allegations of an unlawful agreement. Dkt. No. 22 at 19.  Davis also argues that he did not agree to the alleged conspiracy.  Dkt. No. 27 at 15.  "To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) . . . plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)."  *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 340 (S.D.N.Y. 2019).  The allegations supporting the underlying substantive RICO claims suffice to also sustain the RICO civil conspiracy count and establish agreement given the positions of the Defendants in the Enterprise, the acts that they took, and the financial benefits alleged.  In addition to Glass and Davis, Plaintiffs made sufficient allegations as to Stern to show his participation and agreement in the conspiracy as well as his conduct generally in the affairs of the Enterprise.  Plaintiffs alleged that Stern was the "Chief Executive Officer . . . responsible for the day-to-day operations of the Enterprise," exercised that broad operational authority, including with respect to setting loan rates, set company policy, and benefitted from loan proceeds.  Dkt. No. 20 ¶¶ 234–42.  *See Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 465 (S.D.N.Y. 2018) (citing cases to support that even "conclusory statement" of conspiracy was adequate when supported with allegations

that the Amended Complaint "fails to allege facts establishing that Davis directed or was aware of any alleged illegal activities committed by the Enterprise." Dkt. No. 27 at 12. Davis also challenges whether Amended Complaint alleges any facts regarding his intent. *Id*. Those arguments lack merit.

A civil RICO plaintiff must allege that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). "[T]he RICO defendant must have participated "in the operation or management of the enterprise." *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.,* 17 F. Supp. 3d 207, 224 (E.D.N.Y. 2014) (Bianco, J.) (quoting *DeFalco*, 244 F.3d at 309, in turn citing *Reves*, 507 U.S. at 185). This requires that "the defendant must have had '*some* part in directing [the enterprise's] affairs.'" *First Cap. Asset Mgmt., Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (emphasis added), and "has proven to be a relatively low hurdle for plaintiffs to clear," *id*. "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise." *Id*. (quoting *Reves*, 507 U.S. at 179). However, a person may not be held liable merely for taking directions and performing tasks that are 'necessary and helpful to the enterprise,' or for providing 'goods and services that

---

regarding "their positions within the Palazzolo Enterprise and the individual acts that they undertook on its behalf"); *see also id*. (citing cases); *Related Companies, L.P. v. Ruthling,* 2017 WL 6507759, at *21 (S.D.N.Y. Dec. 18, 2017); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F.Supp.2d 432, 454 (S.D.N.Y. 2004). Unlike with respect to the substantive RICO claim, Plaintiffs allege that "[e]ach Defendant" is liable for RICO conspiracy. Dkt. No. 20 ¶¶ 279–282. However, the Amended Complaint alleges only that the individual Defendants are RICO "persons." The parties have not addressed whether on these pleadings the Entity Defendants who are alleged only to comprise the Enterprise and not to be "persons" who illegally participated in the affairs of the Enterprise can be liable for RICO conspiracy. That question will have to await future briefing, which the Court invites.

ultimately benefit the enterprise.'" *Sky Med. Supply Inc.*, 17 F. Supp. 3d at 224.  "[F]ailing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 299 (E.D.N.Y. 2017).

The Amended Complaint adequately alleges the role of Glass in the operation and management of the Enterprise.  The Amended Complaint states that Glass was an "owner and mastermind" who had "final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, and period of each usurious loan."  Dkt. No. 20 ¶ 221.  Plaintiffs also excerpt an affidavit, which the Court may consider due to its attachment to the complaint, describing Glass as the "money man" and how "[a]nything to do with money had to go directly through . . . Glass."  *Id.* ¶ 222.  In addition, Glass "disseminated financial information," "knew when a wire had been received," and "had authority to increase the funding limit" and "lower a . . . funding limit," *id.* ¶¶ 221, 223–226.  The Amended Complaint further alleges that Glass "is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt" and "form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations" that were "used to make and collect upon the unlawful loans."  *Id.* ¶ 227.  Glass's role in management was confirmed by an interaction with Davis, in which Davis told him that he "obviously ha[s] first right" if Davis sells equity, *id.* ¶ 231, and the fact that he

was updated when new forms were being used, *see id.* ¶ 228.  He also funded the exercise and

directed members of the Enterprise to "collect upon the unlawful loans." *Id.* ¶ 229.  These

allegations are sufficient to meet the "low hurdle" that a person has participated in a RICO

enterprise with requisite intent.

The Amended Complaint also adequately alleges the role of Davis in the operation and

management of the Enterprise and his intent to further the goals of the Enterprise.  Davis was a

"Director of Underwriting" who "[took] actions and[] directed other members of the Enterprise

to take actions," and had a "substantial" "scope of . . . the Enterprise" under his "control," *id.* at

¶¶ 243, 245, 249.  He is also an owner of Yellowstone, *id.* ¶ 342, and holds an interest in

Yellowstone's parent company, *id.* ¶ 257.  Like Glass, the complaint alleges that Davis was

responsible for "policies, practices and instrumentalities" that covered the same areas as Glass.

*Id.* ¶ 244.  He also "fund[ed] the Enterprise, solict[ed] and recruit[ed] members of the Enterprise,

[and] direct[ed] members of the Enterprise to collect upon the unlawful loans." *Id.* ¶ 245.  In

addition, Davis is also responsible for multiple companies that operate as IFOs and also provide

a substantial portion of Yellowstone's profit share.  *Id.* 246.  The complaint alleges specifically

that he also had "full control of the portion of the Enterprise made up of  . . . $40 million in

outstanding receivables as of August 2018." *Id.* ¶ 249.  When trying to sell his equity, he was

also told by Glass that the "[t]he company is up to its *** in lawsuits and government

investigations . . . . All there is no is unlimited personal liability." *Id.* ¶ 231.  Glass also states

that "[they] are hoping to not be charged" and asks Davis facetiously, when Davis seeks to sell

his shares, whether he has heard of the "NEW YORK STATE ATTORNEY GENERAL." *Id.*

These allegations, again, are sufficient to meet the "low hurdle" that a person has participated in

a RICO enterprise and to show his intent to achieve the shared goal with the other defendants of illegal loans.

## IV.    Fraud

Capital Defendants argue that Plaintiffs do not plead sufficient facts for transaction causation or reliance.  In particular, they argue that Plaintiffs "never allege that the Assignors would not have paid or agreed to the 'ACH program' or origination fees but for an alleged misrepresentation."  Dkt. No. 22 at 7.  They also argue that Plaintiffs "do not allege that the Assignors were induced to enter the Agreements based on any alleged misrepresentation about the 'ACH program' or origination fees."  *Id*.  Defendant Davis argues similarly.  Dkt. No. 27 at 10.  Plaintiffs contend that they are not required to allege transaction causation and analogizes the alleged fraud to false invoicing.  Dkt. No. 31 at 38.  The Court agrees that the Plaintiffs have failed to sufficiently plead reliance—in particular, transaction causation, or "but-for" causation—and grants the motion to dismiss Plaintiffs' fraud claims.

The elements of a claim of fraud under New York law are: "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009); *see also Wade Park Land Holdings, LLC v. Kalikow*, 2022 WL 657664, at *31 (S.D.N.Y. Mar. 4, 2022), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022).  Fraud claims under New York law must be pled with heightened particularity under Federal Rule of Civil Procedure 9(b).  *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 687 (S.D.N.Y. 2021).  The Second Circuit has explained that "in order to comply with Rule 9(b), '[a] complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular*

*Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "Rule 9(b) also requires a plaintiff to 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Budhani*, 527 F. Supp. 3d at 687 (quoting *Lerner*, 459 F.3d at 290).  This "strong inference" can be established by either (a) "alleging facts to show that defendants had both motive and opportunity to commit fraud," or (b) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner*, 459 F.3d at 290 (internal quotation marks omitted) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  Even with fraud claims, "allegations may be based on information and belief when facts are particularly within the opposing party's knowledge," provided that they "adduce specific facts supporting a strong inference of fraud." *Alix v. McKinsey & Co.*, 23 F.4th 196, 209 (2d Cir. 2022) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

In order to plead fraud under New York common law, "a plaintiff must demonstrate that a defendant's misrepresentations were the direct and proximate cause of the claimed losses." *Vandashield Ltd. v. Isaacson*, 46 N.Y.S.3d 18, 22 (1st Dep't 2017).  A "plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)."  *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002); *see also Ambac Assur. Corp. v. Countrywide Hosme Loans, Inc.*, N.Y.S.3d 609 (N.Y. Sup. Ct. 2016) (same).  "Under . . . the common law . . . , the plaintiffs must allege . . . 'transaction causation, *i.e.* that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction.'"  *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 455 (S.D.N.Y. 2003); *see also Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 776 (S.D.N.Y. 2011) ("Transaction causation is often synonymous with 'but for'

causation."); *accord AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000)

("Transaction causation means that the violations in question caused the appellant to engage in

the transaction in question."). Thus, "[i]n a fraud action, the plaintiff must show a belief in the

truth of the representation and a change of position in reliance on that belief.'" *Fin. Guaranty

Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *91 (S.D.N.Y. 2020) (quoting

*Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 895 (N.Y. Sup. Ct. Nassau Cty. 2008)).

"Transaction causation is also known as 'reliance' in fraud cases." *Loreley Fin. (Jersey) No. 3

Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 182 (2d Cir. 2015).

Plaintiffs fail to plead facts sufficient to support reliance or transaction causation.

Plaintiffs make the conclusory allegation that they "reasonably relied on these knowingly false

representations by agreeing to pay these fees" and that they have "in fact, paid substantial fees as

a direct and proximate result of these knowingly false representations by Defendants." Dkt. No.

20 ¶¶ 294–295. But they do not allege facts that would support that allegation. On Plaintiffs'

allegations, FTE originally entered into the transactions because it "needed additional financing"

and Defendants were willing to provide it. *Id*. ¶ 119. According to Plaintiffs, the "predatory"

MCA industry generally, and Yellowstone in particular, "prey[s] upon the desperation of [] small

business and their individual owners" with advertising pitches targeted towards "small

businesses cannot get approved for a loan from a traditional bank." *Id*. ¶¶ A., 26, 63, 75. FTE

also entered numerous subsequent funding agreements to pay off earlier agreements. *Id*. ¶¶ 131,

139, 147, 163, 178, 194.

Plaintiffs do not allege that the representations in the funding agreements that, *e.g.*, "the

ACH program is labor intensive and is not an automated process, requiring us to charge this fee

to cover related costs" and the "Origination Fee" is imposed "to cover underwriting and related

expenses," Dkt. No. 23-20 at ECF 8, induced them in any respect to agree to the funding

agreements.  Nor do they allege that they would not have agreed to make those payments if they

knew that not all of the funds that were advanced for those putative purposes were, in fact, used

for those purposes.  Plaintiffs affirmatively concede that "they are not arguing that these

misrepresentations induced them to enter the Agreements for funding."  Dkt. No. 31 at 38.  FTE

appears to have entered the agreements because of the funds they received under them and the

terms under which they would have to pay the Defendants.  How Defendants used those funds

and whether they "cover[ed] underwriting and related expenses," Dkt. No. 20 ¶ 290, or simply

went to Defendants' bottom line would have been a matter of indifference.  The key issue—and

the asserted basis for the decision whether to enter the agreements—was what FTE received and

what it would have to pay and whether it could have gotten a better deal elsewhere.  Even

without the deductions for ACH and due diligence, FTE's agreement was to repay Defendants

for the funds that had been advanced to it at an effective interest rate in excess of 100%.

> The facts pleaded thus do not support a claim that FTE entered into agreements because
of Defendants' alleged misrepresentations regarding how Defendants would apply the due

diligence and ACH program and origination fees.  Because Plaintiffs do not allege that "but for"

Defendants' alleged misrepresentations that the ACH program was labor intensive and that the

fees were to cover related costs and expenses, Plaintiffs would not have entered into the funding

agreements, Plaintiffs cannot establish transaction causation in connection with the decision to

enter into those agreements.  *See*, *e.g.*, *Matana v. Merkin*, 989 F. Supp. 2d 313, 325 (S.D.N.Y.

2013) (dismissing complaint due to failure to "plead facts that supply a plausible basis from

which a factfinder could infer that, but for these representations, KM would have [acted

differently]"); *OSJ Inc. v. Work*, 710 N.Y.S.2d 666, 668 (3d Dep't 2000) (holding that there was

no reliance because "[t]here is no basis to conclude that but for defendants' allegedly tortious conduct, plaintiffs would not have sustained the identical damages"); *Matthews v. Schusheim*, 346 N.Y.S.2d 386, 391 (2d Dep't1973), *aff'd*, 35 N.Y.2d 686 (1974) (finding that plaintiff has "failed to prove" but for causation); *Gould v. Flato*, 10 N.Y.S.2d 361, 366 (N.Y. Sup. Ct. New York Cty. 1938) (finding no reliance where "[t]he facts in the instant case do not warrant a finding that the plaintiff would not have entered into the bargain except for the representation of the defendants"); *cf. Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (finding that "FGIC has sufficiently pleaded transaction causation, as the SAC contains repeated allegations that but for Putnam's fraudulent misrepresentations, FGIC would not have entered into the transaction"); *Sterling Nat. Bank v. Ernst & Young LLP*, 881 N.Y.S.2d 39, 40 (1st Dep't 2009) (finding that transaction causation was found on summary judgment when "the subject loans would not have been advanced without a 'clean opinion' as to Allied's 2000 financial statements").

Moreover, Plaintiffs cannot allege that they changed any position *after* they signed the funding agreements and as a result of the alleged misrepresentations.  There is no allegation that FTE changed its position in any way as a result of the alleged misrepresentation.  After FTE signed the funding agreements, the ACH and origination fees were deducted automatically from what was advanced to them; Plaintiffs took no action to pay Defendants the fees for ACH and due diligence.  *See* Dkt. No. 20 ¶¶ 123, 132, 140, 148, 156, 164, 171, 179, 187.  Furthermore, those fees were deducted by Defendants in the exercise of Defendants' contractual rights that FTE gave them without regard to the alleged misrepresentation.  To the extent that FTE could be deemed to have taken action by engaging in non-action—by not objecting to the deduction of the

fees—that was because the contract gave Defendants the right to deduct those fees and not because of any alleged misrepresentations by Defendants.

In essence, Plaintiffs has not alleged "it took any action, refrained from acting, or entered into any transaction, as a result of, or in reliance upon, the defendants' alleged misstatements or omissions." *Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 663 (S.D.N.Y. 2011) (dismissing common law fraud claims because at the motion to dismiss stage because of failure to allege transaction causation). The false representation by the Defendants did not "cause[] the appellant to engage in the transaction in question." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000).

The allegations of the complaint are readily distinguishable from those in the false invoicing cases upon which Plaintiffs rely. See Dkt. No. 31 at 37–38 (citing *Needham & Co., LLC v. Access Staffing, LLC*, 2016 WL 4399288 (S.D.N.Y. Aug. 12, 2016); *Eagle One Roofing Contractors, Inc. v. Acquafredda*, 2018 WL 1701939 (E.D.N.Y. Mar. 31, 2018); *Brooke v. Schlesinger*, 898 F. Supp. 1076, 1087 (S.D.N.Y. 1995), and *Silverboys, LLC v. Skordas*, 2019 WL 587426, at *1 (N.Y. Sup. Ct. Feb. 11, 2019)). Plaintiffs in those cases relied upon the accuracy of the invoices and paid them—there was no preexisting obligation to pay the amount of the invoices. For example, in *Needham*, the defendants had sent "falsified invoices for staffing services that were never rendered to or requested by" the plaintiff, who had even asserted "that no contract existed." *Needham*, 2016 WL 4399288, at *1 (S.D.N.Y. Aug. 12, 2016). And in *Brooke*, there was no contract alleged as the scheme there involved the defendant insiders seeking "improper advances" to the plaintiff's company and pocketing the proceeds. *Brooke,* 898 F. Supp. at 1081. Similarly in *Acquafredda* and *Silverboys*, the fraudulent subcontractors had been hired to perform certain construction jobs and submitted invoices

"bill[ing] them for equipment and services that were not delivered," *Silverboys*, 2019 WL 587426, at *2; *see also Acquafredda*, 2018 WL 1701939, at *2.

In this case, by contrast, FTE took no action based on the alleged misrepresentation.  It did not enter into the transactions and agree that the amounts could be debited based upon the misrepresentation.  It also did not take action after the agreements were signed based on the alleged misrepresentation.  Nor—unlike the cases of invoices—do the alleged misrepresentations here adjust or modify the total amount of the ACH and origination fees, which remain fixed.  The cases thus are inapposite.

## CONCLUSION

The motions to dismiss are GRANTED IN PART and DENIED IN PART.  The Court grants the motions to dismiss on the common law fraud claims with prejudice.  The Court denies the motions to dismiss as to the RICO conspiracy claim and the substantive RICO claim.

The Clerk of Court is respectfully directed to close Dkt. Nos. 21, 24, 26, and 43.


SO ORDERED.

Dated: September 30, 2022
　　　　New York, New York　　　　_____
　　　　　　　　　　　　　　　　　　　　LEWIS J. LIMAN
　　　　　　　　　　　　　　　　　　　United States District Judge